IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAIʻI

| | |
|---|---|
| IOSEFA PASENE, | Case No. 21-cv-00427-DKW-KJM |
| Plaintiff, | **ORDER GRANTING DEFENDANTS' MOTIONS TO DISMISS WITH PARTIAL LEAVE TO AMEND** |
| vs. | |
| BOISSE CORREA, Honolulu Police Chief, other, BOSSIE CORREA; GREGORY MCCORMICK, Honolulu Police Detective; THEODORE COONS, Honolulu Police Detective; ALBERT LE, Honolulu Police Officer; DANIEL SELLERS, Honolulu Police Officer; OFFICER JOHN DOE, Honolulu Police Officer/Dispatcher; and CITY AND COUNTY OF HONOLULU, | |
| Defendants. | |

In the wake of the Hawaiʻi Supreme Court's decision to overturn his murder conviction, Plaintiff Iosefa Pasene, proceeding *pro se*, asserts various civil rights claims against the City and County of Honolulu and several Honolulu police officers. Dkt. No. 1 ("Complaint"). Defendants City and County of Honolulu, former Honolulu Police Chief Boisse Correa, and Honolulu Police Detective Theodore Coons now move to dismiss Pasene's Complaint, contending that Pasene

1

has failed to state a claim upon which relief can be granted.[1]  Dkt. Nos. 40, 46.

The motions to dismiss are GRANTED, as explained below.

## LEGAL STANDARD

"The standard used to evaluate a motion to dismiss is a liberal one,

particularly when the action has been filed *pro se*."  *Ivey v. Bd. of Regents of Univ.*

*of Alaska*, 673 F.2d 266, 268 (9th Cir. 1982) (citing *Estelle v. Gamble*, 429 U.S. 97

(1976)).  Federal Rule of Civil Procedure 12(b)(6) authorizes a Court to dismiss a

complaint that fails "to state a claim upon which relief can be granted."  Rule

12(b)(6) is read in conjunction with Rule 8(a), which requires "a short and plain

statement of the claim showing that the pleader is entitled to relief."  Fed. R. Civ.

P. 8(a)(2).  "To survive a motion to dismiss, a complaint must contain sufficient

factual matter, accepted as true, to 'state a claim to relief that is plausible on its

face.'"  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atlantic Corp. v.*

*Twombly*, 550 U.S. 544, 570 (2007)).

"A claim has facial plausibility when the plaintiff pleads factual content that

allows the court to draw the reasonable inference that the defendant is liable for the

misconduct alleged."  *Id*. (citing *Twombly*, 550 U.S. at 556).  Factual allegations

that only permit the court to infer "the mere possibility of misconduct" are

---

[1]Defendants McCormick and Le have not yet been served, and Defendant Sellers has not responded to the Complaint.  This Order therefore does not apply to these non-moving defendants.

insufficient.  *Id*. at 679.  Moreover, "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice."  *Id.* at 678 (citing *Twombly*, 550 U.S. at 555) (explaining that "legal conclusions" are not accepted as true).

## RELEVANT BACKGROUND

## I.   Pasene's Murder Conviction

In the early morning hours of March 28, 2009, three men—Iosefa Pasene, Cedro Muña, and Antonius Toloai—were released from police custody, having been previously arrested on an unidentified criminal charge.  *State v. Pasene*, 439 P.3d 864, 871 (Haw. 2019).[2]  At the time of their release from custody, Pasene and Muña were dressed alike and had very similar physical characteristics.[3]  *Id.*

Later that morning, around 4:15 a.m., a man named Joseph Peneueta was killed in Honolulu's Chinatown.  *Id.*; Complaint ¶ 18.  Peneueta and several others were gathered on a sidewalk when two men in a blue Buick sedan stopped at the sidewalk, exited the car, and shot Peneueta several times, killing him.  *Pasene*, 439 P.3d at 871.  Soon after, the Buick was reported burning near Wahiawa.  *Id.*

---

[2]The Court takes judicial notice of publicly filed and available court documents that cannot and have not been reasonably questioned.  *See* Fed. R. Evid. 201(b).

[3]Specifically, both Pasene and Muña wore plain white t-shirts and had short mustaches and long hair.  *State v. Pasene*, 439 P.3d 864, 871 n.2 (Haw. 2019).  Pasene was a 21-year-old Samoan male with black hair and brown eyes, standing 6'2" tall and weighing 250 pounds.  *Id.*  Muña was a 22-year-old Samoan male with black hair and brown eyes, standing 6'1" tall and weighing 240 pounds.  *Id.*

On March 30, 2009, Pasene was arrested for Peneueta's murder.  Complaint ¶¶1, 18.  Pasene was later indicted by a grand jury and charged with second degree murder.  *Pasene*, 439 P.3d at 871.  He was tried three times.  The first and second trials resulted in mistrials due to hung juries.  The third trial, however, resulted in Pasene's conviction.  *Id.*

During the third trial,[4] the State presented testimony from eyewitnesses who identified Pasene as the Buick's driver and Peneueta's shooter.  *Id.* at 873.  Gabriel Sakaria and Richard Tagataese both testified that they saw Pasene drive up in the Buick, exit the car holding a rifle, and shoot Peneueta.  *Id.*; Complaint ¶¶ 21–27.

The State also presented testimony from Cedro Muña that he had traveled to Chinatown with Pasene and Toloai after their release from police custody the morning of the shooting.  *Pasene*, 439 P.3d at 879.  Muña testified that he witnessed Pasene and Peneueta arguing outside a liquor store and that he also witnessed Pasene threaten another man with a gun.  *Id.*  Muña further testified that he was boarding a cab to leave the area when he saw Pasene drive by in a blue Buick and then heard several gunshots.  *Id.*

Muña admitted at trial that his testimony was inconsistent with a statement he gave to detectives on the day of the murder that did not mention Pasene except to say that the men had traveled to Chinatown together.  *Id.*; Complaint ¶ 29.  He

---

[4]The following is only a partial summary of the evidence presented at trial.

further admitted that he only changed his account of that day about four years later, after he was arrested on another criminal charge.  Two months after Peneueta's shooting, Muña had skipped bail on a previous criminal charge and fled to a different state.  *Pasene*, 439 P.3d at 879.  In February 2013, he was arrested on a warrant for the previous charge and extradited to Hawaiʻi, at which point he changed his story and agreed to testify against Pasene.[5]  *Id.*; Complaint ¶¶ 28–29.

Pasene's defense theory at trial was that of mistaken identity, arguing that the killer could have been Muña.  *Pasene*, 439 P.3d at 873.  Pasene presented testimony from Linda Del Rio, a bail bond agent familiar with Pasene, Muña, and Toloai who had posted bail bonds for the three men on the morning of March 28, 2009.  *Id.* at 879.  Del Rio testified that Muña owned a blue four-door sedan, which he had used as collateral on a previous occasion and had tried to use as collateral on the day of the shooting.  *Id.*  She also testified that Muña called her between 10:30 and 11:00 a.m. that day to tell her he "was in Wahiawa" and "had done something and needed to . . . turn himself in," confessing, "Aunty, I shot someone." *Id.*

The State's rebuttal theory was that Muña could not have been the killer because, according to Detectives (here, Defendants) McCormick and Coons,

---

[5]Muña testified at Pasene's second and third trials on August 23, 2013 and March 10, 2014, respectively.  *Pasene*, 439 P.3d at 879.

footage from Chinatown surveillance videos "showed Muña getting into [a] taxi cab" at the time of the shooting. *Id.* at 876. The detectives claimed to have reviewed this footage after the killing but, for an unknown reason, did not keep it. *Id.* (defense counsel stating the footage "somehow was unrecorded or destroyed"). Because this footage was not available as evidence, a question during trial was whether and to what extent the State could ask the detectives what the footage contained. *Id.* at 876–77, 882. The trial judge ruled that the State could solicit testimony from the detectives that, "based upon what [they] viewed in the video, . . . essentially Mr. Muña was cleared." *Id.* at 877. The trial judge forbade the State from referencing any specific footage content. *Id.*

Accordingly, the State presented the detectives' testimonies that they interviewed Muña after the killing but ruled him out as a suspect after reviewing the Chinatown video footage. *Id.* ("Detective McCormick testified that although he viewed the Chinatown surveillance footage in the course of his investigation, it was 'not recoverable.'"); *State v. Pasene*, 420 P.3d 988 at *7 (Haw. Ct. App. 2018) ("Detective Coons reviewed video from surveillance cameras in the Chinatown area . . . [and] testified that his review of the Chinatown video was one of the aspects that led the police to rule out Muña as a suspect."); Complaint ¶¶ 36–37. Additionally, and against the trial court's explicit and repeated warnings, the State also told the jury in opening statement and closing argument that the footage

6

showed Muña departing the area in a cab at the time of the shooting.  *See, e.g., id.* at 874, 880–81.

Having been found guilty of second degree murder during his third trial, Pasene was sentenced to life imprisonment with the possibility of parole.  *Id.* at 882–83.

## II.   Pasene's Motions for a Mistrial on the Basis of Prosecutorial Misconduct

Throughout Pasene's third trial, the trial judge frequently admonished the Deputy Prosecuting Attorney (DPA) for flagrantly and/or intentionally flouting the court's instructions.  For example, the DPA repeatedly ignored the trial judge's direction to refrain from engaging in improper argument during opening statement. *Id.* at 874.  The judge sustained six defense objections on that basis, warning the DPA, "I've sustained many appropriate objections raised at this point.  You know what argument is. You are engaging in argument.  Do not do that." *Id.*

The DPA also made multiple impermissible references to the Chinatown video content while addressing the jury.  In his opening statement, the DPA said that Detectives McCormick and Coons eliminated Muña as a suspect because "the Chinatown cameras were able to capture Mr. Muña getting into the taxi." *Id.* Upon defense objection, the judge admonished the DPA at the bench:

> [G]iven the number of objections that have been sustained thus far, you know, one would question whether or not this is just inadvertent or you are blatantly disregarding the Court's . . . rulings about the

limitations of opening statement. . . .  [C]ertainly a conclusion could be drawn, that could be reasonable based upon the number of those instances, to question whether or not that is, in fact, inadvertent or if you are doing it purposefully.  I certainly hope it's not the latter, . . . [b]ut I ask you to try to be careful.  Because this is the third trial.  We want to make sure that everybody has a fair opportunity to be heard.

*Id.*  The judge did not issue a curative instruction to the jury.  *Id.*

At the conclusion of the State's opening statement, Pasene moved for a

mistrial.  The judge denied the motion, but again warned the DPA:

[T]he sum total of the repeated references or arguments that you made during your opening really . . . causes me to seriously question whether or not it is intentional or it is purely inadvertent.  I don't care, to be quite frank about it.  Both sides are entitled to a fair trial. . . . I'm putting you clearly on notice . . .  [W]e're in a third trial . . . [and] we want to make sure that everything is done as appropriately and properly as possibly can be. . . .  Mr. Pasene deserves a fair trial. . . . And playing fast and loose with . . . the rules or conventions of court really is not going to serve you well if you choose to do that. . . . [G]oing forward I will full well expect you to conduct yourself . . . without the need to inject improper statements, comments, or what have you.

*Id.*

Undeterred, in closing argument, the DPA again referred to the footage

content, saying the detectives "went to the Chinatown station and they looked at

the camera, and they saw a person that looked like Cedro Muña."  *Id.* at 880–81.

The court again sustained defense counsel's objection and again admonished the

DPA at the bench:

[T]here was absolutely no evidence with respect to what was seen on the video.  And your statement during closing argument . . . is

injecting information that was never provided to this jury. . . .  You
have to confine your arguments to the evidence that's been
adduced. . . .  And, you know, at this point, I've told you ad nauseam
that you have to confine your arguments and questioning during
this case to what's appropriate.  And for whatever reason, you're either
incapable of doing that or you refuse.  I'm not sure what it is, but
there's no excuse for it.

*Id.* at 881.  Defense counsel again moved for mistrial on the basis of the

prosecutor's conduct.  *Id.*  The judge denied the motion, but instructed the jury:

You are specifically instructed to completely disregard in its entirety
the last statement made by the [DPA] with respect to what may or
may not have been observed by law enforcement utilizing the
Chinatown surveillance system as to Mr. Muña or anything else for
that matter.  And so you are not to consider it in any way, shape, or
form in your deliberations.

*Pasene*, 420 P.3d 988 at *19.

Following the conclusion of the State's rebuttal closing argument, Pasene

renewed his motion for a mistrial.  *Pasene*, 439 P.3d at 882.  The trial court again

denied the motion, but stated:

[I]t is clear that there has been . . . a pattern of conduct in this
particular case that does one of two things.  It either implicates a
knowing disregard of the rules of court and evidence and ethical
considerations, or it certainly suggests a pattern of not complying with
those. . . .  [I]t certainly at a bare minimum would suggest a lack of
either understanding or an unwillingness or an inability to follow
certain rules and conventions that attend trial. . . .  [B]ased upon what
I've seen, I think there's at least at a bare minimum a suggestion that
your facility with either the rules or what is expected of your conduct
as a trial prosecutor is certainly lacking in some regard.

*Id.*

After the guilty verdict, Pasene timely filed a post-trial motion for a mistrial or a new trial, alleging that prosecutorial misconduct prejudiced his right to a fair trial. *Id.* The trial court denied the motion for the fourth time, this time stating, "[T]his Court finds and concludes that the State's conduct was not improper, and therefore has not risen to the level of misconduct warranting the granting of Pasene's motion." *Id.* at 883.

The Intermediate Court of Appeals affirmed, characterizing some of the DPA's conduct as improper but concluding that "the DPA's alleged acts of misconduct did not deny Pasene a fair trial and did not warrant vacating his convictions." *Pasene*, 420 P.3d 988 at *1, *20; *Pasene*, 439 P.3d at 883.

## III.   The Hawaiʻi Supreme Court's Reversal of Pasene's Conviction

On April 22, 2019, the Hawaiʻi Supreme Court overturned Pasene's conviction, holding that the trial court abused its discretion in denying Pasene's motion for a mistrial. *Pasene*, 439 P.3d at 883; Complaint ¶¶ 4, 61. In doing so, the court found:

> [T]he record in the instant case is replete with examples of the DPA's persistent failure—whether willful or inadvertent—to abide by the circuit court's instructions, our case law and rules regarding the ethical responsibilities of the prosecutor, and the American Bar Association's Criminal Justice Standards for the Prosecution. The DPA's improper statements pervaded every phase of trial, prompting defense counsel to object repeatedly. Some of these statements were particularly prejudicial, as they injected facts not in evidence that directly contradicted Pasene's core theory of the case, or served to

denigrate fundamental constitutional protections guaranteed to criminal defendants.

*Pasene*, 439 P.3d at 890 (citation omitted).[6]  The court concluded:

> Although each instance of the DPA's improper conduct, when examined in isolation, may not rise to the level of misconduct warranting the vacation of Pasene's convictions, . . . the cumulative effect of the DPA's improper conduct was so prejudicial as to deprive Pasene of a fair trial.

*Id.* at 891.  Finally, the court held that the prosecutor's misconduct was not harmless beyond a reasonable doubt, especially in light of the prior two mistrials in which the juries could not reach unanimous verdicts.  *Id.* at 896.

The court thus vacated Pasene's convictions and remanded his case to the circuit court for further proceedings.  *Id.* at 896–97.  Thereafter, on November 5, 2019, the Honolulu First Circuit Court dismissed the case against Pasene with prejudice.  Complaint ¶¶ 4, 61.  Pasene was released from custody on November 6, 2019.  *Id.* ¶¶ 4, 40, 61.

## IV.   Pasene's Complaint

On October 29, 2021, Pasene filed a Complaint[7] against Honolulu and the individual police detectives and officers who handled his case, alleging that "Defendants' unlawful, intentional, willful, deliberately indifferent, reckless,

---

[6]This Order notes only some of the instances of prosecutorial misconduct cited by the Hawaiʻi Supreme Court—those most relevant to Pasene's Complaint and the instant motions to dismiss.
[7]Pasene also filed an application to proceed *in forma pauperis*, which this Court granted on November 30, 2021.  *See* Dkt. No. 9.

and/or bad-faith acts and omissions caused [him] to be falsely arrested, tried, wrongfully convicted, and incarcerated for over ten and a half years for a crime he did not commit." *Id.* ¶ 41.  In particular, Pasene makes the following allegations.

A.   The Defendants used impermissibly suggestive tactics to obtain false eyewitness identifications of Pasene from Sakaria and Tagataese and then misrepresented the strength of those identifications at trial.

At the outset of the Peneueta homicide investigation, Muña, Pasene, and Toloai were considered suspects.  *Pasene*, 420 P.3d 988 at *6.  Detective McCormick, one of the lead homicide detectives in charge, interviewed eyewitnesses Sakaria and Tagataese.  *Id.*; Complaint ¶ 38.  In separate interviews, McCormick showed Sakaria and Tagataese a single photo of Pasene, after which each witness identified Pasene as the shooter.  *Pasene*, 420 P.3d 988 at *6–7.

Pasene contends the detectives' identification techniques were so suggestive that they knew or should have known they would yield false information.  *Id.* ¶¶ 49–51.  The process was not recorded, and McCormick showed each witness the photo "off the record" and prior to their official interviews.  Complaint ¶ 26.  "McCormick showed [Sakaria] Mr. Pasene's photo and who to pick out."  *Id.*

Pasene also contends that Sakaria's and Tagataese's identifications were tenuous.  He alleges that "as many as 25 people on the street at the time of the shooting . . . fled when the suspects pulled up with guns," *id.* ¶ 20, and that Sakaria and Tagataese admitted or testified that:

- "they ran and hid inside of a building underground parking lot once the passenger suspect got out of the car with a gun," *id.*;

- "they ran before the first shot was fired and that their main focus was on the passenger suspect, not the driver, who[m] they stated was still around the driver side with a car in between them when the first shot was fired and at the time that they ran," *id.* ¶ 21;

- "the incident happened real fast and that they were scared and focused on getting away and not getting shot," *id.* ¶ 23;

- "at the time of the shooting they did not know Mr. Pasene and that they just found out his name that day, 03/28/09," *id.* ¶ 24; and

- "they drove together to the main police station and on the way there talked about the shooting in the car and in the waiting room waiting to be interviewed." *Id.* ¶ 25.

B.   <u>The Defendants used impermissibly suggestive and/or coercive tactics to obtain false testimony against Pasene from Muña and then misrepresented the strength of that testimony by failing to disclose that Muña testified pursuant to a "deal."</u>

The day of the shooting, Muña gave a statement to Defendants that did not implicate Pasene in Peneueta's murder. *Id.* ¶ 29. Four years later, he altered his story, after being arrested and extradited to Hawai'i on other criminal charges. *Id.* ¶¶ 28–29. Pasene claims Muña fabricated his altered statement and testimony in 2013 under "pressure[]" from detectives to testify against Pasene in the wake of his first mistrial, in exchange for leniency on the other charges. *Id.* ¶ 30.[8]

---

[8]Pasene claims Muña had charges pending for "terroristic threatening with a firearm" and "second degree promotion of a dangerous drug," and that he was at risk for an "[a]bsconding" charge for skipping bail from 2009 to 2013. Complaint ¶ 33.

13

Pasene also alleges that, during the third trial, Muña denied getting a deal from the State for his testimony, but that Muña later encountered Pasene's mother and sister in California and admitted to them "that he got a deal on his cases by the State to testify against Mr. Pasene and that he did so to get back to his kids." *Id.* ¶¶ 31–32.[9]

Pasene thus contends that Defendants coerced Muña to provide false testimony against Pasene, knowing that their tactics were likely to yield false information, and that Defendants "failed to memorialize, intentionally suppressed, and/or recklessly failed to disclose Cedro Muña['s] promise/deal to testify and blame Mr. Pasene as the shooter." *Id.* ¶¶ 50–51, 53.

C.   <u>The Defendants "failed to memorialize, intentionally suppressed, and/or recklessly failed to disclose" the following exculpatory evidence.</u>

1.   Queen's Medical Center Witness Statement

Pasene alleges that, in the aftermath of the shooting, Defendant Officer Albert Le asked a crowd of eyewitnesses at Queens Medical Center if the shooter was "Cedro," and one individual answered, "Yes." *Id.* ¶¶ 34, 77. "Officer Le failed to get a written or recorded statement from this witness or to even get this eyewitness' identity and contact." *Id.*

---

[9]According to the Hawaiʻi Supreme Court, during Muña's testimony at the third trial, on cross-examination, defense counsel asked, "[Y]ou knew that if you cooperated in a murder case, your attorney could . . . argue to the judge in your case . . . this guy was helpful to the State, and . . . a judge could consider that . . . right?", and Muña responded, "Yeah." *Pasene*, 439 P.3d at 879.

2.     911 Caller Statement

Pasene alleges that an unidentified 911 dispatcher, Defendant Officer John

Doe, received a 911 emergency call from an unknown person at 10:58 a.m. on

March 28, 2009 "who said they knew the identity of the Chinatown shooting

suspects." *Id.* ¶¶ 35, 56, 75.  The dispatcher failed to obtain the caller's personal or

contact information, and none of the Defendants ever followed up on the call.  *Id.*

3.     Linda Del Rio's Statement

Without explanatory detail, Pasene alleges that "Defendants . . . failed to

memorialize, intentionally suppressed, and/or recklessly failed to disclose bail

bond agent Linda Del Rio['s] statement that Cedro Muña confessed to her that he

shot someone, the day the murder took place." *Id.* ¶¶ 54, 74.[10]

4.     Chinatown Video Surveillance Footage

Pasene alleges that Defendants intentionally, recklessly, or negligently failed

to recover, memorialize, and/or disclose the Chinatown footage:

> Chinatown had 26 cameras at the time of the March 28, 2009 shooting
> murder of Joseph Peneueta.  These cameras gave live feedback to the
> Chinatown substation that was located one block up from [the
> shooting].  Most were in the intersections on light poles.  The shooting
> took place on River and Pauahi street where camera #11 was.  These
> cameras re-record over themselves after a day and 18 hours.
> Defendants waited two days to attempt to recover these cameras and

---

[10]Contrary to this allegation, according to the Hawaiʻi Supreme Court, Del Rio testified during
the third trial that Muña had called her between 10:30 and 11:00 a.m. on the day of the shooting
to tell her he "was in Wahiawa" and "had done something and needed to . . . turn himself in,"
confessing, "Aunty, I shot someone." *Id.*

at that time the footage was re-recorded over.[11]  These cameras
belonged to HPD and were used to prevent and solve crime.  At the
time of the shooting, these cameras were used on a daily basis.

*Id.* ¶ 36.  Pasene further alleges that these cameras would have shown Muña

"leaving the scene at the time the 911 calls started coming in to the police station

about a shooting on Pauahi Street."  *Id.* ¶¶ 37, 55, 76, 81.  He states that the camera

evidence "would have tended to prove [his] innocence, cast doubt on the entire

police investigation and prosecution, and le[a]d to the end of [his] pretrial

detention."  *Id.* ¶ 82.

*** 

In accordance with the above factual allegations, Pasene's Complaint asserts

the following counts pursuant to 42 U.S.C. § 1983[12]:

**Count 1:** Deprivation of liberty without due process of law in
violation of the Fourteenth Amendment against all individual
Defendants;

**Count 2:** Malicious prosecution in violation of the Fourth
Amendment against all individual Defendants;

**Count 3:** Civil rights conspiracy against all individual Defendants;

---

[11]It is unclear whether Pasene is alleging that Defendants never viewed the footage.  If so,
contrary to this allegation, according to the Hawaiʻi Supreme Court, Detectives McCormick and
Coons testified that they did review the footage in the days after the shooting but did not retain
the videos.  *Pasene*, 439 P.3d at 876–77.

[12]To establish a Section 1983 claim, a plaintiff must plead that "(1) the defendants acting under
color of state law (2) deprived plaintiff[] of rights secured by the Constitution or federal
statutes."  *Williams v. California*, 764 F.3d 1002, 1009 (9th Cir. 2014) (quoting *Gibson v. United
States*, 781 F.2d 1334, 1338 (9th Cir. 1986)).  All of Pasene's Section 1983 claims meet this
standard because they allege violations of constitutional or federal rights by persons acting under
color of state law.

**Count 4:** Failure to disclose highly significant exculpatory information in violation of *Tatum v. Moody*, 768 F.3d 806 (9th Cir. 2014), against all individual Defendants;

**Count 5:** Supervisory liability against all individual Defendants; and

**Count 6:** Failure to train, supervise, and/or discipline in constitutionally adequate investigation techniques, identification procedures, and/or *Brady* duties in violation of *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658 (1978), against the City and County of Honolulu.

Complaint ¶¶ 2, 7, 47–92. Counts 1–5 are asserted against the individual

Defendants in both their official and individual capacities. *Id.* at 2–3.[13]

On April 11, 2022, the City and County of Honolulu filed a motion to

dismiss Pasene's Complaint for failure to state a claim upon which relief may be

granted. Dkt. No. 40. On May 6, 2022, Correa and Coons jointly filed a motion to

dismiss on the same grounds. Dkt. No. 46.[14] Although Pasene did not oppose

---

[13]Elsewhere in his Complaint, not enumerated in counts, Pasene also conclusorily states that "Defendants' actions deprived [him] of his civil rights under the First, Fourth, Fifth, Eighth, and Fourteenth Amendments to the United States Constitution and laws of the state of Hawai'i." Complaint ¶ 39. Pasene makes no specific allegations, however, regarding the First, Fifth, or Eighth Amendment or any state law. Thus, these claims are DISMISSED WITHOUT PREJUDICE. If Pasene wishes to assert these claims, he should offer a "short and plain statement" to that effect that satisfies Fed.R.Civ.P. 8 and 12.

[14]On January 31, 2022, Pasene had previously filed a request for appointment of counsel, Dkt. No. 20, which the Magistrate Judge denied without prejudice on February 8, 2022, citing certain theoretically curable defects in the request. Dkt. No. 22. On June 6, 2022, after the motions to dismiss were filed, Pasene renewed his request for appointment of counsel. Dkt. No. 48. Because Pasene had not cured the previously noted defects, the Magistrate Judge again denied the request without prejudice on June 14, 2022. Dkt. No. 50. On August 15, 2022, during a telephonic status conference, Pasene orally renewed his request for appointment of counsel. *See* Dkt. No. 59. The Magistrate Judge again denied this request without prejudice for the same reasons as stated in Dkt. No. 50. *See id.*

either motion, the moving Defendants filed a Reply on June 24, 2022.  Dkt. No. 51.

Pursuant to Local Rule 7.1(c), the Court finds this matter suitable for disposition

without a hearing, and this Order follows.  *See* Dkt. No. 52.

## DISCUSSION

I.    **Counts 1–5 against the individual Defendants in their individual capacities are dismissed because "group pleading" is not permitted.**

To properly state a claim under Rule 12(b)(6), a section 1983 plaintiff must

plead facts showing how each of the named defendants "personal[ly] participat[ed]

in the alleged rights deprivation."  *Ewing v. City of Stockton*, 588 F.3d 1218, 1235

(9th Cir. 2009).  In other words, the plaintiff may not attribute general liability for

an alleged wrong to a group of defendants but rather must make "individualized"

allegations.  *Leer v. Murphy*, 844 F.2d 628, 634 (9th Cir. 1988).

Pasene's Complaint engages in impermissible group pleading.  In his entire

Complaint, Pasene makes only the following individualized factual allegations:

- During and/or prior to their identification interviews, Defendant McCormick showed eyewitnesses Sakaria and Tagataese only a single photograph—Pasene's.  Complaint ¶ 26.  He also introduced the photo "before [the eyewitnesses] were interviewed and did so off the record, not recorded."  *Id.*  In particular, McCormick showed Sakaria "Pasene's photo and who to pick out."  *Id.*

- Defendants McCormick and Coons "failed to recover the Chinatown video cameras as evidence for use at trial."  *Id.* ¶ 36.

- Defendant Le failed to record a statement or obtain contact information from the Queen's Medical Center eyewitness who said the shooter was Muña.  *Id.* ¶ 34.

18

- Defendant Doe failed to record contact information from an anonymous 911 caller who said he/she knew the identity of the shooters.  *Id.* ¶ 35.

- Defendants McCormick and Coons were the lead investigators for the homicide, and they "directed all aspects of the investigation or were informed of the results."  *Id.* ¶ 38.

Pasene makes no individualized allegations against Defendant Correa or Defendant Sellers, one of whom is a movant here.  *See generally id.*

Moreover, Pasene fails to make clear how these individualized actions, sparse as they are, contributed to each claimed rights violation.  Counts 1–5 attribute liability to all "Defendants," without specifying how any particular Defendant personally participated.  Thus, all of Pasene's claims against the individual Defendants in their individual capacities are DISMISSED WITHOUT PREJUDICE for failure to plead the claims on an individualized basis.

Pasene may amend his Complaint to remedy this defect.  Over the course of three trials, Pasene likely gained access to information regarding each Defendant's participation in his homicide investigation and prosecution.  If he wishes to amend, Pasene should allege each enumerated count against only the specific Defendant(s) who participated in that particular rights violation and articulate how each individual Defendant participated.  To the extent any named Defendant was not personally involved, Pasene should remove that Defendant from the relevant count (or the Complaint in its entirety).

19

## II.  Most of the claims asserted in Counts 1–5 against the individual Defendants in their individual capacities are *also* dismissed on grounds of Rule 12(b)(6) and/or qualified immunity.

### A.  Count 1: Due Process Claims

Count 1 asserts a generalized claim that Defendants violated Pasene's right to due process of law by depriving him of a fair trial.  *See* Complaint ¶¶ 47–60; U.S. Const. amend. XIV ("No person shall be deprived of life, liberty, or property without due process of law.").  The Court understands Pasene to be asserting at least three due process claims in this count[15]: (1) that Defendants employed unconstitutionally suggestive identification procedures with eyewitnesses Sakaria and Tagataese, *see Neil v. Biggers*, 409 U.S. (1972); (2) that Defendants failed to disclose that the State promised Muña leniency in exchange for his testimony against Pasene, *see Horton v. Mayle*, 408 F.3d 570 (9th Cir. 2005); and (3) that

---

[15]In their Motion to Dismiss, Defendants complain that Count 1's due process claim is ambiguous in that it does not state whether Pasene is asserting a violation of substantive or procedural due process and in that it "does not contain even a 'formulaic recitation of the [claim's] elements.'"  *See* Dkt. No. 46 at 5 (quoting *Iqbal*, 556 U.S. at 678).  Defendants also contend that "the [C]ourt may not interpret the complaint to supply the essential elements of the claim."  *Id.* (quoting *Ivey*, 673 F.2d at 268).  Defendants misunderstand both *Iqbal* and *Ivey*.  First, *Iqbal* states that a formulaic recitation of elements is not sufficient to state a claim; rather, plaintiffs must plead facts.  *Absence* of a recitation of legal elements is no flaw.  And *Ivey* only blocks courts from supplying missing facts.  *Ivey* does *not* preclude a court from divining whether well-pled facts give rise to any legal claims.  On the contrary, that is the Court's role, especially when liberally construing a *pro se* plaintiff's pleadings.  *See id.*; *Estelle*, 429 U.S. at 97.

Defendants deliberately fabricated evidence causing Pasene's deprivation of liberty, *see Devereaux v. Abbey*, 263 F.3d 1070 (9th Cir. 2001).[16]

As explained below, Pasene has successfully stated a claim under a *Biggers* theory but has failed to allege facts sufficient to state claims under the *Horton* and *Devereaux* theories.  Therefore, Count 1's *Horton* and *Devereaux* claims are DISMISSED WITHOUT PREJUDICE with leave to amend.[17]

### 1.    *Biggers*: Unconstitutional Identification Procedures

Pasene has successfully alleged facts sufficient to state a *Biggers* claim that Defendants employed unconstitutional identification procedures with eyewitnesses Sakaria and Tagataese.  A police identification procedure violates due process if it is both (i) suggestive and (ii) unnecessarily so.  *Biggers*, 409 U.S. at 196, 198, 201.  In order to be considered suggestive, the procedure's suggestiveness must taint the reliability of the identification by creating a "very substantial likelihood of irreparable misidentification."  *Id.*; *see also United States v. Montgomery*, 150 F.3d 983, 992 (9th Cir. 1998) ("An identification procedure is suggestive when it emphasizes the focus upon a single individual thereby increasing the likelihood of misidentification.").  Suggestiveness is assessed "case-by-case," based on the "totality of the circumstances."  *Biggers*, 409 U.S. at 200–01.  Factors to be

---

[16]Separately, in Count 4, Pasene asserts a fourth due process violation for failure to disclose exculpatory evidence under *Tatum v. Moody*, 768 F.3d 806 (9th Cir. 2014).

[17]If Pasene wishes to amend his Complaint, he should plead each of his due process claims in separate counts, rather than one generalized "due process" or "fair trial" count.

considered in evaluating the likelihood of misidentification include (i) the witness' opportunity to view the criminal during the crime, (ii) the witness' degree of attention, (iii) the accuracy of the witness' description of the criminal prior to the identification procedure, (iv) the level of certainty demonstrated by the witness at the time of the identification, and (v) the length of time between the crime and the identification. *Id.*

Pasene has alleged facts sufficient to state a *Biggers* claim of unnecessarily suggestive identification procedures. Pasene has alleged that Defendants showed Sakaria and Tagataese, who did not know Pasene, a single photo—Pasene's— rather than a photo array.[18] Complaint ¶ 26; *see also Pasene*, 420 P.3d 988 at *7 (stating that McCormick showed Tagataese and Sakaria a single photo, whereas he used a six photograph lineup in his interview with another witness, Filipo, who was unable to make an identification). Pasene has also alleged that the identification procedure was not recorded, that McCormick showed each witness his photo "off the record" and prior to the official interviews, and that "Mr. Sakaria testified that Defendant McCormick showed him Mr. Pasene's photo and who to pick out." Complaint ¶ 26; *Pasene*, 420 P.3d 988 at *6–7. These factual allegations certainly suffice to indicate that the procedure was unnecessarily suggestive.

---

[18]In *Perry v. New Hampshire*, 132 S. Ct. 716, 724–25 (2012), the Supreme Court rejected the proposition that the use of a single photograph for witness identification is *per se* unconstitutional.

Taken in the light most favorable to Pasene, his factual allegations also permit a reasonable inference that there was a substantial likelihood of irreparable misidentification. *See Biggers*, 409 U.S. at 198. Pasene alleges that Sakaria and Tagataese had an obscured view of the driver during the crime. Although the witnesses testified that they were present on the sidewalk when the car drove up, chaos ensued when the twenty-five people present fled once the suspects brandished guns and before the driver emerged. *See* Complaint ¶ 20. The witnesses said that as soon as the passenger got out of the car with a gun, they "ran and hid inside of a building underground parking lot," and they did so "before the first shot was fired," at which time the "driver . . . was still around the driver side with a car in between them." *Id.* ¶¶ 20–21. The witnesses also testified that "the incident happened real fast." *Id.* ¶ 21. Pasene alleges that the witnesses testified their attention was focused on "the passenger suspect, not the driver," and "they were scared and focused on getting away and not getting shot." *Id.* ¶¶ 21, 23.

Under the totality of the circumstances, the facts alleged by Pasene more than suffice to permit a reasonable inference that Sakaria and Tagataese misidentified Pasene under unnecessarily suggestive circumstances.[19]

---

[19]Although not clear, Pasene also seems to allege that Defendants used impermissibly coercive identification procedures with Muña by pressuring him to testify in exchange for leniency on criminal charges. *See* Complaint ¶ 51. Whether an identification procedure is unconstitutionally coercive depends on the totality of the circumstances. *United States v. Carr*, 761 F.3d 1068 (9th Cir. 2014). While a leniency deal permits the inference that Muña experienced some pressure, that alone does not permit a reasonable inference of unconstitutional coerciveness. *See Horton*,

## 2.    *Horton*: Failure to Disclose Muña's Leniency Deal

Pasene has failed to allege facts sufficient to state a *Horton* claim that

Defendants failed to disclose Muña's leniency deal.  Under *Horton*, a prosecutor's

failure to disclose a deal between the State and a prosecution witness, in which the

State promises the witness leniency in exchange for the witness' testimony,

violates *Brady v. Maryland*, 373 U.S. 83 (1963), because evidence of that deal

could be used by the defense to impeach the witness.[20]  *Horton*, 408 F.3d at 578.

Here, Pasene attempts to state a *Horton* claim.  He alleges that Muña

received a leniency deal with respect to unrelated criminal charges by agreeing to

testify against Pasene, and that Muña denied getting such a deal during his

testimony at the third trial.  Complaint ¶¶ 29–31.  He says Muña later admitted to

Pasene's family members that he received such a deal in exchange for his

testimony so he could "get back to his kids."  *Id.* ¶ 32.  Without explanatory detail,

---

408 F.3d 570 (showing that the existence of a deal alone is not unduly coercive as a matter of
law, so long as it is disclosed).  Pasene does not, for example, "claim that [Muña] was deprived
of food, friends, and counsel, or deprived of sleep, or subjected to extended interrogation, or that
[he] was mentally disabled and subject to misleading questioning, or that [he] was a juvenile or
without the benefit of proper *Miranda* warnings."  *See Carr*, 761 F.3d at 1075 (collecting
examples of where courts have held that witnesses were unconstitutionally coerced) (internal
citations omitted).  Thus, to the extent Pasene asserts a claim of coercive identification
procedures with Muña, this claim is DISMISSED WITHOUT PREJUDICE.  If Pasene is in
possession of additional information tending to show actual coercion, he may amend this claim.
[20]*Brady v. Maryland*, 373 U.S. 83 (1963) compels the prosecution to disclose material evidence
that is favorable to the accused, including both exculpatory and impeachment evidence.  *United
States v. Bagley*, 473 U.S. 667 (1985).

Pasene asserts that Defendants "failed to memorialize, intentionally suppressed, and/or recklessly failed to disclose" the existence of the deal. *Id.* ¶¶ 50–51, 53.

Importantly, Pasene makes no allegation regarding which Defendant hid the existence of the deal or from whom the deal was hidden. Furthermore, according to the Hawaiʻi Supreme Court, Muña admitted that a deal existed during cross-examination at the third trial, when defense counsel asked, "[Y]ou knew that if you cooperated in a murder case, your attorney could . . . argue to the judge in your case . . . this guy was helpful to the State, and . . . a judge could consider that . . . right?", and Muña responded, "Yeah." *Pasene*, 439 P.3d at 879.[21]

In order to plead a *Horton* claim, Pasene must plausibly allege that some particular Defendant hid the existence of the deal from defense counsel prior to either of the trials at which Muña testified, such that the defense would have been unable to impeach Muña on the stand with this information. Because Pasene has not alleged facts from which the Court could reasonably infer that this occurred, Pasene's *Horton* due process claim is DISMISSED WITHOUT PREJUDICE and with leave to amend.

---

[21]This is not to say that Muña's admission on the stand would suffice for purposes of *Brady* and *Horton* if the prosecutor or other Defendants did not disclose the existence of any deal to defense counsel prior to the second or third trials.

3.    *Devereaux*: Deliberate Fabrication of Evidence

Pasene has failed to allege facts sufficient to state a *Devereaux* claim that

Defendants deliberately fabricated evidence.  It is "virtually self-evident" that

"there is a clearly established constitutional due process right not to be subjected to

criminal charges on the basis of false evidence that was deliberately fabricated by

the government." *Devereaux*, 263 F.3d at 1074–75.  To plausibly plead a

fabrication-of-evidence claim, a plaintiff must allege that "(1) the defendant

official deliberately fabricated evidence; and (2) the deliberate fabrication caused

the plaintiff's deprivation of liberty." *Spencer v. Peters*, 857 F.3d 789, 798 (9th

Cir. 2017).  Deliberate fabrication can be shown by either "direct evidence of

fabrication" or "circumstantial evidence related to a defendant's motive."

*Caldwell v. City and Cnty. of S.F.*, 889 F.3d 1105, 1112 (9th Cir. 2018).

Here, Pasene claims that Defendants fabricated evidence against him by

"knowingly or in reckless disregard for the truth" obtaining false identifications

and/or testimony from Tagataese, Sakaria, and Muña.  Complaint ¶¶ 48–52.  In

support, Pasene conclusorily alleges that Defendant McCormick deliberately

conducted the identification interviews with Sakaria, Tagataese, and Muña in such

suggestive and/or coercive ways that he knew his tactics would yield false

information.  *Id.* ¶¶ 26, 30.

26

Pasene's assertions do not permit the Court to reasonably infer the first *Devereaux* element—that Defendants *deliberately* fabricated evidence.  Pasene has not alleged any evidence of direct fabrication.  *See Caldwell*, 889 F.3d at 1112.  Nor has he offered any circumstantial evidence as to Defendants' *motives* to fabricate evidence.  *See id.*  To succeed in stating this claim, Pasene must make plausible factual allegations showing Defendants' motives were to intentionally mislead or to obtain a conviction with indifference to Pasene's guilt or innocence.  Alleging that Defendants *recklessly* employed misleading tactics does not suffice.  *See* Complaint ¶¶ 49–51, 53.  Conclusory statements that Defendants were indifferent to the truth similarly do not suffice.  *See id.*

Because Pasene's allegations are not sufficient to satisfy the first element of his *Devereaux* due process claim, that claim is DISMISSED WITHOUT PREJUDICE and with leave to amend.

B.     Count 2: Malicious Prosecution Claim

Pasene has failed to allege facts sufficient to state a claim for malicious prosecution.  In order to state a claim of malicious prosecution, a plaintiff must plausibly allege that the proceedings against him (1) were instituted without probable cause and (2) with malice, and (3) were terminated in his favor.  *See Awabdy v. City of Adelanto*, 368 F.3d 1062, 1066 (9th Cir. 2004).  Malice exists only if "the motive in instituting the suit . . . [was] for a purpose other than

27

bringing the defendant to justice." *Thompson v. Clark*, 142 S. Ct. 1332, 1338

(2022) (internal quotation marks omitted).  An indictment by a grand jury is *prima*

*facie* evidence of probable cause.  *See Awabdy*, 368 F.3d at 1066; *see also Degroot*

*v. United States*, 786 Fed. Appx. 638, 642 (9th Cir. 2019).  To rebut that *prima*

*facie* evidence, a plaintiff must prove that the "criminal prosecution was induced

by fraud, corruption, perjury, fabricated evidence, or other wrongful conduct

undertaken in bad faith."  *See Awabdy*, 368 F.3d at 1067.

Pasene has failed to plausibly plead the first two elements of malicious

prosecution—that the proceedings were instituted without probable cause and with

malice.[22]  Because Pasene was indicted by a grand jury in connection with

Peneueta's killing, *see Pasene*, 439 F.3d at 871, *prima facie* evidence of probable

cause exists.  *See Awabdy*, 368 F.3d at 1066; *Degroot*, 786 Fed. Appx. at 642.  As

discussed in the *Devereaux* analysis, *supra*, although Pasene has alleged that the

evidence against him was achieved by manipulative and/or suggestive tactics, these

sorts of tactics are not *per se* reflective of "bad faith" or "malice."  To successfully

rebut the *prima facie* evidence, Pasene must allege facts showing that the

---

[22]Pasene has plausibly alleged the third element of a malicious prosecution claim--that the proceedings against him were favorably terminated.  Favorable termination exists if "the criminal prosecution ended without a conviction"; it does not require any other "affirmative indication of innocence."  *Thompson*, 142 S. Ct. at 1341.  In alleging that the circuit court dismissed his case with prejudice after the Hawai'i Supreme Court vacated his conviction, *see* Complaint ¶ 4, Pasene has satisfied this element.

Defendants instituted the proceedings against him with some motivation other than bringing him to justice—in other words, with deliberate indifference to his guilt or innocence.  *See Awabdy*, 368 F.3d at 1066; *Thompson*, 142 S. Ct. at 1338.

Because Pasene has failed to allege facts sufficient to satisfy the first two elements of a malicious prosecution claim, that claim IS DISMISSED WITHOUT PREJUDICE with leave to amend.[23]

C.    Count 3: Civil Rights Conspiracy Claim

Count 3 is DISMISSED WITH PREJUDICE because intradepartmental conspiracy liability is not a "clearly established" Section 1983 right, and, thus, the Defendants are entitled to qualified immunity on that claim.  *See Ziglar v. Abbasi*, 137 S. Ct. 1843, 1867–68 (2017).[24]

In general, "[a] civil conspiracy is a combination of two or more persons who, by some concerted action, intend to accomplish some unlawful objective for the purpose of harming another which results in damage."  *Lacey v. Maricopa Cnty.*, 693 F.3d 896, 935 (9th Cir. 2012) (citation omitted).  Section 1983

---

[23]Defendants state that the Court should dismiss Count 2 because "[a] claim of malicious prosecution is not cognizable under § 1983 if process is available within the state judicial system to provide a remedy."  Dkt. No. 46 at 7–8 (citing *Bretz v. Kelman*, 773 F.2d 1026 (9th Cir. 1985) (en banc)).  Defendants end their analysis there.  *See id.*  Because Defendants provide the Court with no other information, this basis for dismissal is not further considered.

[24]Qualified immunity shields a government official from individual liability unless (1) the official violates a statutory or constitutional right (2) that was "clearly established" at the time of the challenged conduct.  *Ashcroft v. al-Kidd*, 563 U.S. 731, 735 (2011) (citing *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)).

conspiracy claims are allowed under some circumstances—for example, among state officials from multiple departments.  *See id.*

However, the U.S. Supreme Court recently held that it is not "clearly established," for purposes of qualified immunity, that state officials *from within the same department* may be held liable for civil conspiracy under § 1983.  *Ziglar*, 137 S. Ct. 1867–69.  When those officials speak to one another and work together in the course of their official duties, it is not currently clearly established whether they are considered separate "people," or whether they act on behalf of a single collective entity.  *Id.*  As the Court explained:

> The Court's [analogous antitrust] precedent indicates that there is no unlawful conspiracy when officers within a single corporate entity consult among themselves and then adopt a policy for the entity. Under this principle—sometimes called the intracorporate-conspiracy doctrine—an agreement between or among agents of the same legal entity, when the agents act in their official capacities, is not an unlawful conspiracy.  The rule is derived from the nature of the conspiracy prohibition.  Conspiracy requires an agreement—and in particular an agreement to do an unlawful act—between or among two or more separate persons.  When two agents of the same legal entity make an agreement in the course of their official duties, however, as a practical and legal matter their acts are attributed to their principal. And it then follows that there has not been an agreement between two or more separate people. . . .
>
> To be sure, this Court has not given its approval to this doctrine in the specific context of § 1985(3).  There is a division in the courts of appeals, moreover, respecting the validity or correctness of the intracorporate-conspiracy doctrine with reference to § 1985[(3)] conspiracies.  Nothing in this opinion should be interpreted as either approving or disapproving the intracorporate conspiracy doctrine's application in the context of an alleged § 1985(3) violation.  The

> Court might determine, in some later case, that different
> considerations apply to a conspiracy respecting [constitutional]
> guarantees, as distinct from a conspiracy in the antitrust context.  Yet
> the fact that the courts are divided as to whether or not a § 1985(3)
> conspiracy can arise from official discussions between or among
> agents of the same entity demonstrates that the law on the point is not
> well established.  When the courts are divided on an issue so central to
> the cause of action alleged, a reasonable official lacks the notice
> required before imposing liability. . . .

*Id.* (citations omitted) (granting state officials qualified immunity with respect to

the § 1985(3) intradepartmental conspiracy claims).

Pasene alleges that the HPD Defendants conspired to engage in the

otherwise stated constitutional rights violations: namely, the *Biggers*, *Horton*,

*Devereaux*, and *Tatum* due process claims (Counts 1 and 4) and the Fourth

Amendment malicious prosecution claim (Count 2).  Because his claims are

against Defendants from within the same governmental department, this claim falls

within the category of conspiracy claims from which the officials are entitled to

qualified immunity under *Ziglar*.  Accordingly, Count 3 is DISMISSED WITH

PREJUDICE.[25]

D.    Count 4: *Tatum* Failure-to-Disclose Claim

Under *Tatum v. Moody*, a state official violates the Fourteenth Amendment's

Due Process Clause if he (1) fails to disclose (2) highly significant or potentially

---

[25]The Court notes that it is not clear how Pasene's conspiracy claim would have benefited him, given that it adds no Defendants who were not already allegedly personally involved in the alleged constitutional violations.

dispositive exculpatory evidence to prosecutors, (3) through "conduct that is culpable in that the officers understood the risks to the plaintiff's rights from withholding the information or were completely indifferent to those risks," (4) leading to plaintiff's detention of "unusual length." 768 F.3d at 819–20. In order to be considered highly significant or exculpatory to the point of being potentially dispositive, the suppressed evidence must be not only material but "*strongly indicative of the plaintiff's innocence.*" *Id.* at 820. "[O]fficial conduct violates due process only when it shocks the conscience, a standard satisfied in circumstances [where officers] either consciously or through complete indifference disregard[ed] the risk of an unjustified deprivation of liberty." *Id.* at 820–21.

Here, Pasene states in his Complaint that Defendants "failed to memorialize, intentionally suppressed, and/or recklessly failed to disclose" the following evidence, "in an effort to secure [his] conviction without regard to his actual innocence." Complaint ¶ 52.

- Queen's Medical Center witness statement that the shooter was "Cedro," *id.* ¶¶ 34, 77;

- 911 caller's statement that he/she "knew the identity of the Chinatown shooting suspects," *id.* ¶¶ 35, 56, 75;

- Linda Del Rio's statement that Cedro Muña confessed to her that he shot someone the day the murder took place, *id.* ¶¶ 54, 74;

- Chinatown video surveillance footage from camera #11, which "belonged to the HPD," that would have shown Muña in the area at the time of the shooting. *Id.* ¶¶ 36–37, 55, 76, 81.

32

Pasene states that this evidence would have tended to exculpate him, along with "cast[ing] doubt on the entire police investigation and prosecution, and le[ading] to the end of Mr. Pasene'[s] pretrial detention." *Id.* ¶ 82.

Under *Tatum*'s first element, Pasene has adequately alleged that the Defendants failed to disclose three of the four pieces of evidence. Taking Pasene's allegations as true, the police department suppressed the Chinatown footage because they had it in their possession and failed to retain it or failed to turn it over to the prosecutors.[26] Likewise, Defendant Le did not document the medical center witness' contact information or follow up with the witness, and Defendant Doe did not document the 911 caller's contact information or follow up.[27]

However, Pasene has not adequately alleged that Defendants failed to disclose the Del Rio statement to prosecutors, since it appears that Del Rio in fact testified during the third trial that Muña had called her between 10:30 and 11:00 a.m. on the day of the shooting to tell her he "was in Wahiawa" and "had done something and needed to . . . turn himself in," confessing, "Aunty, I shot

---

[26]Pasene contends that the HPD failed to seek out the footage for two days, at which point it had been erased. Complaint ¶ 81. At trial, detectives testified that they *did* recover the footage in time to review them but did not retain it. *See, e.g.*, *Pasene*, 439 F.3d at 877. Either way, these facts support the proposition that Defendants did not turn over the footage to the prosecution or defense.

[27]It would be helpful to know how Pasene came to know about the witnesses' statements if they were never disclosed to the prosecutor or defense by Defendants. However, this lack of information does not require dismissal.

someone." *Pasene*, 439 P.3d at 879.  In order to plausibly allege that Defendants failed to disclose this statement to the prosecutors, Pasene needs to include some information about who suppressed it, from whom it was suppressed, when, and how.

Under *Tatum*'s second element, taking all allegations and inferences in the light most favorable to Pasene, all four items are highly significant exculpatory evidence or "strongly indicative of the plaintiff's innocence," especially when taken in the aggregate and compared to the evidence against him.  *See Tatum*, 768 F.3d at 820.  First, an eyewitness' statement, "Yes," when asked if the shooter was "Cedro," is highly pertinent and highly exculpatory as to Pasene.  Second, a 911 caller's statement that he/she knows the identity of the shooter is also highly relevant, and potentially exculpatory, depending on what the caller says on follow-up.  Third, Del Rio's statement that Muña confessed to her that he shot someone on the day of the murder is obviously highly exculpatory as to Pasene.[28]

Fourth, a tape containing an image of Muña—a person who closely matches Pasene's description—departing the murder scene right after the shooting is also highly significant and potentially exculpatory, depending on the details of the footage.  Considering that this allegation closely tracks what the DPA said was on

---

[28]These witnesses' credibility or reliability, or reasons Defendants may not have followed up with the witnesses, is not at issue on a motion to dismiss.

the footage at the third trial, it is plausible that the tapes showed Muña leaving the area right after the shooting, rather than right before or concurrently.[29]  Contrary to Defendants' assertion in their Motion to Dismiss that Pasene has failed to allege "what the camera would have shown, or how it would have been exculpatory," *see* Dkt. No. 46-1 at 10–11, Pasene *has* done so.  *See* Complaint ¶ 37 ("Cedro Muña was on these cameras in Chinatown at the time 911 calls started coming in about the shooting of Joseph Peneueta.").

Under *Tatum*'s third element, Pasene has failed to adequately allege that four of the six individual Defendants understood the risks to Pasene of withholding the evidence or exercised complete indifference to his innocence.[30]  Pasene makes no allegation about how Le and Doe were involved in the investigation such that it can reasonably be inferred that those officers understood the implications of their actions with regard to the witness statements.  Moreover, Pasene makes no allegations at all about Sellers and Correa that show that they withheld any evidence or understood the implications of that withholding.  Pasene does allege that McCormick and Coons "were the lead investigators" of the homicide, and that

---

[29]Defendants' Motion to Dismiss also states that "no officers had the opportunity to view the video, and thus did not have a basis for turning over or withholding such evidence."  Dkt. No. 46-1 at 11.  Defendants go on, "There is no indication that they knew what would be on the camera footage, or that it would be highly exculpatory."  *Id.*  This account directly conflicts with McCormick's and Coons' testimonies at trial, and, at best, presents questions of fact not ripe for consideration here.

[30]This defect is closely related to Pasene's "group pleading" issue discussed above in Section I.B.1.

they were responsible for the Chinatown footage and failed to retain it.  Complaint ¶ 38.  Thus, in that one respect, Pasene has satisfied this element.  However, Pasene gives no information showing that McCormick or Coons, although they were lead detectives, exhibited culpable conduct or motives with regard to the Queen's Medical Center, 911 caller, or Del Rio statements, given that there are no detailed allegations tying them to those pieces of evidence or showing that they were even aware of that evidence.

Under *Tatum*'s fourth element, Pasene has adequately pled that he was detained for an unusual length of time.  *Tatum* did not prescribe an exact amount of time to satisfy a standard of "unusual length" but held that twenty-seven months met the standard.  768 F.3d at 820.  Here, Pasene was incarcerated for over ten years—well beyond twenty-seven months—certainly an unusual length by almost any standard.

In sum, Count 4 is PARTIALLY DISMISSED WITHOUT PREJUDICE for failure to state a claim with leave to amend.  Pasene has adequately alleged that McCormick and Coons failed to disclose the Chinatown footage in a culpable manner.  All other aspects of this Count must be re-pled, consistent with the guidance offered above, if Pasene wishes to pursue it.

E.      Count 5: Supervisory Liability

Pasene has failed to allege facts sufficient to state a claim for supervisory liability.  Under Section 1983, a supervisor may be held liable for a subordinate's constitutional violations "if the supervisor participated in or directed the violations, or knew of the violations and failed to act to prevent them."  *Maxwell v. Cnty. of San Diego*, 708 F.3d 1075, 1086 (9th Cir. 2013) (holding that a jury could reasonably find officer defendants in a § 1983 case liable for failure to intervene as the ranking officers present while witnessing allegedly unconstitutional acts take place by subordinate officers).

Here, Pasene has not adequately alleged that the moving Defendants were supervisors who "participated in," "directed," or knowingly "failed to act to prevent" their subordinates' constitutional violations.  *See id.*  First, Pasene has not alleged any facts to show that Correa was even aware of the Peneueta investigation and prosecution.  Although Pasene has alleged that Coons was the lead homicide investigator for the case, this alone is not sufficient to hold Coons liable on the basis of supervisory liability.  To state this claim, Pasene would need to show that Coons personally participated in, directed, or failed to intervene in violations committed by other people.  *See id.*  Plaintiff's vague and conclusory assertions that the numerous Defendants failed to supervise, train, or control unnamed

subordinates, *see* Complaint ¶ 89, are not enough.  Thus, this claim is DISMISSED

WITHOUT PREJUDICE with leave to amend.

## III.    Count 6 against the City and County of Honolulu is dismissed under Rule 12(b)(6).

In Count 6, Pasene alleges that the City and County of Honolulu failed to

train, supervise, and/or discipline its employees in constitutionally adequate

investigation techniques, identification procedures, and/or *Brady* duties, in

violation of *Monell*, 436 U.S. at 658.

A local government may be liable for an injury under § 1983 under three

theories: (i) policy or custom, (ii) failure to train, and/or (iii) ratification.  *Id.*

Pasene states that Honolulu is liable under each of the three theories.  In short, as

discussed more fully below, Pasene has merely recited the legal definition of each

theory, *see* Complaint ¶¶ 94–96; he has not provided *any* facts to support his

claims.  *See Iqbal*, 556 U.S. at 678 ("Threadbare recitals of the elements of a cause

of action, supported by mere conclusory statements, do not suffice.").  Thus, Count

6 is DISMISSED WITHOUT PREJUDICE for failure to state a claim with leave to

amend.

### A.    Policy or Custom

A local government violates *Monell* if its "policy or custom, whether made

by its lawmakers or by those whose edicts or acts may fairly be said to represent

official policy, inflict[ed] the [constitutional] injury."  *Monell*, 436 U.S. at 694.  A

"practice or custom means any permanent, widespread, well-settled practice or custom that constitutes a standard operating procedure of the defendant." *Hunter v. Cnty. of Sacramento*, 652 F.3d 1225, 1229 (9th Cir. 2011). The existence of such a standard operating procedure may be proven by evidence of an official policy, or by "evidence of repeated constitutional violations for which the errant municipal officials were not discharged or reprimanded." *Gillette v. Delmore*, 979 F.2d 1342, 1349 (9th Cir. 1992). "Proof of random acts or isolated events is insufficient to establish custom." *Navarro v. Block*, 72 F.3d 712, 714 (9th Cir. 1995).

Pasene makes one slight attempt to provide facts in support of this theory. He states, "The unconstitutional customs, policies, patterns, and practices of the City and County of Honolulu have caused numerous individuals to be wrongfully convicted in addition to Mr. Pasene . . . includ[ing] Joshua Spriesterbach [and] Alvin Jardine." Complaint ¶ 97. This is not enough. Pasene has provided no facts about these cases such that the Court may reasonably infer that they show any "permanent, widespread, well-settled practice or custom." Nor has Pasene alleged facts showing that those cases present a pattern that is even relevant here—for example, by involving the same alleged constitutional violations or individuals. Pasene provides no information about which departments were involved in those

cases, the nature of the cases, or how the cases were terminated.  Thus, Pasene has

failed to state a claim of unconstitutional policy or custom.

      B.    <u>Failure to Train</u>

A local government violates *Monell* if it "fail[s] to train employees in a

manner that amounts to 'deliberate indifference' to a constitutional right, such that

'the need for more or different training is so obvious, and the inadequacy so likely

to result in the violation of constitutional rights, that the policymakers of the city

can reasonably be said to have been deliberately indifferent to the need.'"

*Rodriguez v. Cnty. of L.A.*, 891 F.3d 776, 802 (9th Cir. 2018) (quoting *City of*

*Canton v. Harris*, 489 U.S. 378, 390 (1989).  Municipal liability may only be

imposed when the failure to train reflects a "deliberate or conscious choice."  *City*

*of Canton*, 489 U.S. at 389.

Given these principles, a plaintiff seeking to impose municipal liability for

failure to train must show: "(1) an inadequate training program, (2) deliberate

indifference on the part of the [municipality] in adequately training its law

enforcement officers, and (3) [that] the inadequate training actually caused a

deprivation of [the plaintiff's] constitutional rights."  *Merritt v. Cnty. of L.A.*, 875

F.2d 765, 770 (9th Cir. 1989).  Failure to train may be shown through a "pattern of

tortious conduct by inadequately trained employees" or "a failure to equip law

enforcement officers with specific tools to handle recurring situations." *Bd. of Cnty. Comm'rs of Bryan Cnty., Okla. v. Brown*, 520 U.S. 397, 407–09 (1997).

Here, again, Pasene has alleged no facts tending to show a failure to train employees of the City and County of Honolulu.  He offers no facts pointing to a particular inadequate training program, a pattern of tortious conduct (aside from his own isolated case), or a failure to equip officers with the tools and training they need in *recurring* situations.  Pasene has stated that two other people were wrongfully convicted, but, as described above, he has provided no supporting facts showing that the cases were handled by the same "inadequately trained employees" or that the situations were somehow "recurring."  Thus, Pasene has failed to state a claim of failure to train.

C.    Ratification

Finally, a local government violates *Monell* if "an official with final policy-making authority . . . ratifie[s] a subordinate's unconstitutional decision or action." *Gravelet-Blondin v. Shelton*, 728 F.3d 1086, 1097 (9th Cir. 2013).  Such ratification requires an "express[] approv[al]" or adoption of the subordinate's acts. *Trevino v. Gates*, 99 F.3d 911, 920 (9th Cir. 1996).  The policymaker's decision must be a "conscious, affirmative choice," *Gillette*, 979 F.2d at 1347, "tantamount to the announcement or confirmation of a policy."  *Haugen v. Brosseau*, 339 F.3d 857, 875 (9th Cir. 2003), *rev'd on other grounds* by *Brosseau v. Haugen*, 543 U.S.

194 (2004) (per curiam).  Thus, it requires proof of the policymaker's "knowledge of the alleged constitutional violation."  *Christie v. Iopa*, 176 F.3d 1231, 1239 (9th Cir. 1999).   A mere failure "to overrule the unconstitutional discretionary acts of subordinates[,]" without expressly endorsing or approving of the conduct, is insufficient.  *Gillette*, 679 F.2d at 1348.

Although the Chief of Police may be considered a final policymaker in some circumstances, Pasene has not specifically stated that Correa is the final policymaker at issue under this theory.  Nor has he made factual allegations that would permit the reasonable inference that Correa (or any other final policymaker) made any conscious, affirmative choice to ratify any conduct.  In fact, there is no allegation that any policymaker was *aware* of any of the alleged conduct.  Further, precisely what conduct the unnamed policymaker approved, along with how and when they did so, how much they knew when deciding to do so, and for what purposes, appears nowhere in the Complaint.  Given the absence of specific factual allegations, the Court is unable to reasonably infer that any policymaker deliberately chose to endorse any unconstitutional conduct.

In sum, Pasene has failed to state a claim under any of the three *Monell* theories, and the claims against the City and County of Honolulu are thus DISMISSED WITHOUT PREJUDICE with leave to amend.

IV.    **All claims against the individual Defendants in their official capacities are dismissed as redundant.**

"An official capacity suit against a municipal officer is equivalent to a suit against the entity." *Ctr. for Bio-Ethical Reform, Inc. v. L.A. Cnty. Sheriff Dep't*, 533 F.3d 780, 799 (9th Cir. 2008) (citing *Kentucky v. Graham*, 473 U.S. 159, 165–66 (1985)).  Therefore, when a plaintiff names both a local government entity and a municipal officer in his official capacity, "the court may dismiss the officer as a redundant defendant." *Id.*; *see also Larkin v. Kenison*, 475 F. Supp. 3d 1124, 1149 (D. Haw. 2020) (collecting District of Hawaiʻi cases that have dismissed official-capacity claims as redundant of municipality claims and explaining that "[t]here is no longer a need to bring official-capacity actions against local government officials, for under *Monell*, [] local government units can be sued directly for damages . . . ." (quoting *Kentucky v. Graham*, 473 U.S. at 167 n.14 (1985))), *rev'd on other grounds*, 2022 WL 1769791 (9th Cir. 2022).

Here, because Pasene has already named the City and County of Honolulu, his claims against the local government officer Defendants in their official capacities are redundant and are DISMISSED WITH PREJUDICE.

## CONCLUSION

Defendants' motions to dismiss, Dkt. Nos. 40, 46, are GRANTED, as follows:

- Counts 1, 2, 4, and 5 are DISMISSED WITHOUT PREJUDICE for failure to allege individual conduct.

- Count 1's *Horton* and *Devereaux* claims and Counts 2, 4, and 5 are *additionally* DISMISSED WITHOUT PREJUDICE for failure to state a claim.

- Count 3 is DISMISSED WITH PREJUDICE because it alleges the violation of a right that has not been clearly established.

- Count 6 is DISMISSED WITHOUT PREJUDICE for failure to state a claim.

- All claims against the individual Defendants in their official capacities are DISMISSED WITH PREJUDICE because they are redundant.

- To the extent Pasene also intended to assert First, Fifth, and Eighth Amendment claims, and any Hawai'i state law claims, they are DISMISSED WITHOUT PREJUDICE for failure to assert any factual allegations relevant to these claims.

For all claims that are dismissed without prejudice, Pasene is granted LEAVE TO

AMEND in order to cure the defects explained herein.[31]

---

[31]Defendants additionally argue that Pasene's Complaint is time-barred.  Dkt. Nos. 40-1 at 16–17; 46-1 at 14–15.  In Hawai'i, there is a two-year statute of limitations for most Section 1983 claims.  *See Pele Def. Fund v. Party*, 837 P.2d 1247, 1259 (Haw. 1992); *see also* Haw. Rev. Stat. § 657-7 (2020).  In general, if a claim is brought pursuant to a prosecution, the two-year clock begins when the prosecution ends in a manner favorable to the plaintiff.  *See McDonough v. Smith*, 139 S. Ct. 2149, 2156–58 (2019) (citing *Heck v. Humphrey*, 512 U.S. 477, 484–85 (1994)).  This is so because of the "pragmatic concerns with avoiding parallel criminal and civil litigation over the same subject matter and the related possibility of conflicting civil and criminal judgments."  *Id.* at 2157.  Here, although the Supreme Court vacated Pasene's conviction on April 22, 2019, the case against him was not dismissed until November 5, 2019.  *See* Complaint ¶¶ 4, 61.  In fact, Pasene remained in custody until November 6, 2019.  *See id.*  Pasene's complaint was filed on October 29, 2021, less than two years after the charges against him were dropped.  Thus, his claims are not barred by the statute of limitations.

Pasene may have until **September 23, 2022** to file an amended complaint. The Court cautions Pasene that failure to file an amended complaint by September 23, 2022 will result in the automatic dismissal of this action without prejudice and without further notice.  The Court also advises that any amended complaint Pasene submits must stand alone.  That is, he may not rely on or incorporate his previous Complaint; he must, instead, re-assert any previous allegations and claims in a single, new, comprehensive filing.  To be clear, upon the filing of any amended complaint, the original Complaint will be treated as if it does not exist for purposes of this litigation.

The Clerk is directed to mail Pasene a copy of form "Pro Se 1, Complaint for a Civil Case."

IT IS SO ORDERED.

DATED: September 2, 2022 at Honolulu, Hawaiʻi.



Derrick K. Watson
United States District Judge

_Iosefa Pasene v. Boisse Correa, et al._; Civil No. 21-00427 DKW-KJM; **ORDER GRANTING DEFENDANTS' MOTIONS TO DISMISS WITH PARTIAL LEAVE TO AMEND**