IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAIʻI

| | |
|---|---|
| IOSEFA PASENE,<br><br>　　　　Plaintiff,<br><br>　vs.<br><br>BOISSE CORREA, Honolulu Police Chief, other, BOSSIE CORREA; GREGORY MCCORMICK, Honolulu Police Detective; THEODORE COONS, Honolulu Police Detective; ALBERT LE, Honolulu Police Officer; DANIEL SELLERS, Honolulu Police Officer; OFFICER JOHN DOE, Honolulu Police Officer/Dispatcher; and CITY AND COUNTY OF HONOLULU,<br><br>　　　　Defendants. | Case No. 21-cv-00427-DKW-KJM<br><br>**ORDER (1) GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTIONS TO DISMISS; AND (2) DIRECTING APPOINTMENT OF COUNSEL FOR PLAINTIFF** |

In his First Amended Complaint ("FAC"), Dkt. No. 70, Plaintiff Iosefa Pasene, proceeding *pro se*, alleges various civil rights claims against the City and County of Honolulu ("City") and several Honolulu Police Department ("HPD") officers, all stemming from his lengthy incarceration that ended with his November 2019 release following a vacatur of his criminal conviction and a dismissal of his indictment. Before the Court are Defendants City, Correa, and Coons' motions to

1

dismiss.   Dkt. Nos. 77, 78 ("MTDs").   The MTDs are GRANTED IN PART and DENIED IN PART, as explained below.

## LEGAL STANDARD

Federal Rule of Civil Procedure 12(b)(6) authorizes a Court to dismiss a complaint that fails "to state a claim upon which relief can be granted."  Rule 12(b)(6) is read in conjunction with Rule 8(a), which requires "a short and plain statement of the claim showing that the pleader is entitled to relief."  Fed. R. Civ. P. 8(a)(2).  "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).

"A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Id*. (citing *Twombly*, 550 U.S. at 556).  Factual allegations that only permit the court to infer "the mere possibility of misconduct" are insufficient.  *Id*. at 679.  Moreover, "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice."  *Id.* at 678 (citing *Twombly*, 550 U.S. at 555) (explaining that "legal conclusions" are not accepted as true).

# RELEVANT FACTUAL ALLEGATIONS AND PROCEDURAL HISTORY[1]

## I.   Pasene's Murder Conviction

In the early morning hours of March 28, 2009, three men—Iosefa Pasene, Cedro Muña, and Antonius Toloai—were released from police custody following an arrest on an unidentified criminal charge.  *State v. Pasene*, 439 P.3d 864, 871 (Haw. 2019).[2]  At the time of their release, Pasene and Muña were dressed alike and had similar physical characteristics.[3]  *Id.*

Later that morning, around 4:15 a.m., a man named Joseph Peneueta was killed in Honolulu's Chinatown.  *Id.*; FAC ¶ 18.  Peneueta and several others were gathered on a sidewalk when two men in a blue Buick sedan stopped, exited their vehicle, and shot Peneueta several times, killing him.  *Pasene*, 439 P.3d at 871.  Soon after, the Buick was reported burning near Wahiawa.  *Id.*

On March 30, 2009, Pasene was arrested for Peneueta's murder.  FAC ¶ 43.  Pasene was later indicted by a grand jury and charged with second degree murder.  *Pasene*, 439 P.3d at 871.  He was tried three times.  The first and second trials

---

[1]Many of the facts in this section have been repeated from the Court's prior order granting Defendants' first motions to dismiss, Dkt. No. 64 ("September 2022 Order"), in order to provide one inclusive, coherent summary without the need to cross-reference.

[2]The Court takes judicial notice of publicly filed and available court documents that cannot be and have not been reasonably questioned.  *See* Fed. R. Evid. 201(b).

[3]Specifically, both Pasene and Muña wore plain white t-shirts and had short mustaches and long hair.  *Pasene*, 439 P.3d at 871 n.2.  Pasene was described as a 21-year-old Samoan male with black hair and brown eyes, standing 6'2" tall and weighing 250 pounds.  *Id.*  Muña was described as a 22-year-old Samoan male with black hair and brown eyes, standing 6'1" tall and weighing 240 pounds.  *Id.*

resulted in hung juries.  The third trial, however, resulted in Pasene's conviction. *Id.*

During the third trial,[4] the State presented testimony from several eyewitnesses who identified Pasene as the Buick's driver and Peneueta's shooter. *Id.* at 873; FAC ¶¶ 20–26, 52, 52a–k.  The State also presented testimony from Muña that he had traveled to Chinatown with Pasene and Toloai after their release from police custody the morning of the shooting.  *Pasene*, 439 P.3d at 879.  Muña testified that he witnessed Pasene and Peneueta arguing outside a liquor store and witnessed Pasene threaten another man with a gun.  *Id.*  Muña further testified that he was boarding a cab to leave the area when he saw Pasene drive by in a blue Buick and then heard several gunshots.  *Id.*

Muña admitted at trial that his testimony was inconsistent with a statement he gave to detectives on the day of the murder that did not mention Pasene except to say that the men had traveled to Chinatown together.  *Id.*; FAC ¶¶ 31–36.  He further admitted that he only changed his account of that day about four years later, in February 2013, after he was arrested for skipping bail and fleeing to a different state, *Pasene*, 439 P.3d at 879; FAC ¶¶ 32, 37, at which point he remembered additional details and agreed to testify against Pasene.  More specifically, Muña

---

[4]The following is only a partial summary of the evidence presented at trial.

testified at Pasene's second and third trials on August 23, 2013 and March 10, 2014, respectively. *Pasene*, 439 P.3d at 879.

Pasene's principal defense theory at trial was mistaken identity, arguing that the killer could have been Muña. *Id.* at 873. Pasene presented testimony from Linda Del Rio, a bail bond agent familiar with Pasene, Muña, and Toloai who had posted bonds for the three men on the morning of March 28, 2009. *Id.* at 879. Del Rio testified that Muña owned a blue four-door sedan, which he had used as collateral on a previous occasion and had tried to use as collateral on the day of the shooting. *Id.* She also testified that Muña called her between 10:30 and 11:00 a.m. that day to tell her he "was in Wahiawa" and "had done something and needed to . . . turn himself in," confessing, "Aunty, I shot someone." *Id.*

The State's rebuttal theory was that Muña could not have been the killer because, according to Detectives McCormick and Coons, footage from Chinatown surveillance videos "showed Muña getting into [a] taxi cab" at the time of the shooting. *Id.* at 876. The detectives claimed they reviewed this footage after the killing but, for an unknown reason, did not retain it. *Id.*

Because this footage was not available to the defense, a question arose during trial as to whether and to what extent the State could ask the detectives what the footage contained. *Id.* at 876–77, 882. The trial judge ruled that the State could solicit testimony from the detectives that, "based upon what [they] viewed in

the video, . . . essentially Mr. Muña was cleared." *Id.* at 877.  But the trial judge

forbade the State from referencing any specific footage content. *Id.* Accordingly,

the State presented the detectives' testimony that they interviewed Muña after the

killing but ruled him out as a suspect after reviewing the video footage. *Id.*

("Detective McCormick testified that although he viewed the Chinatown

surveillance footage in the course of his investigation, it was 'not recoverable.'");

*State v. Pasene*, 420 P.3d 988 at *7 (Haw. Ct. App. 2018) ("Detective Coons

reviewed video from surveillance cameras in the Chinatown area . . . [and] testified

that his review of the Chinatown video was one of the aspects that led the police to

rule out Muña as a suspect.").  Additionally, and against the trial court's explicit

and repeated warnings, the State told the jury in opening statement and closing

argument that the footage showed Muña departing the area in which Penueuta was

murdered in a cab. *See, e.g.*, *Pasene*, 439 P.3d at 874, 880–81.

Having been found guilty of second degree murder during his third trial,

Pasene was sentenced to life imprisonment with the possibility of parole. *Id.* at

882–83.

## II.   Pasene's Motions for a Mistrial on the Basis of Prosecutorial Misconduct

Throughout Pasene's third trial, the trial judge frequently admonished the

Deputy Prosecuting Attorney (DPA) for flagrantly and/or intentionally flouting the

court's instructions.  For example, the DPA repeatedly ignored the trial judge's

direction to refrain from engaging in improper argument during opening statement. *Id.* at 874.  The judge sustained six defense objections on that basis, warning the DPA, "I've sustained many appropriate objections raised at this point.  You know what argument is. You are engaging in argument.  Do not do that." *Id.*

The DPA also made multiple impermissible references to the Chinatown video content while addressing the jury.  In his opening statement, the DPA said that Detectives McCormick and Coons eliminated Muña as a suspect because "the Chinatown cameras were able to capture Mr. Muña getting into the taxi." *Id.* Upon defense objection, the judge admonished the DPA at the bench:

> [G]iven the number of objections that have been sustained thus far, you know, one would question whether or not this is just inadvertent or you are blatantly disregarding the Court's . . . rulings about the limitations of opening statement. . . .  [C]ertainly a conclusion could be drawn, that could be reasonable based upon the number of those instances, to question whether or not that is, in fact, inadvertent or if you are doing it purposefully.  I certainly hope it's not the latter, . . . [b]ut I ask you to try to be careful.  Because this is the third trial.  We want to make sure that everybody has a fair opportunity to be heard.

*Id.*  The judge, however, did not issue a curative instruction to the jury. *Id.*

At the conclusion of the State's opening statement, Pasene moved for a mistrial.  The judge denied the motion, but again warned the DPA:

> [T]he sum total of the repeated references or arguments that you made during your opening really . . . causes me to seriously question whether or not it is intentional or it is purely inadvertent.  I don't care, to be quite frank about it.  Both sides are entitled to a fair trial. . . . I'm putting you clearly on notice . . .  [W]e're in a third trial . . . [and] we want to make sure that everything is done as appropriately and

> properly as possibly can be. . . .   Mr. Pasene deserves a fair trial. . . .
> And playing fast and loose with . . . the rules or conventions of court
> really is not going to serve you well if you choose to do that. . . .
> [G]oing forward I will full well expect you to conduct yourself . . .
> without the need to inject improper statements, comments, or what
> have you.

*Id.*

Undeterred, in closing argument, the DPA again referred to the specific

footage content excluded by the judge, saying the detectives "went to the

Chinatown station and they looked at the camera, and they saw a person that

looked like Cedro Muña." *Id.* at 880–81.  That resulted in the court again

sustaining defense counsel's objection and again admonishing the DPA at the

bench:

> [T]here was absolutely no evidence with respect to what was seen on
> the video.  And your statement during closing argument . . . is
> injecting information that was never provided to this jury. . . .  You
> have to confine your arguments to the evidence that's been
> adduced. . . .  And, you know, at this point, I've told you ad nauseam
> that you have to confine your arguments and questioning during this
> case to what's appropriate.  And for whatever reason, you're either
> incapable of doing that or you refuse.  I'm not sure what it is, but
> there's no excuse for it.

*Id.* at 881.  Defense counsel again moved for mistrial on the basis of the

prosecutor's conduct.  *Id.*  The judge denied the motion, but instructed the jury:

> You are specifically instructed to completely disregard in its entirety
> the last statement made by the [DPA] with respect to what may or
> may not have been observed by law enforcement utilizing the
> Chinatown surveillance system as to Mr. Muña or anything else for

that matter.  And so you are not to consider it in any way, shape, or form in your deliberations.

*Pasene*, 420 P.3d 988 at *19.

Following the conclusion of the State's rebuttal closing argument, Pasene renewed his motion for a mistrial.  *Pasene*, 439 P.3d at 882.  The trial court again denied the motion, but stated:

> [I]t is clear that there has been . . . a pattern of conduct in this particular case that does one of two things.  It either implicates a knowing disregard of the rules of court and evidence and ethical considerations, or it certainly suggests a pattern of not complying with those. . . .  [I]t certainly at a bare minimum would suggest a lack of either understanding or an unwillingness or an inability to follow certain rules and conventions that attend trial. . . .  [B]ased upon what I've seen, I think there's at least at a bare minimum a suggestion that your facility with either the rules or what is expected of your conduct as a trial prosecutor is certainly lacking in some regard.

*Id.*

After the guilty verdict, Pasene timely filed a post-trial motion for a mistrial or a new trial, alleging that prosecutorial misconduct prejudiced his right to a fair trial.  *Id.*  The trial court denied the motion for the fourth time, this time stating, "[T]his Court finds and concludes that the State's conduct was not improper, and therefore has not risen to the level of misconduct warranting the granting of Pasene's motion."  *Id.* at 883.

The Intermediate Court of Appeals affirmed, characterizing some of the DPA's conduct as improper but concluding that "the DPA's alleged acts of

misconduct did not deny Pasene a fair trial and did not warrant vacating his convictions." *Pasene*, 420 P.3d 988 at *1, *20; *Pasene*, 439 P.3d at 883.

## III.   The Hawai'i Supreme Court's Reversal of Pasene's Conviction

On April 22, 2019, the Hawai'i Supreme Court overturned Pasene's conviction, holding that the trial court abused its discretion in denying Pasene's motion for a mistrial. *Pasene*, 439 P.3d at 883; FAC ¶¶ 4, 58. In doing so, the court found:

> [T]he record in the instant case is replete with examples of the DPA's persistent failure—whether willful or inadvertent—to abide by the circuit court's instructions, our case law and rules regarding the ethical responsibilities of the prosecutor, and the American Bar Association's Criminal Justice Standards for the Prosecution. The DPA's improper statements pervaded every phase of trial, prompting defense counsel to object repeatedly. Some of these statements were particularly prejudicial, as they injected facts not in evidence that directly contradicted Pasene's core theory of the case, or served to denigrate fundamental constitutional protections guaranteed to criminal defendants.

*Pasene*, 439 P.3d at 890 (citation omitted).[5] The court concluded:

> Although each instance of the DPA's improper conduct, when examined in isolation, may not rise to the level of misconduct warranting the vacation of Pasene's convictions, . . . the cumulative effect of the DPA's improper conduct was so prejudicial as to deprive Pasene of a fair trial.

---

[5]This Order notes only some of the instances of prosecutorial misconduct cited by the Hawai'i Supreme Court—those most relevant to Pasene's FAC and the instant MTDs.

*Id.* at 891.  Finally, the court held that the prosecutor's misconduct was not harmless beyond a reasonable doubt, especially in light of the prior two mistrials in which the juries could not reach unanimous verdicts.  *Id.* at 896.

The court vacated Pasene's convictions and remanded his case to the circuit court for further proceedings.  *Id.* at 896–97.  Thereafter, on November 5, 2019, the Honolulu First Circuit Court dismissed the case against Pasene with prejudice. FAC ¶¶ 4, 58.  Pasene was released from custody on November 6, 2019.  *Id.* ¶¶ 4, 43, 58.

## IV.   Pasene's First Complaint

On October 29, 2021, Pasene filed a Complaint[6] against the City and the individual police detectives and officers who handled his case—former HPD Chief Boisse Correa, HPD Detectives Gregory McCormick and Theodore Coons, and HPD Officers Albert Le, Daniel Sellers, and John/Jane Doe—alleging that "Defendants' unlawful, intentional, willful, deliberately indifferent, reckless, and/or bad-faith acts and omissions caused [him] to be falsely arrested, tried, wrongfully convicted, and incarcerated for over ten and a half years for a crime he did not commit."  Complaint ¶ 41, Dkt. No. 1.  In particular, Pasene alleged the following counts pursuant to 42 U.S.C. § 1983[7]:

---

[6]Pasene also filed an application to proceed *in forma pauperis*, which this Court granted on November 30, 2021.  *See* Dkt. No. 9.

[7]To establish a Section 1983 claim, a plaintiff must plead that "(1) the defendants acting under color of state law (2) deprived plaintiff[] of rights secured by the Constitution or federal

**Count 1:** Deprivation of liberty without due process of law in violation of the Fourteenth Amendment against all individual Defendants, including claims under:
   a. *Neil v. Biggers*, 409 U.S. 188 (1972)
   b. *Horton v. Mayle*, 408 F.3d 750 (9th Cir. 2005), and
   c. *Devereaux v. Abbey*, 263 F.3d 1070 (9th Cir. 2001);

**Count 2:** Malicious prosecution in violation of the Fourth Amendment against all individual Defendants;

**Count 3:** Civil rights conspiracy against all individual Defendants;

**Count 4:** Failure to disclose highly significant exculpatory information in violation of *Tatum v. Moody*, 768 F.3d 806 (9th Cir. 2014), against all individual Defendants;

**Count 5:** Supervisory liability against all individual Defendants; and

**Count 6:** Failure to train, supervise, and/or discipline in constitutionally adequate investigation techniques, identification procedures, and/or *Brady* duties in violation of *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658 (1978), against the City.

Complaint ¶¶ 2, 7, 47–92.  Counts 1–5 were asserted against the individual

Defendants in both their official and individual capacities.  *Id.* at 2–3.  Elsewhere

in his Complaint, not enumerated in counts, Pasene also conclusorily stated that

"Defendants' actions deprived [him] of his civil rights under the First, Fourth,

Fifth, Eighth, and Fourteenth Amendments to the United States Constitution and

---

statutes." *Williams v. California*, 764 F.3d 1002, 1009 (9th Cir. 2014) (quoting *Gibson v. United States*, 781 F.2d 1334, 1338 (9th Cir. 1986)).  As stated in the September 2022 Order, all of Pasene's Section 1983 claims meet this standard because they allege violations of constitutional or federal rights by persons acting under color of state law.  Dkt. No. 64 at 16 n.12.

laws of the state of Hawai'i." *Id.* ¶ 39.  Pasene made no specific allegations,

however, regarding the First, Fifth, or Eighth Amendment or any state law.

On April 11, 2022, the City filed a motion to dismiss Pasene's Complaint for

failure to state a claim upon which relief may be granted.  Dkt. No. 40.  On May 6,

2022, Correa and Coons jointly filed a motion to dismiss on the same grounds.

Dkt. No. 46.  Although Pasene did not oppose either motion, the moving

Defendants replied on June 24, 2022.  Dkt. No. 51.

On September 2, 2022, the Court issued an Order ("September 2022 Order")

granting the moving Defendants' motions to dismiss with partial leave to amend.

Dkt. No. 64 at 43–44.  Counts 1, 2, 4, and 5 were dismissed without prejudice for

engaging in "group pleading"—failing to allege individualized conduct.  *Id.*

Counts 1b (*Horton*), 1c (*Devereaux*), 2, 4, 5, and 6 were also dismissed without

prejudice for failure to state a claim.  *Id.*  Count 3 was dismissed with prejudice

because it alleged the violation of a right that has not been clearly established.  *Id.*

All claims against the individual Defendants in their official capacities were

dismissed with prejudice as redundant.  *Id.*  Finally, to the extent Pasene intended

to assert First, Fifth, and/or Eighth Amendment claims, and any Hawai'i state law

claims, those were dismissed without prejudice for failure to assert any factual allegations relevant to those claims. *Id.*[8]

Pasene was granted until September 23, 2022 to file an amended complaint for any claims dismissed without prejudice. *Id.* at 44–45. On September 15, 2022, Pasene moved for additional time. *See* Dkt. No. 66. That request was granted, extending the amendment deadline to October 14, 2022. Dkt. No. 67.

## V.   Pasene's FAC

On October 12, 2022, Pasene filed the FAC, Dkt. No. 70, re-asserting all of his prior-alleged counts[9] and adding factual allegations in attempt to cure the deficiencies described in the September 2022 Order. As explained in the September 2022 Order, Count 3 is DISMISSED WITH PREJUDICE because intradepartmental conspiracy liability is not a "clearly established" Section 1983 right, and, thus, the moving Defendants are entitled to qualified immunity on that claim. Dkt. No. 64 at 31–33. With regard to each remaining Count, the FAC alleges the following:

---

[8]The September 2022 Order did not apply to the non-moving Defendants McCormick, Le, or Sellers. Dkt. No. 64 at 2 n.1. At that time, Defendants McCormick and Le had not been served, and Sellers had not responded to the Complaint. *Id.*

[9]Counts 1–5 are asserted against the individual Defendants in their individual capacities. As stated in the September 2022 Order, to the extent these claims are asserted against the individual Defendants in their official capacities, those have been dismissed with prejudice as redundant. *See* Dkt. No. 64 at 46. Pasene also attempts to re-assert his unelaborated First, Fifth, and Eighth Amendment claims and Hawai'i state law claims. FAC ¶ 42. As noted in the September 2022 Order, Dkt. No. 64 at 17 n.13, those claims may only be pursued by offering a "short and plain statement," including facts, that satisfies Fed. R. Civ. P. 8 and 12.

## A.    Count 1a: Unnecessarily Suggestive Identification Procedures[10]

At the outset of the Peneueta homicide investigation, Muña, Pasene, and

Toloai were considered suspects.  *Pasene*, 420 P.3d 988 at *6.  Pasene alleges that

certain evidence strongly implicated Muña.  For example:

- Muña was in the Chinatown area at the time of the shooting and, in the moments immediately following the shooting, he hurriedly boarded a cab at a nearby intersection.  FAC ¶¶ 36–37.

- Muña engaged in odd behavior by directing the cab to the "Plaza hotel," but then, after the cab arrived, had to redirect the cab to a different hotel because he had "forgot[ten] that he wasn't a registered guest" at the "Plaza."  *Id.* ¶ 52f.

- Shortly after the shooting, Officer Le approached a crowd of witnesses at Queen's Medical Center, where Peneueta had been transported, and asked if the shooter was "Cedro," whereupon one witness answered, "Yes it was." *Id.* ¶¶ 29, 53e, 58a, 59a.

- A bail bond agent, Linda Del Rio, who was familiar with both Pasene and Muña, informed Detectives McCormick and Coons that, on the morning of the murder, Muña had attempted to put a blue Buick up as collateral for his bail bond, matching the description of the vehicle driven by Peneueta's killers.  *Id.* ¶¶ 53b, 59d.[11]

- Del Rio also told the officers that Muña had called her between 10:30 and 11:00 a.m. on the day of the shooting to tell her he "was in Wahiawa," and "had done something and needed to . . . turn himself in," confessing, "Aunty, I shot someone."  *Id.*; *Pasene*, 439 P.3d at 879.  Shortly after the shooting,

---

[10]Count 1 asserts a generalized claim that Defendants violated Pasene's right to due process of law by depriving him of a fair trial.  *See* FAC ¶¶ 50–57; U.S. Const. amend. XIV ("No person shall be deprived of life, liberty, or property without due process of law.").  Under this heading, Pasene makes three separate claims, discussed here as Counts 1a, 1b, and 1c.  Separately, in Count 4, Pasene asserts a fourth due process violation for failure to disclose exculpatory evidence under *Tatum v. Moody*, 768 F.3d 806 (9th Cir. 2014).

[11]Pasene also alleges that Muña was the registered owner of the blue Buick at some point in time, at least as recently as January 2009.  FAC ¶¶ 39, 52f.

the Buick involved in the shooting was reported burning near Wahiawa. *Ibid.* at 871.  McCormick and Coons failed to obtain a written statement from Del Rio, telling her they would document her statement and then never doing so.  FAC ¶¶ 53b, 59d.[12]

- A person named Malo Sooalo, who was or is Muña's cousin, "was in a physical altercation with [Peneueta] the night of the shooting," apparently providing Muña with motive.  *Id.* ¶ 41.

Pasene alleges that, in the face of this evidence, Defendants McCormick and Coons, the lead homicide detectives in charge of the Peneueta investigation, knowingly or recklessly used impermissibly suggestive tactics to obtain false identifications of Pasene as the shooter from six eyewitnesses—Gabriel Sakaria, Richard Tagataese, Ropati Daniel Saleimoa-Kekau, Cherie-Ann Ramos, Iakopo Samuelu, and Muña.  Pasene alleges that he is innocent of the homicide and that the sole evidence incriminating him came from these misidentifications. FAC ¶¶ 1, 3.  More specifically, Pasene alleges that between March and May 2009, McCormick and Coons interviewed the first five of these eyewitnesses.  *Id.* ¶¶ 26, 30, 52, 52a–e, 52h–k.  In separate interviews, McCormick and Coons jointly showed each of these witnesses a single photo of Pasene, after which each witness identified Pasene as the shooter.  *Pasene*, 420 P.3d 988 at *6–7; FAC ¶¶ 26, 52, 52a–e, 52h–k.  Although the identifications were not recorded, Pasene asserts that these Officer Defendants first showed each witness the single photo "off the

---

[12]Del Rio testified accordingly during the third trial.  *Pasene*, 439 P.3d at 879.

16

record" and prior to their official interviews. *Id.* At least some of these five witnesses were not familiar with Pasene prior to being shown the photo. Pasene claims the Defendants "pressured" these five witnesses to identify Pasene. FAC ¶ 52b; *e.g.*, *ibid.* ¶ 52e ("[Sakaria testified] he was shown [] Pasene photo and who to pick out.").

Four years later, the officers obtained an eyewitness identification of Pasene from Muña. During his prior statement immediately after the shooting, Muña had in no way implicated Pasene in the shooting. However, in the wake of Pasene's first mistrial, and upon being promised leniency regarding a separate unrelated criminal charge, Muña suddenly changed his story and agreed to point the finger at Pasene. *Id.* ¶ 52f (explaining how the Defendants pressured Muña into implicating Pasene); *ibid.* ¶ 37 (alleging that Muña later confessed to Pasene's mother and sister that he had been "coerced" by McCormick and Coons to "lie" and "blame Iosefa Pasene and [Pasene's cousin] Zorro Rye as the shooters").

Pasene also contends that all six eyewitness identifications were tenuous for other reasons. With regard to the first five witnesses, he claims "25 people on the street at the time of the shooting [] fled when suspects pulled up with firearms," indicating a chaotic scene. *Id.* ¶ 20. Sakaria and/or Tagataese testified that:

- "they ran and hid inside of a building underground parking lot once the passenger suspect got out of the car with a gun," *id.*;

- "they ran before the first shot was fired and that their main focus was on the passenger suspect, not the driver who they later claimed was Mr. Pasene," *id.* ¶ 21;

- "the incident happened real fast and that they were scared and focused on getting away and not getting shot," *id.* ¶ 22;

- "at the time of the shooting they did not know Mr. Pasene and that they just found out his name that day, 03/28/09," *id.* ¶ 23;

- "Peneueta was shot while he was laying on his back facing upwards and that he was shot on his front body, which is a false statement because medical examiner Kathy De Alwin testified that the victim had all shots to his back and the evidence shows [*sic*]," *id.* ¶ 24;

- "the driver suspect was still around the driver side of the car with a car in between him and the driver when he ran," *id.* ¶ 52d;

- "he didn't see suspects get back in [the] car and leave," *id.* ¶ 52e;

- "that he didn't know what the driver suspect was wearing, [and] he didn't know the color of the suspect's car," *id.* ¶¶ 52d–e; and

- "they drove together to the main police station and on the way there talked about the shooting in the car and in the waiting room waiting to be interviewed."

*Id.* ¶ 25. Pasene also alleges that:

- Saleimoa-Kekau told an inconsistent story, maintained a close friendship with Muña, and received lenience on criminal charges for testifying for the State. *Id.* ¶ 52h (alleging that Saleimoa-Kekau "talk[ed] to Cedro after the shooting, Cedro called him and told him he's being blamed as the shooter," and "Cedro [] told him don't say nothing about the shooting");

- Ramos was high on meth during the shooting incident, was influenced by her friendship with Peneueta's sister Lorena and the fact that she is related to Tagataese, lied to her parole officer, and was persuaded to

18

testify against Pasene in exchange for help obtaining parole. *Id.* ¶ 52j (alleging that her meth usage made Ramos an unreliable witness—for example, at the first trial, the prosecutor asked Ramos to point out Pasene and she pointed out Zorro Rye instead); *ibid.* (alleging that Ramos refused to testify the first seven times she was asked to do so);

- Saleimoa-Kekau said that Ramos was not at the shooting, *id.*; and

- Samuelu did not have a clear view of the shooters and, thus, gave no initial statement. Then, after discovering from outside sources that the prosecution was targeting Pasene, he gave a delayed statement implicating Pasene because he knew that testifying in the State's favor could help him gain parole for his own criminal charges. *Id.* ¶ 52k.

Pasene alleges that Muña's testimony was equally shaky. First and foremost, Muña was himself an initial suspect in the homicide. *Id.* at ¶ 52f. Moreover, Muña's story changed drastically over the years. Muña provided a first statement to the HPD on March 28, 2009, in which his only mention of Pasene was to say that the men had traveled to Chinatown together. *Id.* ¶¶ 31–36; *Pasene*, 439 P.3d at 879. Four years later—and, importantly, after Muña had been arrested and extradited to Hawai'i on unrelated criminal charges and pursuant to a leniency deal on those charges—Muña provided a second statement in which he said he saw Pasene threaten Saleimoa-Kekau with a gun right before the shooting and also saw Pasene driving by himself in the blue Buick right before the shooting. FAC ¶¶ 33–37, 52f, 53a, 59e. Muña then gave a third inconsistent statement, in which he said for the first time that another person, Pasene's cousin Zorro Rye, was with Pasene when he threatened Saleimoa-Kekau with a gun and drove by in the Buick. *Id.*

### B.   <u>Count 1b: Failure to Disclose Muña's Leniency Deal</u>

Pasene alleges that Defendants McCormick and Coons knowingly or recklessly failed to disclose to the prosecutor and/or defense prior to the second and/or third trials that Muña testified against Pasene pursuant to a formal or informal leniency deal between Muña and the police officers.  In particular, Pasene alleges:

- Muña's first statement in 2009 did not implicate Pasene in the murder.  FAC ¶¶ 32, 52f.

- In February 2013, Muña was arrested on a warrant for criminal charges unrelated to the Peneueta murder and was extradited to Hawaiʻi.  *Id.* ¶¶ 32, 37, 52f.

- After his arrest and extradition, Muña changed his story and made a second and third statement to police, which statements increasingly implicated Pasene in the murder.  *Id.* ¶¶ 32–34.

- Muña testified against Pasene at Pasene's second and third trials on August 23, 2013 and March 10, 2014, respectively.  *Pasene*, 439 P.3d at 879; FAC ¶¶ 35, 36, 52f.

- When he testified at the second trial, Muña was in custody in the extradited matter at Oʻahu Community Correctional Center.  *Ibid.* ¶¶ 35, 53a.

- When he testified at the third trial, Muña was "a free man."  *Id.* ¶¶ 36, 53a.

- Muña's testimony against Pasene at the second and/or third trials was done pursuant to McCormick and Coons' promises that he would be treated leniently with respect to his criminal charges.  *Id.* ¶¶ 32, 36–37, 52f, 53a, 59e.

- Muña had been "facing over a decade in prison" after "go[ing] on [t]he run while facing a class B felony," and was "almost guaranteed to go to prison . . . ." *Id.*

- On an unnamed date, Muña encountered Pasene's mother Velva and sister Sheila at a store in California and "confessed that he got a deal to lie on [] Pasene and blame him as the one that shot and killed [] Peneueta on 3/28/09." *Id.* ¶ 37. Muña also told them that "he was coerced by [Defendants McCormick and Coons] to change his first and second statement and to do a third statement and blame [] Pasene and Zorro Rye as the shooters . . . and in exchange he would not get charged for "terroristic threatening . . . where he was accused of threatening someone with a gun in Chinatown" [and h]e was also promised to get released after he testified for the state and blame [] Pasene, he would receive probation on his promotion of a dangerous drug charge in the second degree." *Id.* ¶¶ 37, 52f, 53a, 59e, 68b.

- Muña "also was not charged for absconding while on bail." *Id.*

- Muña testified at the second trial that "he never got a deal from the prosecutors' office" to testify. *Id.* ¶ 52f.

- Muña denied receiving any promise or deal "on his own cases to change his first statement and to testify against [] Pasene during his testimony at the third trial." *Id.* ¶ 38.[13]

- "Defendants [] McCormick and [] Coons . . . failed to memorialize, intentionally suppressed, and/or recklessly failed to disclose [] Muña's promise/deal to testify and blame Mr. Pasene as the shooter . . . ." *Id.* ¶¶ 53, 53a.

---

[13]According to the Hawaiʻi Supreme Court, during Muña's testimony at the third trial, on cross-examination, defense counsel asked, "[Y]ou knew that if you cooperated in a murder case, your attorney could . . . argue to the judge in your case . . . this guy was helpful to the State, and . . . a judge could consider that . . . right?", and Muña responded, "Yeah." *Pasene*, 439 P.3d at 879.

### C.  <u>Count 1c: Fabrication of Evidence</u>

Pasene alleges that McCormick and Coons fabricated Muña's testimony against Pasene by encouraging and pressuring Muña to alter his statements and testimony in 2013 and 2014 in the wake of Pasene's first mistrial and in exchange for leniency on Muña's other charges. *Id.* ¶¶ 30, 32–34, 37, 52b, 52f.  Pasene further alleges that McCormick and Coons fabricated the testimonies of Sakaria, Tagataese, Daniel, Ramos, and Samuelu—knowing that those statements and testimonies were likely false—by using unreliable identification procedures, pressuring them to identify Pasene, and then misrepresenting the strength of those testimonies at trial.  *Id.* ¶ 52a.

Pasene also alleges that McCormick and Coons both testified falsely before the grand jury that Saleimoa-Kekau had identified Pasene as shooting an Ak-47 when the witness had, in fact, never said that.  *Id.* ¶ 52c.  He asserts that McCormick testified falsely before the grand jury that Tagataese had identified Pasene's cousin, Zorro Rye, with a gun on Pauahi Street on the night of the murder when Tagataese had, in fact, never said that.  *Id.*[14]  And he claims that McCormick testified falsely at the first trial that he had never received any information indicating that Muña was one of the people involved with the murder, even though

---

[14]Pasene also alleges that Coons should have stopped McCormick from testifying falsely.  FAC ¶ 52c ("Defendant Theodore Coons as the lead homicide detective should have reported this false information and corrected this, but he chose not to . . . .").

he had received Del Rio's statement that Muña had confessed to her that he had shot someone.  *Id.* at ¶ 53b.

Pasene alleges that these fabrications were intentional and motivated by a desire to obtain a conviction after the first trial resulted in a mistrial.  *See id.* ¶¶ 52–53e.  He also alleges that Muña was or is related to HPD Officer Eric Tanavasa, a member of HPD's Crime Reduction Unit ("CRU") who worked with the officers investigating the Peneueta murder.  *Id.* ¶ 40.

### D.    Count 2: Malicious Prosecution

Pasene alleges the proceedings against him were favorably terminated when the circuit court dismissed his case with prejudice after the Hawai'i Supreme Court vacated his conviction.  With regard to whether the proceedings against him were instituted without probable cause and with malice, Pasene alleges, as described *supra*, in the facts pertaining to Count 1c, and *infra*, in the facts pertaining to Count 4, that Defendants McCormick and Coons intentionally fabricated and suppressed certain evidence.  Pasene also alleges that Defendants were motivated to fabricate and/or suppress this evidence in order to obtain a conviction after the first trial ended in a mistrial.  *See id.* ¶¶ 52–53e.

### E.   Count 4: Intentional Suppression of Exculpatory Evidence

#### 1.   Chinatown Video Surveillance Footage

Pasene alleges that Defendants McCormick, Coons, and Sellers all admitted to viewing the Chinatown video footage[15]—which came from cameras that "belong[ed] to the HPD," *id.* ¶ 53c—but then failed to save the footage as evidence for trial, allowing it to be erased.  *Id.*  ¶¶ 53c, 59b.  He claims:

> Chinatown had 26 cameras at the time of the March 28, 2009 shooting.  These cameras gave live feedback to the Chinatown substation that was located one block up from [the shooting].  Most were in the intersections on light poles.  The shooting took place on River and Pauahi street where camera #11 was.  These cameras re-record over themselves after a day and 18 hours.  Defendants waited two days to attempt to recover these cameras and at that time the footage was not recoverable.  These camera footages were downloadable and able to be saved but were not.

*Id.* ¶ 28.  Pasene further alleges that these cameras would have shown Muña leaving the scene of the crime around the time the 911 calls started coming in to the police station about the shooting.  *Id.* ¶¶ 52f, 53c, 59b.

#### 2.  911 Caller Statement

Pasene alleges that, at 10:58 a.m. on March 28, 2009, an unidentified 911 dispatcher, Defendant John or Jane Doe, received a 911 call from an unknown person "who said they knew the identity of the Chinatown shooting suspect."  *Id.*

---

[15]McCormick and Coons testified that they reviewed the footage in the days after the shooting but did not retain the videos.  *Pasene*, 439 P.3d at 876–77.

¶¶ 27, 53d.  The dispatcher failed to obtain the caller's personal or contact information, in order to allow this caller to make a written or recorded statement. *Id.*  Neither Doe nor McCormick nor Coons, whom Pasene alleges should have been aware of the call, ever followed up with the witness.  *Id.*  Pasene claims HPD has a protocol of recording statements from witnesses to felony criminal cases.  *Id.*

### 3.    Queen's Medical Center Witness Statement

Pasene alleges that, in the aftermath of the shooting, Officer Le traveled to Queen's Medical Center upon information that roughly 25 witnesses were there. *Id.* ¶¶ 29, 53e, 58a, 59a.  When he arrived, Le "was told by a male to go talk to a group of males who seemed to be there for the victim."  *Id.*  Le "walked up to a male and asked if Cedro Muña was the suspect and the male responded, Yes it was."  *Id.*  Le then "failed to get a written or recorded statement from this witness and this important witness' name and contact."  *Id.*

### 4.    Linda Del Rio's Statement

Pasene alleges that Del Rio told McCormick and Coons that, the morning of the murder, Muña confessed to her that he shot someone, and that, a few hours prior to the shooting, Muña had tried to put a blue Buick up as collateral for his bail bond.  *Id.* ¶¶ 53b, 59d.  McCormick and Coons told her they would write her

statement down for her, but then never did so, and never reported the statement to the defense prior to the first trial.  *Id.*[16]

     5.    Cedro Muña's Cousin's Physical Altercation with Peneueta

Pasene alleges that Defendants McCormick, Coons, and Sellers all knew, but failed to disclose to the defense prior to the first trial, that Malo Sooalo, Cedro Muña's cousin, was in a physical altercation with Peneueta on the night of the shooting.  *Id.* ¶¶ 40–41.  That altercation could have given Muña cause or motive to engage Peneueta.  *See id.*

**F.    Count 5: Supervisory Liability**

Pasene alleges that all of the named Defendants, including the City, Correa, McCormick, Coons, Sellers, Le, and Doe:

> failed to adequately train, supervise, and/or control their subordinates who obtained coerced, fabricated, or suggested identifications, and suppressed exculpatory information[;] . . .

> violated Mr. Pasene's constitutional right by their subordinates and by generally showing a reckless or callous indifference to Mr. Pasene's rights[;] . . . [and]

> failed to train, supervise, and/or control their subordinates, their indifference to the actions of their subordinates, and their indifference to Mr. Pasene's rights encouraged and permitted their subordinates to fabricate evidence and to fail to document and to disclose exculpatory evidence.

---

[16]Del Rio testified during the third trial that Muña had called her between 10:30 and 11:00 a.m. on the day of the shooting to tell her he "was in Wahiawa" and "had done something and needed to . . . turn himself in," confessing, "Aunty, I shot someone." *Pasene*, 439 P.3d at 879.  Pasene alleges that Del Rio was also a state witness at the first trial in June 2012, but it is unclear what she testified there.  FAC ¶ 58b.

*Id.* ¶¶ 80–82.  Pasene also alleges that Defendants McCormick and Coons, as lead investigators, knew or should have known that Le failed to document the Queen's witness statement, that Doe failed to document the 911 witness statement, and that Sellers failed to recover the Chinatown video surveillance footage, and should have corrected that misconduct.

Pasene also alleges that HPD Chief Correa knew or should have known about all of the above alleged misconduct because it was HPD policy "to keep him updated on all cases, especially of high profile murders," *id.* ¶¶ 2, 53c, and given that he personally "held a news conference on this case misleading the public about a turf war among gang members, while referring to [] Pasene."  *Id.* ¶¶ 30, 53c.

### G.    Count 6: *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658 (1978)

Pasene alleges:

The City and County of Honolulu, by and through its policy makers, created and maintained a custom, policy, and/or practice [or discipline] of failing to train, supervise, and/or discipline their employees and agents, including Defendants, regarding constitutionally adequate investigation techniques[,] . . . regarding constitutionally proper identification procedures to ensure that unreliable, discredited, and improper identifications techniques were not utilized[,] . . . [and] regarding their obligations to document and disclose exculpatory evidence pursuant to their *Brady* obligations.

Having unconstitutional Customs, policies, patterns, and practices of the City and County of Honolulu have caused numerous individuals to be wrongfully convicted in addition to Mr. Pasene, individual wrongfully convicted include:

a.  Joshua Spriesterbach
b.  Alvin Jardine
c.  Tracy Yoshimura
d.  Sefo Fatai.

*Id.* ¶¶ 85–88.

## VI.  The Instant Motions to Dismiss

On October 27, 2022, the City, Correa, and Coons filed the instant MTDs, Dkt. Nos. 77–78, contending that Pasene's FAC failed to cure the deficiencies described in the September 2022 Order and that the FAC should be dismissed as against them.  Pasene did not oppose the MTDs, and the moving Defendants did not file a reply brief.  The Court elected to decide this matter without a hearing pursuant to Local Rule 7.1(c), and this Order follows.

## DISCUSSION[17]

## I.  Pasene has largely cured the "group pleading" deficiency from his original Complaint.

To properly state a claim under Rule 12(b)(6), a section 1983 plaintiff must plead facts showing how each of the named defendants "personal[ly] participat[ed] in the alleged rights deprivation."  *Ewing v. City of Stockton*, 588 F.3d 1218, 1235

---

[17] As a preliminary matter, the Court notes that Defendants McCormick, Le, and Doe have not been served.  *See* Dkt. Nos. 25–27 (noting that the U.S. Marshal was unable to locate McCormick and Le, and that HPD and Corporation Counsel did not provide a forwarding address); Dkt. No. 91 (extending the time for service to February 17, 2023 for good cause).  Defendant Sellers has been served but has not responded to the Complaint.  *See* Dkt. No. 63 (Clerk's entry of default as to Sellers).  Thus, for purposes of this Order, Defendants McCormick, Le, Sellers, and Doe are referred to as the non-moving Defendants.

(9th Cir. 2009).  In other words, a plaintiff may not attribute general liability for an alleged wrong to a group of defendants but rather must make "individualized" allegations.  *Leer v. Murphy*, 844 F.2d 628, 634 (9th Cir. 1988).

Pasene's original Complaint failed to adhere to these principles.  However, the Court does not agree with the moving Defendants that Pasene's FAC "exacerbates" this issue.  *See* Dkt. Nos. 77-1 at 9, 78-1 at 3.  Rather, as described in the facts sections above, the FAC adds many individualized allegations about how particular Defendants personally participated in the alleged violations. *Compare with* Dkt. No. 64 at 18–19 (identifying only five individualized allegations made by Pasene in his Complaint).  Therefore, none of Pasene's claims is dismissed on the basis of group pleading.

That said, Pasene has not eliminated group pleading entirely.  Where relevant, this Order notes where that is so.

## II.   Counts 1, 2, 4, and 5 are dismissed without prejudice as against Correa but survive as against the remaining Defendants.[18]

### A.   Count 1a: Unnecessarily Suggestive Identification Procedures

In Count 1a, Pasene asserts a claim under *Biggers*, 409 U.S. at 188, alleging that Defendants McCormick and Coons employed unconstitutionally suggestive

---

[18]With very little supporting argument, the moving Defendants state that Counts 1, 2, 4, and 5 should be dismissed under the second prong of qualified immunity because they are not based on "clearly established" constitutional rights.  *See, e.g.*, Dkt. No. 78-1 at 2, 12, 13, 16, 19, 23.  As explained, the Court disagrees: each right implicated in these counts has long been clearly established for purposes of qualified immunity.

identification procedures with six eyewitnesses.  In its September 2022 Order, this Court previously decided that Pasene's Complaint successfully alleged facts sufficient to state a *Biggers* claim against McCormick with regard to two of those eyewitnesses.  As Pasene's FAC only adds to the relevant factual allegations, the Court continues to hold that this claim is sufficiently pled.  Moreover, the claim now survives as against Coons as well as McCormick, and with regard to six witness identifications, rather than two.

Under *Biggers*, a police identification procedure violates due process if it is both (i) suggestive and (ii) unnecessarily so.  *Id.* at 196, 198, 201.  In other words, the procedure's suggestiveness must taint the reliability of the identification by creating a "very substantial likelihood of irreparable misidentification."  *Id.*; *see also United States v. Montgomery*, 150 F.3d 983, 992 (9th Cir. 1998) ("An identification procedure is suggestive when it emphasizes the focus upon a single individual thereby increasing the likelihood of misidentification.").  Suggestiveness is assessed "case-by-case," based on the "totality of the circumstances."  *Biggers*, 409 U.S. at 200–01.  Factors to be considered in evaluating the likelihood of misidentification include (i) the witness' opportunity to view the criminal during the crime, (ii) the witness' degree of attention, (iii) the accuracy of the witness' description of the criminal prior to the identification procedure, (iv) the level of certainty demonstrated by the witness at the time of the

identification, and (v) the length of time between the crime and the identification. *Id.*

Here, Pasene alleges that McCormick and Coons showed Sakaria, Tagataese, Saleimoa-Kekau, Ramos, and Samuelu—at least some of whom did not know Pasene prior to their witness interview—a single photo—Pasene's—rather than a photo array.[19]  FAC ¶¶ 26, 52, 52a–e, 52h–k; *see also Pasene*, 420 P.3d 988 at *7 (stating that McCormick showed Tagataese and Sakaria a single photo, whereas he used a six photograph lineup in his interview with another witness, Filipo, who was unable to make an identification).  Pasene also alleges that the identification procedures were not recorded, that McCormick and Coons showed each witness the photo "off the record" and prior to official interviews, and that Defendants "pressured" the witnesses to positively identify Pasene.  *Id.* ¶¶ 52b, 52e ("[Sakaria testified] he was shown [] Pasene [*sic*] photo and who to pick out.").  With regard to the sixth witness, Muña, Pasene alleges that Muña confessed to Pasene's mother and sister that police pressured him into lying and implicating Pasene four years after Muña had given his initial statement, and only in exchange for leniency concerning his own criminal charges.  *Id.* ¶¶ 37, 52f.  These factual

---

[19]In *Perry v. New Hampshire*, 132 S. Ct. 716, 724–25 (2012), the Supreme Court rejected the proposition that the use of a single photograph for witness identification is *per se* unconstitutional.

allegations suffice to indicate that the procedure with regard to these six witnesses was unnecessarily suggestive.[20]

Taken in the light most favorable to Pasene, his factual allegations also permit a reasonable inference that there was a substantial likelihood of irreparable misidentification. *See Biggers*, 409 U.S. at 198. Pasene alleges, for instance, that Sakaria and Tagataese had an obscured view of the driver during the crime. Although Sakaria and Tagataese testified that they were present on the sidewalk when the car drove up, chaos shortly ensued among the twenty-five people present once the suspects brandished guns. *See* FAC ¶¶ 20–23. The witnesses testified that "the incident happened real fast and that they were scared and focused on getting away and not getting shot," and that they "didn't know what the driver suspect was wearing," and "didn't know the color of the suspect's car." *Id.* ¶¶ 22, 52d–e. Moreover, the witnesses' testimonies differed from the medical examiner's testimony, in that they claimed Peneueta was shot from the front, while the medical examiner testified that the victim was shot in the back. *Id.* ¶ 24.

Similarly, with regard to Saleimoa-Kekau, Ramos, and Samuelu, Pasene alleges that all three told inconsistent stories and that all three were reluctant to testify and did so only belatedly and in exchange for leniency concerning their own

---

[20]The Court rejects Coons' argument that Pasene has failed to assert individualized allegations against Coons, and that Pasene's factual allegations in this regard are "conclusory." Dkt. No. 78-1 at 6, 9–10. Additional specificity beyond the facts described herein, at this stage of the proceedings, is not necessary.

criminal charges.  *See Horton*, 408 F.3d at 578–79 (explaining that a leniency deal has the tendency to undermine the reliability of the corresponding testimony).  He also alleges that Saleimoa-Kekau was friends with Muña, that Ramos was high on meth during the shooting and mistakenly identified someone else when she was asked to identify Pasene at trial, that Ramos had a history of lying to law enforcement, and that testified that Ramos was not present during the shooting— all facts tending to undermine the credibility of these identifications.  *See* FAC ¶¶ 52h–k.

Finally, it is nearly self-evident that Muña's testimony was on shaky ground. He himself was an initial suspect in the shooting, and his story with regard to Pasene changed drastically between his initial interview immediately after the shooting in March 2009 and his second and third interviews years later, after Pasene's first mistrial, and after Muña was arrested on unrelated criminal charges. *See id.* ¶¶ 31–37, 52f, 53a, 59e; *Pasene*, 439 P.3d at 879.

Under the totality of the circumstances, the FAC's allegations more than suffice to permit a reasonable inference that these eyewitnesses misidentified Pasene under the unnecessarily suggestive circumstances McCormick and Coons devised.[21]

---

[21]Inasmuch as Pasene also asserts this claim against Correa, the claim is dismissed without prejudice, as there are no factual allegations explaining Correa's role.

33

**B.**    <u>**Count 1b: Failure to Disclose Muña's Leniency Deal**</u>

In Count 1b, Pasene asserts a claim under *Horton*, 408 F.3d at 570, alleging that Defendants McCormick and Coons failed to disclose promises of consideration to Muña in exchange for his testimony.  Under *Horton*, the failure to disclose a leniency deal, in which police officers had promised a State witness consideration in exchange for his testimony, may violate *Brady v. Maryland*, 373 U.S. 83 (1963) because evidence of that deal could be used by the defense to impeach the witness.  *Id.* at 578; *see also Mellen v. Winn*, 900 F.3d 1085, 1103–04 (9th Cir. 2018) (re-affirming the principle that police officers have a clear duty under *Brady* to disclose material impeachment evidence to prosecutors).[22]

In its September 2022 Order, this Court decided that Pasene's original Complaint failed to allege facts sufficient to state a *Horton* claim against any of the Defendants because the Complaint alleged only that all Defendants had "failed to memorialize, intentionally suppressed, and/or recklessly failed to disclose" the existence of the deal.  Complaint ¶¶ 50–51, 53.  Among other things, Pasene had not alleged which Defendant(s) had failed to make disclosure or to whom.  *See* Dkt. No. 64 at 24–25.

---

[22]*See also Napue v. Illinois*, 360 U.S. 264, 269–70 (1959) (holding it was a denial of Fourteenth Amendment due process where witness falsely testified that he had received no promises of consideration in return for his testimony, and the State did not correct that false testimony).

In contrast, the FAC contains sufficient factual matter to plausibly plead this claim. The FAC's allegations permit a reasonable inference that McCormick and Coons made either formal or informal promises of leniency to Muña for agreeing to testify against Pasene in the second and third trials. McCormick and Coons led the investigation of Pasene, they testified at all three trials, and they were the officers who interviewed Muña and took his statements over the years at issue. Muña's first statement in 2009, temporally proximate to the homicide, in no way implicated Pasene. FAC ¶¶ 32, 52f. Four years later, after Muña's arrest and extradition on unrelated charges, and after Pasene's first mistrial, Muña drastically changed his story. *Id.* ¶¶ 32–34, 37, 52f. According to Pasene, the unrelated charges against Muña were serious, consisting of "terroristic threatening" while in possession of a gun, "promotion of a dangerous drug . . . in the second degree," and "absconding while on bail." *Id.* ¶¶ 37, 52f, 53a, 59e, 68b (alleging that Muña was "facing over a decade in prison"). In fact, when Muña testified at Pasene's second trial on August 23, 2013, he was in custody on the unrelated criminal charges at Oʻahu Community Correctional Center—but by the time he testified at Pasene's third trial on March 10, 2014, he was "a free man." *Id.* ¶¶ 35–36, 53a. Muña's testimony, in other words, directly impacted his custodial status. Pasene also alleges that Muña *admitted* to Pasene's mother and sister that he received a

leniency deal "to lie on [] Pasene and blame him as the one that shot and killed []
Peneueta . . . ." *Id.* ¶ 37.

The FAC's allegations also support the inference that McCormick and
Coons hid from defense counsel the existence of their alleged promises of leniency
to Muña.  Muña testified at the second trial that "he never got a deal from the
prosecutors' office."  *Id.* ¶ 52f; *see also ibid.* ¶ 38 (alleging Muña "denied
receiv[ing] a promise or a deal on his own cases to change his first statement and
to testify against [] Pasene during his testimony at the third trial").  Although Muña
admitted at the third trial that he "knew that if [he] cooperated in a murder case,
[his] attorney could . . . argue to the judge in [his] case . . . this guy was helpful to
the State, and . . . a judge could consider that," *Pasene*, 439 P.3d at 879, this does
nothing to reveal the deals that, at least as alleged, had already been cut.

In sum, from these allegations, it is plausible that McCormick and Coons
made promises to Muña in exchange for his statements and testimony and then
failed to disclose those promises prior to the second and/or third trials, in violation
of *Horton*.[23]

---

[23]Inasmuch as Pasene also asserts this claim against Correa, the claim is dismissed without
prejudice, as there are no factual allegations explaining Correa's role.

### C.    Count 1c: Deliberate Fabrication of Evidence

In Count 1c, Pasene asserts a claim under *Devereaux*, 263 F.3d at 1070, alleging that McCormick and Coons deliberately fabricated evidence against him. Under *Devereaux*, "there is a clearly established constitutional due process right not to be subjected to criminal charges on the basis of false evidence that was deliberately fabricated by the government." *Id.* at 1074–75. To plausibly plead a fabrication-of-evidence claim, a plaintiff must allege that "(1) the defendant official deliberately fabricated evidence; and (2) the deliberate fabrication caused the plaintiff's deprivation of liberty." *Spencer v. Peters*, 857 F.3d 789, 798 (9th Cir. 2017). Deliberate fabrication can be shown by either "direct evidence of fabrication" or "circumstantial evidence related to a defendant's motive." *Caldwell v. City and Cnty. of S.F.*, 889 F.3d 1105, 1112 (9th Cir. 2018).

Pasene's original Complaint conclusorily alleged that all Defendants had deliberately obtained false identifications and/or testimony from Sakaria, Tagataese, and Muña. In its September 2022 Order, this Court decided that the Complaint's meager allegations did not permit a reasonable inference as to the first *Devereaux* element—that Defendants had *deliberately* fabricated evidence. Pasene had not alleged any evidence of direct fabrication, nor had he offered any circumstantial evidence as to Defendants' motives to fabricate the evidence. The FAC remedies these shortcomings.

With regard to fabrication, Pasene alleges facts sufficient to permit a reasonable inference that McCormick and Coons fabricated evidence.  Pasene claims that both McCormick and Coons encouraged Muña to "lie" and blame Pasene for the shooting.  *Id.* ¶ 37.  He claims they misled and pressured five other eyewitnesses into falsely identifying Pasene.  *Id.* ¶ 52a.[24]  He claims that both Defendants then testified falsely before the grand jury in specific ways.  *Id.* ¶ 52c.[25] And he claims McCormick testified at the first trial that he had never received any information implicating Muña in the murder, which was false in light of Del Rio's statement to that effect.  *Id.* ¶ 53b.

With regard to motive, Pasene alleges Muña was or is related to an HPD Officer who worked with the Peneueta investigating officers.  If true, that would permit the inference that the officers were operating with favoritism toward Muña. *See id.* ¶ 40.  Pasene also notes that Muña's altered statements and testimony came in the wake of Pasene's first mistrial—at which Muña had *not* testified and prior to which Muña had *not* provided any incriminating information against Pasene.  *Id.*

---

[24]The moving Defendants conclusorily state that "[o]fficers cannot be said to directly 'fabricate' identifications that come from third parties . . . ."  Dkt. No. 78-1 at 13–14.  As the Defendants provide no legal authority for this proposition that is anything but self-evident, the Court rejects the contention.

[25]The moving Defendants are correct that Pasene has not plausibly alleged a claim against *Coons* for *McCormick's* false grand jury testimony.  *See* Dkt. No. 77-1 at 17 ("[T]here are no allegations that Coons was present during McCormick's grand jury testimony (which is highly improbable), had the ability to stop such testimony, and/or knew that such alleged testimony was factually inaccurate.  That is not how a grand jury works."); Dkt. No. 78-1 at 14 (similar).  However, Pasene has plausibly alleged that Coons himself testified falsely before the grand jury.

¶¶ 52–53e.  This fact permits the inference that McCormick and Coons' motive might have been to obtain a conviction without regard to Pasene's innocence or guilt, and which was not likely without Muña's about-face.  This inference is compounded by the DPA's actions during the third trial.  Although not directly implicative of McCormick and Coons, taken in the light most favorable to Pasene, the DPA's conduct contributes to the inference that the prosecutorial and cooperating investigative team were willing to intentionally violate rules of ethics in order to attain a conviction and close the case.  During the third trial, the DPA repeatedly drove the trial judge to the brink with repeated instances of misconduct[26] that ultimately led the Hawai'i Supreme Court to vacate Pasene's conviction.  At this initial stage of the proceedings, common sense allows the inference that the DPA's actions during trial were reflective of the entire law enforcement team.  Taken together, Pasene's allegations suffice to state *Devereaux*'s first element of deliberate fabrication.

Pasene's allegations also state *Devereaux*'s second element, causation.  This element only requires the plaintiff to show "a reasonable likelihood that the

---

[26] *See, e.g.*, *Pasene*, 439 P.3d at 874 ("[O]ne would question whether or not this is just inadvertent or you are blatantly disregarding the Court's . . . rulings . . . .  [C]ertainly a conclusion could be drawn . . . to question whether or not that is, in fact, inadvertent or if you are doing it purposefully."); *ibid.* (in response to a separate instance of malfeasance: "[T]he sum total of the repeated [misconduct] . . . causes me to seriously question whether or not it is intentional or it is purely inadvertent. . . .  [W]e're in a third trial . . . [and] Mr. Pasene deserves a fair trial."); *ibid.* at 881, 882 (two more similar occasions).

allegedly fabricated [] evidence could have affected the judgment of the jury."

*Richards v. Cnty. of San Bernardino*, 39 F.4th 562, 572, 574 (9th Cir. 2022)

(rejecting but-for causation). Pasene points out, and Defendants do not dispute,

that "[n]o physical or forensic evidence inculpated [him]." FAC ¶ 3. Rather,

"[t]he sole evidence incriminating him was the misidentification[s] unlawfully

procured by the HPD Defendants." *Id.* There is a reasonable likelihood that the

fabrications could have affected the judgment of the jury in at least one of Pasene's

three trials and contributed to Pasene's detention. In sum, Pasene's *Devereaux*

claim survives.[27]

### D.    Count 2: Malicious Prosecution

In order to state a claim of malicious prosecution, a plaintiff must plausibly

allege that the proceedings against him (1) were instituted without probable cause

and (2) with malice, and (3) were terminated in his favor. *See Awabdy v. City of

Adelanto*, 368 F.3d 1062, 1066 (9th Cir. 2004). Malice exists only if "the motive

in instituting the suit . . . [was] for a purpose other than bringing the defendant to

justice." *Thompson v. Clark*, 142 S. Ct. 1332, 1338 (2022) (internal quotation

marks omitted). An indictment by a grand jury is *prima facie* evidence of probable

cause. *See Awabdy*, 368 F.3d at 1066; *see also Degroot v. United States*, 786 Fed.

---

[27]Inasmuch as Pasene also asserts this claim against Correa, the claim is dismissed without
prejudice, as there are no factual allegations explaining Correa's role.

Appx. 638, 642 (9th Cir. 2019).  To rebut that *prima facie* evidence, a plaintiff

must prove that the "criminal prosecution was induced by fraud, corruption,

perjury, fabricated evidence, or other wrongful conduct undertaken in bad faith."

*See Awabdy*, 368 F.3d at 1067.

   In its September 2022 Order, the Court held that Pasene had failed to

plausibly plead the first two elements of malicious prosecution—that the

proceedings were instituted without probable cause and with malice.  In light of the

new facts pled in the FAC, Pasene has cured these deficiencies.

   With regard to the first element, the grand jury indictment here, *see Pasene*,

439 F.3d at 871, is *prima facie* evidence of probable cause.  *See Awabdy*, 368 F.3d

at 1066.  However, Pasene has rebutted that *prima facie* evidence—as explained in

the *Devereaux* analysis, *supra*, and in the *Tatum* analysis, *infra*—by pleading that

the criminal prosecution against him was induced by McCormick and Coons'

fraud, fabrications, suppressions, and/or other wrongful conduct undertaken in bad

faith.  *See Awabdy*, 368 F.3d at 1066; *Thompson*, 142 S. Ct. at 1338; *see also* FAC

¶ 63 ("Defendants caused the charges . . . to be filed by knowingly providing the

prosecution misinformation, concealing exculpatory evidence, and otherwise

engaging in wrongful and bad faith conduct that was actively instrumental in

causing the initiation of the legal proceedings against Mr. Pasene.").  The FAC

also permits the inference that this wrongful conduct *caused* his prosecution, given

41

that the alleged misidentifications constituted the primary evidence against him.
*See ibid.* ¶ 3.  And, as explained in the *Devereaux* analysis, *supra*, Pasene has
alleged that McCormick and Coons instituted the proceedings against him with
malice, or with some motivation other than bringing him to justice.

Pasene has also plausibly alleged the third element of a malicious
prosecution claim—that the proceedings against him were favorably terminated.
Favorable termination exists if "the criminal prosecution ended without a
conviction"; it does not require any other "affirmative indication of innocence."
*Thompson*, 142 S. Ct. at 1341.  In alleging that the circuit court dismissed his case
with prejudice after the Hawaiʻi Supreme Court vacated his conviction, *see* FAC
¶¶ 4, 58, Pasene has satisfied this element.  In sum, Pasene's malicious prosecution
claim survives.[28]

### E.      Count 4: Intentional Suppression of Exculpatory Evidence

Under *Tatum*, 768 F.3d at 806, a law enforcement officer violates the
Fourteenth Amendment's Due Process Clause if he (1) fails to disclose (2) highly
significant or potentially dispositive exculpatory evidence to prosecutors, (3)
through "conduct that is culpable in that the officers understood the risks to the
plaintiff's rights from withholding the information or were completely indifferent

---

[28]Inasmuch as Pasene also asserts this claim against Correa, the claim is dismissed without
prejudice, as there are no factual allegations explaining Correa's role.

to those risks," (4) leading to plaintiff's detention of "unusual length." *Id.* at 819–

20.  In order to be considered "highly significant" or "exculpatory," the suppressed

evidence must be not only material but "*strongly* indicative of the plaintiff's

innocence." *Id.* at 820.  "[O]fficial conduct violates due process only when it

shocks the conscience, a standard satisfied in circumstances [where officers] either

consciously or through complete indifference disregard[ed] the risk of an

unjustified deprivation of liberty." *Id.* at 820–21.

In its September 2022 Order, this Court previously decided that Pasene's

original Complaint alleged facts sufficient to state a *Tatum* claim against Coons.

Dkt. No. 64 at 36. That remains the case.  The FAC, however, does more.  It

alleges:

- McCormick, Coons, and/or Sellers viewed the Chinatown video surveillance footage showing Muña in close proximity at the time of the shooting and failed to attempt to recover it for at least two days, at which point it had been erased.  FAC ¶¶ 52f, 53c, 59b. The cameras and footage belonged to the HPD.  *Id.*

- Doe failed to obtain contact information or a written statement from the 911 caller at 10:58 a.m. on March 28, 2009.  That caller stated he or she "knew the identity of the Chinatown shooting suspect." *Id.* ¶¶ 27, 53d.  McCormick and Coons also never followed up.  *Id.*

- Le failed to obtain contact information or a written statement from the Queen's Medical Center witness who said the shooter was Muña.  *Id.* ¶¶ 29, 53e, 58a, 59a.

- McCormick and Coons did not record or disclose to the prosecutor, prior to at least the first trial, Del Rio's statement that Muña

confessed to the shooting and owned a blue Buick of the type involved in the shooting.  *Id.* ¶¶ 53b, 59d.

- McCormick, Coons, and Sellers did not disclose to the prosecutor, prior to at least the first trial, that Malo Sooalo, Muña's cousin, was in a physical altercation with Peneueta on the night of the shooting, *id.* ¶¶ 40–41, providing Muña with motive to harm Peneueta.

Under *Tatum*'s first element, and viewing Pasene's allegations in the light most favorable to him, Pasene adequately alleges that the stated Defendants failed to disclose the five pieces of evidence.  McCormick, Coons, and Sellers had the Chinatown footage in their possession, knew it showed Muña near the shooting, and failed to disclose it; Doe did not obtain or disclose the 911 caller's contact information or written statement;[29] Le did not disclose the Queen's witness' contact information or statement;[30] McCormick and Coons did not disclose Del Rio's statements;[31] and McCormick, Coons, and Sellers did not disclose the physical altercation between Malo Sooalo and Peneueta.

---

[29]The moving Defendants claim Pasene has not made adequate factual allegations regarding this call.  Dkt. No. 77-1 at 23.  The Court disagrees: Pasene provides the date and time of the call, and the limited information the caller supposedly left.  Combined with the other officers' alleged conduct, a reasonable inference can be drawn that the officers did not want to know about potentially exculpatory information and worked to avoid it.

[30]The moving Defendants ask the Court to take judicial notice of portions of the third trial transcript in which Le testified regarding the witness encounter at Queen's Medical Center. Dkt. Nos. 77-1 at 22–23, 78-1 at 21–22.  The Court declines to do so in the context of a motion to dismiss.  Moreover, even if it is true that Le disclosed this encounter prior to the first trial, that fact would not dispose of Pasene's allegations against Le and/or his supervising officers that it was a violation to fail to obtain and disclose the witness' statement or contact information.

[31]Although Del Rio testified to these statements during the third trial, *see Pasene*, 439 P.3d at 879, it may still be true that the police did not document or disclose these statements prior to the first or second trials resulting in continued detention.  That said, as the moving Defendants

Under *Tatum*'s second element, making all inferences in Pasene's favor, all five items are highly significant exculpatory evidence or "strongly indicative of the plaintiff's innocence," especially when taken in the aggregate and compared to the evidence against him. *See Tatum*, 768 F.3d at 820. First, a video containing an image of Muña—a person who closely matches Pasene's description—departing the murder scene right after the shooting is highly significant and potentially exculpatory, depending on the details of the footage.[32]  Second, a 911 caller's statement that he/she knows the identity of the shooter is also highly relevant and potentially exculpatory. Third, an eyewitness' statement, "Yes it was," when asked if the shooter was "Cedro [Muña]," is highly pertinent and highly exculpatory as to Pasene. Fourth, Del Rio's statement that Muña confessed to her that he shot someone on the day of the murder is obviously highly exculpatory as

---

correctly point out, the FAC contradicts itself by alleging that Del Rio testified to these statements at the first trial. *See* FAC ¶ 59(d); Dkt. No. 78-1 at 22–23. Pasene's *pro se* FAC is admittedly confusing at times. Nonetheless, it must be viewed in the light most favorable  to him at the Rule 12 stage.

[32]The moving Defendants contend that the FAC, by claiming that Pasene and Muña looked alike on the night of the shooting, undermines Pasene's separate allegation that the officers *maliciously* failed to recover the Chinatown video footage. *See* Dkt. No. 78-1 at 18, 20. It is unclear, however, why this fact would "negate[]" Pasene's allegation of malicious purpose. According to the officers' unequivocal assertions about their ability to view the footage within forty-two hours of the shooting and before it was erased, the footage showed Muña, not Pasene, entering a cab very near the time of the shooting. This evidence was potentially inculpatory as to Muña, and therefore exculpatory as to Pasene, whether or not Defendants now claim that they could have thought it was *Pasene* on the footage. Moreover, Defendants' contention would require an inference in Defendants' favor, an inference that is not allowable at this stage.

to Pasene.[33]  The fifth item, the fact that Muña's cousin was in a physical altercation with Peneueta the night of the shooting, may not be, on its own, "strongly indicative" of Pasene's innocence; but, taken in the aggregate with the other suppressed items, it is highly exculpatory.

Under *Tatum*'s third element, Pasene has adequately alleged that Coons acted with culpability.  As one of the two lead investigators on this case for a decade and over the course of three trials, Coons certainly understood the risks to Pasene of withholding at least the Chinatown footage, Del Rio statements, and the Sooalo physical altercation.  As McCormick, Sellers, Le, and Doe are non-moving Defendants here, the Court need not assess whether Pasene has made sufficient allegations regarding their culpability.

Under *Tatum*'s fourth element, Pasene has adequately pled that he was detained for an unusual length of time.  *Tatum* did not prescribe an exact amount of time to satisfy a standard of "unusual length" but held that twenty-seven months met the standard.  768 F.3d at 820.  Here, Pasene was incarcerated for over ten years—well beyond twenty-seven months—certainly an unusual length by almost any measure.  In sum, Count 4 survives.[34]

---

[33]As the Court noted in its September 2022 Order, these witnesses' credibility or reliability is not at issue on a motion to dismiss.  Dkt. No. 64 at 34 n.28.
[34]Inasmuch as Pasene also asserts this claim against Correa, the claim is dismissed without prejudice, as there are no factual allegations explaining Correa's role.

F.    **Count 5: Supervisory Liability**

Under Section 1983, a supervisor may be held liable for a subordinate's constitutional violations "if the supervisor participated in or directed the violations, or knew of the violations and failed to act to prevent them." *Maxwell v. Cnty. of San Diego*, 708 F.3d 1075, 1086 (9th Cir. 2013) (holding that a jury could reasonably find officer defendants liable for failure to intervene as the ranking officers present while witnessing unconstitutional acts by subordinate officers).

Here, Pasene has not adequately alleged that Correa was a supervisor who "participated in," "directed," or knowingly "failed to act to prevent" his subordinates' constitutional violations. *See id.* Although Pasene has alleged facts to show that Correa was aware of the Peneueta investigation and prosecution, *see* FAC ¶¶ 30, 53c (alleging that Correa personally "held a news conference on this case misleading the public about a turf war among gang members, while referring to [] Pasene"), he has not alleged any facts tending to prove that Correa was contemporaneously aware of any of the other alleged violations in the FAC, such that Correa could have directed or failed to intervene to prevent or remedy those violations.  The fact that Pasene alleges it was HPD policy and procedure "to keep [Correa] updated on all cases, especially of high-profile murders," FAC ¶¶ 2, 53c, is not enough to show Correa's culpability under *Maxwell*.

47

With regard to Coons, Pasene has successfully stated a claim of supervisory liability.  Pasene alleges that Coons was the lead homicide investigator for the case and that, as such, he knew or should have known (i) that Le failed to document the Queen's Medical Center witness statement, (ii) that Doe failed to document the 911 caller witness statement, and (iii) that Sellers failed to recover the Chinatown footage.  With regard to the Chinatown footage, in particular, Pasene alleges that Coons himself watched the video footage in the forty-two hours after the shooting, and that Sellers failed to recover it, under Coons' watch.  Count 5 survives.[35]

## III.    Count 6 fails to state a claim against the City.

In Count 6, Pasene alleges that the City failed to train, supervise, and/or discipline its employees in constitutionally adequate investigation techniques, identification procedures, and/or *Brady* duties, in violation of *Monell*, 436 U.S. at 658.  A local government may be liable for an injury under § 1983 under three theories: (i) policy or custom, (ii) failure to train, and/or (iii) ratification.  *Id.* Pasene states that the City is liable under all three.  As discussed more fully below, however, and as was true with the original Complaint, *see* September 2022 Order at 38–42, Pasene has merely recited the legal definition of each theory, *see* FAC ¶¶ 85–88; he has not provided *any* facts to support his claims.  *See Iqbal*, 556 U.S.

---

[35]This claim survives as to Coons, as well as, of course, to the non-moving Defendants.  The Court notes, however, that it is unlikely Pasene has alleged facts sufficient to show supervisory liability with regard to Doe, Le, or Sellers.

at 678 ("Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice.").  Thus, Count 6 is dismissed for failure to state a claim.  No leave to amend is permitted, as Pasene has already once tried and failed, and has done so again, despite specific guidance from the Court.

A.   <u>Policy or Custom</u>

A local government violates *Monell* if its "policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflict[ed] the [constitutional] injury." *Monell*, 436 U.S. at 694.  A "practice or custom means any permanent, widespread, well-settled practice or custom that constitutes a standard operating procedure of the defendant." *Hunter v. Cnty. of Sacramento*, 652 F.3d 1225, 1229 (9th Cir. 2011).  The existence of such a standard operating procedure may be proven by evidence of an official policy, or by "evidence of repeated constitutional violations for which the errant municipal officials were not discharged or reprimanded." *Gillette v. Delmore*, 979 F.2d 1342, 1349 (9th Cir. 1992).  "Proof of random acts or isolated events is insufficient to establish custom." *Navarro v. Block*, 72 F.3d 712, 714 (9th Cir. 1995).

Pasene's only attempt to provide supportive facts lies in his claim that "[the] unconstitutional customs, policies, patterns, and practices of the City [] have

caused numerous individuals to be wrongfully convicted in addition to Mr. Pasene

. . . includ[ing] Joshua Spriesterbach[,] Alvin Jardine[,] Tracy Yoshimura[, and]

Sefo Fatai."  FAC ¶ 88.  As the Court explained in its September 2022 Order:

> This is not enough.  Pasene has provided no facts about these cases
> such that the Court may reasonably infer that they show any
> "permanent, widespread, well-settled practice or custom."  Nor has
> Pasene alleged facts showing that those cases present a pattern that is
> even relevant here—for example, by involving the same alleged
> constitutional violations or individuals.  Pasene provides no
> information about which departments were involved in those cases,
> the nature of the cases, or how the cases were terminated.[36]

Dkt. No. 64 at 39–40.[37]  Thus, Pasene has still failed to state a claim of

unconstitutional policy or custom.

   B.   <u>Failure to Train</u>

   A municipality violates *Monell* if it "fail[s] to train employees in a manner

that amounts to 'deliberate indifference' to a constitutional right, such that 'the

need for more or different training is so obvious, and the inadequacy so likely to

result in the violation of constitutional rights, that the policymakers of the city can

reasonably be said to have been deliberately indifferent to the need.'"  *Rodriguez v.*

*Cnty. of L.A.*, 891 F.3d 776, 802 (9th Cir. 2018) (citation omitted).  Municipal

---

[36]The City further claims that these cases are factually dissimilar from Pasene's.  Dkt. No. 77-1 at 4–5.

[37]Count 6 of Pasene's original Complaint consisted of the same allegations, except that Pasene's FAC has simply added two names, Tracy Yoshimura and Sefo Fatai.

liability may only be imposed when the failure to train reflects a "deliberate or conscious choice." *City of Canton v. Harris*, 489 U.S. 378, 389 (1989).

Given these principles, a plaintiff seeking to impose municipal liability for failure to train must show: "(1) an inadequate training program, (2) deliberate indifference on the part of the [municipality] in adequately training its law enforcement officers, and (3) [that] the inadequate training actually caused a deprivation of [the plaintiff's] constitutional rights." *Merritt v. Cnty. of L.A.*, 875 F.2d 765, 770 (9th Cir. 1989). Failure to train may be shown through a "pattern of tortious conduct by inadequately trained employees" or "a failure to equip law enforcement officers with specific tools to handle recurring situations." *Bd. of Cnty. Comm'rs of Bryan Cnty., Okla. v. Brown*, 520 U.S. 397, 407–09 (1997).

Here, again, Pasene has alleged no facts tending to show a failure to train. He offers no facts pointing to a particular inadequate training program, a pattern of tortious conduct, or a failure to equip officers with the tools and training they need in *recurring* situations. Pasene has stated that four other people were wrongfully convicted, but he has given no supporting facts showing that the cases were handled by the same "inadequately trained employees" or that the situations were somehow "recurring." Thus, Pasene has failed to state a claim of failure to train.

C.     Ratification

Finally, a local government violates *Monell* if "an official with final policy-making authority . . . ratifie[s] a subordinate's unconstitutional decision or action." *Gravelet-Blondin v. Shelton*, 728 F.3d 1086, 1097 (9th Cir. 2013).  Such ratification requires an "express[] approv[al]" or adoption of the subordinate's acts. *Trevino v. Gates*, 99 F.3d 911, 920 (9th Cir. 1996).  The policymaker's decision must be a "conscious, affirmative choice," *Gillette*, 979 F.2d at 1347, "tantamount to the announcement or confirmation of a policy."  *Haugen v. Brosseau*, 339 F.3d 857, 875 (9th Cir. 2003), *rev'd on other grounds* by *Brosseau v. Haugen*, 543 U.S. 194 (2004) (per curiam).  Thus, it requires proof of the policymaker's "knowledge of the alleged constitutional violation."  *Christie v. Iopa*, 176 F.3d 1231, 1239 (9th Cir. 1999).   A mere failure "to overrule the unconstitutional discretionary acts of subordinates[,]" without expressly endorsing or approving of the conduct, is insufficient.  *Gillette*, 679 F.2d at 1348.

Here, again, as the Court explained in its September 2022 Order:

> Although the Chief of Police may be considered a final policymaker in some circumstances, Pasene has not specifically stated that Correa is the final policymaker at issue under this theory.  Nor has he made factual allegations that would permit the reasonable inference that Correa (or any other final policymaker) made any conscious, affirmative choice to ratify any conduct.

Dkt. No. 64 at 42.  Although Pasene has edited his FAC to include an allegation that Correa was aware of this case, *see* FAC ¶¶ 30, 53(c) (stating Correa led a

52

"news conference on this case," mentioning Pasene by name), there is still no allegation that Correa was aware of the specific alleged violations by the officers on the ground. Further, as explained in the September 2022 Order, Pasene has still not stated precisely what conduct the unnamed policymaker approved, along with how and when they did so, how much they knew when deciding to do so, and for what purposes. *See* Dkt. No. 64 at 42. Given the absence of specific factual allegations, it would be unreasonable to infer that any policymaker deliberately chose to endorse any unconstitutional conduct.

In sum, Pasene has failed to state a claim under any of the three *Monell* theories. The claims against the City are thus dismissed. *See Lockett v. Cnty. of L.A.*, 977 F.3d 737, 741 (9th Cir. 2020) (explaining that municipalities may only be held liable under one of the three *Monell* theories—not under a theory of *respondeat superior*).

## IV. The Court directs the appointment of counsel for Pasene.[38]

Although there is no constitutional right to counsel in a civil case, *Lassiter v. Dep't of Soc. Servs.*, 452 U.S. 18, 25–27 (1981), a court may "under 'exceptional circumstances' appoint counsel for indigent civil litigants . . . ." *Palmer v. Valdez*, 560 F.3d 965, 970 (9th Cir. 2009) (citing 28 U.S.C. § 1915(e)(1)); *Agyeman v.*

---

[38]Pasene has previously moved for appointment of counsel numerous times. *See, e.g.*, Dkt. Nos. 20, 48, 59, 69, 80. Thus far, each motion has been denied without prejudice. *See, e.g.*, Dkt. Nos. 22, 50, 59, 71, 81.

*Corrections Corp. of Am.*, 390 F.3d 1101, 1103 (9th Cir. 2004) (quoting 28 U.S.C.

§ 1915(e)(1))( "In proceedings *in forma pauperis*, the district court 'may request an

attorney to represent any person unable to afford counsel."").   In determining

whether "exceptional circumstances" exist, the Court must consider both the

"likelihood of success on the merits," and "the ability of the petitioner to articulate

his claim *pro se* in light of the complexity of the issues involved." *Palmer*, 560

F.3d at 970 (quoting *Weygandt v. Look*, 718 F.2d 952, 954 (9th Cir. 1983)).

Here, exceptional circumstances exist.  First, in light of the instant Order

deciding that numerous constitutional claims survive, to include claims under

*Biggers*, *Horton*, *Devereaux*, and *Tatum*, along with claims of malicious

prosecution and supervisory liability—there is some likelihood of success on the

merits.  Certainly, as Pasene puts it, his claims are "legit[imate]." *See* Dkt. No. 69

at 3.

Second, this case undoubtedly involves complex factual allegations over a

period of over ten years and three trials.  Pasene's FAC is lengthy and, despite

surviving, confusing.  The Court was able to evaluate the merits of Pasene's claims

only by a painstaking process of parsing out the many allegations and determining

which were relevant to his various constitutional claims.  Although Pasene has

shown that he is marginally able to articulate his claims well enough to survive this

phase, it does not appear that he will be able to litigate or even articulate his valid

claims beyond this stage without the help of counsel, especially in light of the number and complexity of the issues involved.[39]  As an example, in response to this Court's September 2022 Order outlining the many deficiencies in Pasene's original Complaint, Pasene succeeded in adding facts to his FAC, but not in the coherent, organized, or cogent way this Court specifically requested.  Therefore, as Pasene has shown he is indigent and exceptional circumstances exist, the Court orders the appointment of counsel.

## CONCLUSION

Defendants' motions to dismiss, Dkt. Nos. 77, 78, are GRANTED IN PART and DENIED IN PART.  Specifically, all counts against Correa are DISMISSED for failure to state a claim.  Count 6 against the City is dismissed for the same reason.  Counts 1a, 1b, 1c, 2, 4, and 5 as against Coons and the non-moving Defendants survive.[40]  No further leave to amend is permitted.

//

//

//

---

[39]Pasene claims he "has a lack of understanding of the law and rules of this court and is unable to fully litigate these claims."  He also says that he has a learning disability.  *See, e.g.*, Dkt. No. 80 at 2.

[40]As stated herein, Count 3 remains dismissed, as do all unenumerated claims under the First, Fifth or Eighth Amendments or Hawaiʻi state laws.

Finally, the Court directs the appointment of counsel for Pasene and refers that issue to the assigned Magistrate Judge for further proceedings.

IT IS SO ORDERED.

DATED: February 17, 2023 at Honolulu, Hawai'i.



Derrick K. Watson
Chief United States District Judge

---

*Iosefa Pasene v. Boisse Correa, at al*; Civil No. 21-00427 DKW-KJM; **ORDER (1) GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTIONS TO DISMISS; AND (2) DIRECTING APPOINTMENT OF COUNSEL FOR PLAINTIFF**