IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAI'I

| | |
|---|---|
| IOSEFA PASENE, | Case No. 21-cv-00427-DKW-WRP |
| Plaintiff, | **ORDER GRANTING IN PART AND DENYING IN PART DEFENDANT'S MOTION TO DISMISS** |
| vs. | |
| BOISSE CORREA, *et al.*, | |
| Defendants. | |

Plaintiff Iosefa Pasene, proceeding *pro se*, alleges in his First Amended Complaint ("FAC") that the City and County of Honolulu ("the City") and Honolulu Police Department ("HPD") Chief Boisse Correa, Detectives Gregory McCormick and Theodore Coons, and Officers Albert Le and Daniel Sellers engaged in various civil rights violations resulting in his decade-long incarceration on a murder charge vacated in 2019 by the Hawai'i Supreme Court.  On February 17, 2023, the Court granted in part and denied in part two motions to dismiss filed by the City, Dkt. No. 77, and Coons and Correa, Dkt. No. 78.  Dkt. No. 92.  Before the Court is an additional unopposed motion to dismiss, filed by Sellers, contending that Pasene has failed to state a claim upon which relief may be granted.  Dkt. No. 106.

Having reviewed the FAC, the motion to dismiss, and the record generally, the Court agrees that Pasene has failed to cure the previously identified group pleading deficiencies as to Counts 1a, 1b, 1c, and 5.  The Court disagrees, however,

that Pasene has engaged in impermissible group pleading with regard to Counts 2 and 4, or that Sellers is entitled to qualified immunity regarding the same. Accordingly, as more fully explained below, Sellers' motion to dismiss is GRANTED IN PART and DENIED IN PART.

## FACTUAL & PROCEDURAL BACKGROUND[1]

In the early hours of March 28, 2009, three men—Iosefa Pasene, Cedro Muna, and Antonius Toloai—were released from police custody following their arrest the previous day. *State v. Pasene*, 439 P.3d 864, 871 (Haw. 2019).[2] A few hours later, two men in a blue Buick sedan drove up to the sidewalk on North Pauahi Street in Honolulu's Chinatown, got out of the car, and shot and killed a man named Joseph Peneueta. *Pasene*, 439 P.3d at 879; FAC at ¶ 1, 18, Dkt. No. 70. Two days later, on March 30, 2009, Pasene was arrested for the crime. FAC at ¶ 43. After three separate trials,[3] Pasene was convicted of second degree murder and sentenced to life imprisonment with the possibility of parole. *Pasene*, 439 P.3d at 871; FAC at ¶ 1.

At trial, the State relied heavily on eyewitnesses who testified that they had seen Pasene drive up to Peneueta in a blue Buick, exit the car, and shoot him.

---

[1]This Order sets forth a condensed version of the factual and procedural background of this case as relevant to this motion to dismiss. More detailed versions are set forth in the Court's prior Orders, Dkt. Nos. 64 & 92, and will not be repeated here.

[2]The Court takes judicial notice of publicly available court documents whose accuracy cannot be and have not been reasonably questioned. *See* Fed. R. Evid. 201(b).

[3]Pasene's first and second trials ended in mistrials due to hung juries. *Pasene*, 439 P.3d at 871.

*Pasene*, 439 P.3d at 873; FAC at ¶¶ 20–26, 52, 52a–k.  The State also presented

testimony from Muna, stating that he and Pasene had traveled to Chinatown

together, that he had witnessed Pasene and Peneueta arguing and Pasene threaten

another man with a gun, and that, while boarding a taxi, he saw Pasene drive by in

a blue Buick and heard gunshots.  *Pasene*, 439 P.3d at 879.  At trial, Muna

admitted that his testimony was inconsistent with a prior statement given to police

on the day of the murder that did not mention Pasene, except to say that they had

traveled to Chinatown together.  *Id.*; FAC at ¶¶ 31–36.  Muna further admitted that

his testimony only changed in 2013, after he had been arrested for skipping bail

and fleeing to a different state and therefore agreed to testify against Pasene.

*Pasene*, 439 P.3d at 879; FAC at ¶¶ 32, 37.

Pasene's primary defense was one of mistaken identity, claiming that the

killer might have been Muna.[4]  *Pasene*, 439 P.3d at 873.  Pasene presented

testimony from a bail bond agent familiar with both him and Muna who testified

that Muna owned a blue Buick and had called the agent on the day of the murder to

tell her that he "had done something and needed to . . . turn himself in" because

"Aunty, I shot someone."  *Id.* at 879.   In response, the State contended that Muna

---

[4]Muna and Pasene shared similar physical characteristics and were dressed alike at the time of
their release from police custody on March 28, 2009.  *See Pasene*, 439 P.3d at 871 n.2
(describing "Pasene as a 21-year-old Samoan male with black hair and brown eyes, standing
6'2" tall, and weighing 250 pounds" and "Muna as a 22-year-old Samoan male with black hair
and brown eyes, standing 6'1" tall, and weighing 240 pounds" with both "wearing plain white t-
shirts with short mustaches and long hair.").

could not have been the killer because footage from Chinatown surveillance videos "showed Muna getting into [a] taxi cab" at the time of the shooting.  *Id.* at 876. Although the HPD investigators purportedly reviewed this footage following Peneueta's murder, they did not retain it and it was subsequently deleted.  *Id.*  The trial judge therefore barred the State from referencing any specific footage, limiting the Deputy Prosecuting Attorney ("DPA") to soliciting testimony from the detectives that, "based upon what [they] viewed in the video, . . . essentially Mr. Muna was cleared."  *Id.* at 877.   Despite these and other explicit instructions and warnings, the State informed the jury during opening statements and closing arguments that the investigators had eliminated Muna *because* footage depicted him getting into a taxi and departing the area in which Peneueta was killed.  *Id.* at 874, 880–81.

Based on this and other frequent and flagrant violations of the trial court's instructions by the DPA, Pasene moved for a mistrial three times during the third trial, and again after the guilty verdict.  *Id.* at 874, 880–882.  Each time, the motion was denied.  *Id.* at 874, 876, 880–83.  Pasene then appealed to the Intermediate Court of Appeals ("ICA").  Despite neither "condon[ing]" nor "excus[ing]" the DPA's conduct, the ICA nonetheless affirmed the conviction, finding that "the prosecutor's alleged acts of misconduct did not deny Pasene a fair trial and do not

warrant vacating his convictions." *State v. Pasene*, 420 P.3d 988, at *20 (Haw. Ct. App. 2018).

On April 22, 2019, the Hawaiʻi Supreme Court reversed, finding that the trial court had abused its discretion by denying Pasene's motion for a mistrial. *Pasene*, 439 P.3d at 883; FAC at ¶¶ 4, 58.  Specifically, the court found that the DPA's conduct had been so egregious and pervasive as to taint the fairness of the entire trial and could not be said to be harmless beyond a reasonable doubt. *Pasene*, 439 P.3d at 890–91, 896.  Following remand, the First Circuit Court for the State of Hawaiʻi dismissed with prejudice the charges against Pasene.  FAC at ¶¶ 4, 58.  He was released from custody on November 6, 2019.  *Id.* at ¶¶ 43, 58.

On October 29, 2021, Pasene filed a Complaint[5] against the City and County of Honolulu and the various police officers and detectives who had been involved with investigating and prosecuting his case.  Dkt. No. 1.  Pasene's original Complaint appeared to assert violations of the First, Fourth, Fifth, Eighth, and Fourteenth Amendments to the United States Constitution, civil rights conspiracy, supervisory liability, municipal failure to train, supervise, and/or discipline under *Monell v. Dep't of Soc. Servs. of City of New York*, 436 U.S. 658 (1978), and unidentified state laws.  *See generally* Dkt. No. 1.  On April 11, 2022, the City

---

[5]In addition to his Complaint, Pasene filed an application to proceed *in forma pauperis*, Dkt. No. 4, which the Court granted on November 30, 2021.  *See* Dkt. No. 9.

filed a motion to dismiss, contending that Pasene failed to state a claim upon which relief may be granted.  Dkt. No. 40.  On May 6, 2022, Correa and Coons jointly filed a second motion to dismiss on the same grounds.  Dkt. No. 46.  The Court granted both motions on September 2, 2022 with partial leave to amend.  Dkt. No. 64.  Specifically, the Court dismissed without prejudice Counts 1, 2, 4, 5, and 6 for group pleading and/or failure to state a claim, and dismissed with prejudice Count 3 and all claims alleged against the individual Defendants in their official capacities.  *Id.* at 44.  Further, to the extent that Pasene intended to assert any First, Fifth, and/or Eighth Amendment claims, or any Hawaiʻi state law claims, the Court dismissed them without prejudice due to Pasene's failure to assert any relevant factual allegations.  *Id.*

On October 12, after being granted an extension of time, *see* Dkt. No. 67, Pasene filed his FAC, Dkt. No. 70, reasserting all of his prior-alleged counts,[6] and adding factual detail—including specific Defendants' names—in an attempt to cure the pleading deficiencies explained by the Court.  As interpreted by the Court, the FAC brings the following claims:

---

[6]As explained in the Court's prior orders, despite being re-asserted in the FAC, several of Pasene's claims were and remain dismissed with prejudice, including Count 3 and Counts 1–5 as asserted against the individual Defendants in their official capacities.  Dkt. No. 64 at 44. Moreover, Pasene appears to again assert his unelaborated First, Fifth, and Eighth Amendment claims and Hawaiʻi state law claims.  FAC at ¶ 42.  Without further explanation, including specific factual allegations, such claims must be dismissed under Federal Rules of Civil Procedure 8(a) and 12(b)(6).  *See* Dkt. No. 64 at 17 n.13; Dkt. No. 92 at 14 n.9.

**Count 1:** Deprivation of liberty without due process of law in violation of the Fourteenth Amendment, including claims under:

    a. *Neil v. Biggers*, 409 U.S. 188 (1972), for use of unconstitutionally suggestive identification procedures (Count 1a)

    b. *Horton v. Mayle*, 408 F.3d 570 (9th Cir. 2005), for failure to disclose leniency deals made with witnesses in exchange for their testimony (Count 1b); and

    c. *Devereaux v. Abbey*, 263 F.3d 1070 (9th Cir. 2001), for deliberate fabrication of evidence (Count 1c);

**Count 2:** Malicious prosecution in violation of the Fourth Amendment;

**Count 3:** Civil rights conspiracy;

**Count 4:** Intentional suppression of highly significant and/or exculpatory evidence in violation of the Fourteenth Amendment's Due Process Clause and *Tatum v. Moody*, 768 F.3d 806 (9th Cir. 2014);

**Count 5:** Supervisory liability for a subordinate's constitutional violations under 42 U.S.C. § 1983; and

**Count 6:** Failure to train, supervise, and/or discipline in constitutionally adequate investigation techniques, identification procedures, and/or *Brady* duties in violation of *Monell v. Dep't of Soc. Servs. of City of New York*, 436 U.S. 658 (1978).

FAC at ¶¶ 2, 7, 47–92; Dkt. No. 92 at 12, 14–28.

On October 27, 2022, the City, Coons, and Correa filed two motions to dismiss, contending that Pasene had failed to cure the deficiencies from the original Complaint, and that the FAC should be dismissed for again failing to state a claim upon which relief may be granted.  Dkt. Nos. 77–78.  On February 17, 2023, the Court issued an Order ("February 2023 Order"), granting in part and denying in part these motions to dismiss.  Dkt. No. 92.  Specifically, the Court

dismissed all counts against Correa and the City, but found that Pasene had now alleged sufficient factual detail to state a claim as to Counts 1, 2, 4, and 5 against Coons and the non-moving Defendants.[7]  *Id.* at 29, 55.

On February 27, 2023, Sellers filed a motion to dismiss.[8]  Dkt. No. 94.  The Court denied this motion as Sellers had previously defaulted on Pasene's original Complaint.  Dkt. No. 95.  Sellers moved to set aside the entry of default, Dkt. No. 96, which the Court granted, Dkt. No. 105.  On July 31, 2023, Sellers brought a renewed motion to dismiss the FAC.  Dkt. No. 106.  Pasene did not oppose the motion and Sellers did not file a Reply.  Pursuant to Local Rule 7.1(c), the Court elected to decide this matter without a hearing, Dkt. No. 123, and this Order follows.

## STANDARD OF REVIEW

Federal Rule of Civil Procedure 12(b)(6) authorizes the Court to dismiss a complaint that fails "to state a claim upon which relief can be granted."  Rule 12(b)(6) is read in conjunction with Rule 8(a), which requires "a short and plain statement of the claim showing that the pleader is entitled to relief."  Fed. R. Civ. P. 8(a)(2).  In other words, "[t]o survive a motion to dismiss, a complaint must

---

[7]For purposes of the February 2023 Order, the non-moving Defendants consisted of McCormick, Le, and Doe, who had not been served, and Sellers, who had an entry of default against him. Dkt. No. 92 at 28 n.17.

[8]The Court notes that Defendants McCormick, Le, and Doe have still not been served.  *See* Dkt. No. 120 (seeking a subpoena to discover, *inter alia*, the identity of Officer Doe and the addresses of McCormick and Sellers so as to effect service upon the same).

contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).

A claim is considered facially plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id*. (citing *Twombly*, 550 U.S. at 556). However, "the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions." *Id.* As such, "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice," nor do factual allegations that only permit the Court to infer "the mere possibility of misconduct." *Id.* at 678–79 (citing *Twombly*, 550 U.S. at 555).

## DISCUSSION[2]

The following claims remain against Sellers:  Count 1a–c, Count 2, Count 4, and Count 5.  Dkt. No. 92 at 55.  Sellers contends that he is entitled to dismissal of each on the grounds of failure to plead individualized allegations and qualified immunity.  The Court addresses each argument in turn.

---

[9]As Pasene is *pro se*, the Court liberally construes his pleadings.  *See Eldridge v. Block*, 832 F.2d 1132, 1137 (9th Cir. 1987).

I.    **Group Pleading**

To survive a motion to dismiss under Rule 12(b)(6), a plaintiff bringing

claims pursuant to 42 U.S.C. § 1983 must plead facts "alleg[ing] personal

participation in the constitutional violation on the part of the individual." *Hyun Ju*

*Park v. City & Cnty. of Honolulu*, 292 F.Supp.3d 1080, 1090 (D. Haw. 2018)

(citing *Jones v. Williams*, 297 F.3d 930, 934 (9th Cir. 2002)).   Generalized

allegations of wrongdoing or liability by a group of defendants are not sufficient;

rather, a plaintiff must "'set forth specific facts as to each individual defendant's'

deprivation of his rights." *Hallal v. Seroka*, 2018 WL 3528709, at *3 (E.D. Cal.

July 20, 2018) (quoting *Leer v. Murphy*, 844 F.2d 628, 634 (9th Cir. 1988)).

A.    **Count 1a: Unnecessarily Suggestive Identification Procedures[10]**

In Count 1a, Pasene asserts that Defendants engaged in the use of

unnecessarily suggestive identification procedures.   These claims are brought

pursuant to *Neil v. Biggers*, 409 U.S. 188 (1972), which provides that such

procedures are unconstitutional as a violation of due process.   *Id.* at 196, 198, 201.

To be unnecessarily suggestive, the procedure must create a "very substantial

likelihood of irreparable misidentification."   *Id.*; *see also United States v.*

---

[10]Count 1 is framed broadly as a Section 1983 claim for violation of Pasene's right to due
process of law under the Fourteenth Amendment.  *See* Dkt. No. 70 at ¶¶ 50–57.  In parsing
Pasene's admittedly confusing FAC, the Court previously found Count 1 to be split into three
separate constitutional claims—discussed here as Counts 1a, 1b, and 1c.  *See* Dkt. No. 92 at 15
n.10.

*Montgomery*, 150 F.3d 983, 992 (9th Cir. 1998) ("An identification procedure is

suggestive when it emphasizes the focus upon a single individual thereby

increasing the likelihood of misidentification.") (quotation marks, brackets, and

citations omitted).  To evaluate suggestiveness, the Court must undertake an

individualized evaluation, based on the "totality of the circumstances," and

considering factors such as:

> the opportunity of the witness to view the criminal at the time of the crime,
> the witness' degree of attention, the accuracy of the witness' prior
> description of the criminal, the level of certainty demonstrated by the
> witness at the confrontation, and the length of time between the crime and
> the confrontation.

*Biggers*, 409 U.S. at 199–200.

Here, the Court previously found that both Pasene's original Complaint and

FAC alleged facts sufficient to state a *Biggers* claim against McCormick and

Coons.  Dkt. No. 92 at 30.  Pasene alleges that McCormick and Coons showed at

least five eyewitnesses—Gabriel Sakaria, Richard Tagataese, Ropati Daniel

Saleimoa-Kehaku, Cherie-Ann Ramos, and Iakopo Samuelu—a singular photo of

Pasene, rather than a photo array.  FAC at ¶¶ 26, 52, 52a–b, 52d–e, 52h–k; *see also*

*Pasene*, 420 P.3d 988, at *6–7 (stating that McCormick used a single photo of

Pasene in his interviews with Tagataese and Sakaria, but showed a six-photo array

to another eyewitness—Samson Filipo—who was unable to make a positive

identification).  McCormick and Coons purportedly did so "off the record" and

"pressured" the witnesses to positively identify Pasene.  FAC at ¶¶ 52b, 52e.

Moreover, Pasene also alleges that a sixth witness—Muna—confessed to Pasene's

mother and sister that four years after his initial statement, McCormick and Coons

pressured him into falsely implicating Pasene in exchange for leniency on his own

criminal charges.  *Id.* at ¶¶ 37, 52f.  The Court found that, taken in the light most

favorable to Pasene, these allegations created a substantial likelihood of irreparable

misidentification.  *See* Dkt. No. 92 at 32–33.

However, despite the FAC's detail in describing how McCormick and Coons

allegedly engaged in such unnecessarily suggestive identification procedures,

Pasene fails to make a single factual allegation explaining how *Sellers* engaged in

any of the same.  Rather, Pasene ascribes each of the purportedly misleading

identification procedures to McCormick and Coons alone.  *See* FAC at ¶¶ 52, 52a–

e, 52g–k, 53a.  Accordingly, insofar as Count 1a is asserted against Sellers, it is

dismissed.

### B.   Count 1b: Failure to Disclose Muña's Leniency Deal

In Count 1b, Pasene asserts a claim under *Horton v. Mayle*, 408 F.3d 570

(9th Cir. 2005), alleging that Defendants unconstitutionally failed to disclose that

they had made a leniency deal with Muna in exchange for his testimony.  *Horton*

provides that the failure to disclose such a leniency deal—that is, the promise to a

State witness of consideration in exchange for testimony—may violate *Brady v.*

*Maryland*, 373 U.S. 83 (1963) because evidence of the deal could be key

impeachment material for the defense.  408 F.3d at 578–79; *see also Mellen v.*

*Winn*, 900 F.3d 1085, 1103–04 (9th Cir. 2018) (re-affirming that law enforcement

officers have a *Brady* duty to disclose material impeachment evidence to

prosecutors).

In the February 2023 Order, the Court found that Pasene's FAC alleged

sufficient factual detail to permit the reasonable inference that McCormick and

Coons promised Muna leniency in exchange for his agreement to testify against

Pasene during the second and third trials.  *See* Dkt. No. 92 at 35; FAC at ¶ 52b.

The Court also found that Pasene had sufficiently alleged that McCormick and

Coons had obscured this deal from defense counsel.  *See* Dkt. No. 92 at 36; FAC at

¶ 38 ("Cedro Muna denied receiving a promise or deal on his own cases to change

his first statement and to testify against Iosefa Pasene during his testimony at the

third trial); FAC at ¶ 52f (Muna testified at Pasene's second trial that "he never got

a deal from the prosecutor's office").

In contrast, the FAC still fails to allege facts sufficient to state a *Horton*

claim against Sellers.  The FAC states only that McCormick and Coons—not

Sellers—participated in each of the interviews with Muna, took his statements over

the years, and, as Muna purportedly admitted to Pasene's family, "promised [to

Muna] to get released after he testified for the state and blame Iosefa Pasene, he

would receive probation on his promotion of a dangerous drug charge in the second degree . . . [and] not [be] charged for absconding while on bail." FAC at ¶ 37. Therefore, because Pasene has failed to allege that Sellers was in any way connected with making promises to Muna in exchange for his testimony, or with failing to disclose the existence of such a deal to the defense prior to Pasene's second and/or third trials, Count 1b is dismissed.

### C.   <u>Count 1c: Deliberate Fabrication of Evidence</u>

In Count 1c, Pasene brings a claim pursuant to *Devereaux v. Abbey*, 263 F.3d 1070 (9th Cir. 2001), alleging that Defendants deliberately fabricated evidence against him, thereby resulting in the deprivation of his liberty without due process of law. *Devereaux* provides that "there is a clearly established constitutional due process right not to be subjected to criminal charges on the basis of false evidence that was deliberately fabricated by the government." *Id.* at 1074–75. To successfully assert such a claim, the plaintiff must allege: "(1) the defendant official deliberately fabricated evidence and (2) the deliberate fabrication caused the plaintiff's deprivation of liberty." *Spencer v. Peters*, 857 F.3d 789, 798 (9th Cir. 2017). Evidence is considered to be deliberately fabricated when the plaintiff shows either "direct evidence of deliberate fabrication" or "circumstantial evidence related to a defendant's motive." *Caldwell v. City & Cnty. of San Francisco*, 889 F.3d 1105, 1112 (9th Cir. 2018).

Here, the Court found in its February 2023 Order that Pasene's FAC alleged facts sufficient to permit the reasonable inference that McCormick and Coons deliberately fabricated evidence and that such fabrication contributed to his wrongful incarceration. *See* Dkt. No. 92 at 37–39.  Specifically, the FAC contended that McCormick and Coons coerced Muna to "lie" and "blame [Pasene] as the one who shot and killed Joseph Peneueta," misled several eyewitnesses into misidentifying Pasene, and testified falsely in front of the grand jury and at trial. FAC at ¶¶ 37, 52a, 52c, 53b.  Further, Pasene alleged such fabrications may have been motivated by personal bias, including a familial relationship between Muna and an HPD officer, as well as the desire to obtain a conviction following the first and second mistrials. *Id.* at ¶¶ 40, 52–53e; Dkt. No. 92 at 38–39.  As these false identifications were the "sole evidence incriminating him," the Court found that Pasene had sufficiently shown that such fabrications caused Pasene's wrongful incarceration.  FAC at ¶ 3; Dkt. No. 92 at 39–40.

Despite these elaborations, however, the FAC once again fails to provide any factual detail connecting Sellers with the alleged fabrication of evidence.  To the extent that Count 1c of the FAC mentions Sellers, it is only to allege that he testified as to the familial relationship between Muna and an HPD officer during one of Pasene's trials.  FAC at ¶ 40.  This, by itself, is not sufficient to show that Sellers participated in directly fabricating evidence contributing to Pasene's

wrongful incarceration.  *See Caldwell*, 889 F.3d at 1112.  Accordingly, because Pasene's allegations are not sufficient to support his *Devereaux* claim against Sellers, Count 1c is dismissed.

### D.   Count 2: Malicious Prosecution

In Count 2, Pasene alleges that Defendants engaged in malicious prosecution.  To bring a claim for malicious prosecution under Section 1983, a plaintiff must allege the elements of the state law claim and establish that the prosecution was conducted "for the purpose of denying [him] equal protection or another specific constitutional right."  *Awabdy v. City of Adelanto*, 368 F.3d 1062, 1066 (9th Cir. 2004) (quoting *Freeman v. City of Santa Ana*, 68 F.3d 1180, 1189 (9th Cir. 1995)).  Under Hawaiʻi law, the elements of the claim include: "(1) that the prior proceedings were terminated in the plaintiffs' favor, (2) that the prior proceedings were initiated without probable cause, and (3) that the prior proceedings were initiated with malice."  *Myers v. Cohen*, 688 P.2d 1145, 1148 (Haw. 1984) (citation omitted).  A grand jury indictment is *prima facie* evidence of probable cause, which a plaintiff may only rebut by proving that the "criminal prosecution was induced by fraud, corruption, perjury, fabricated evidence, or other wrongful conduct undertaken in bad faith."  *Awabdy*, 368 F.3d at 1067–68; *see also DeGroot v. United States*, 786 F. App'x 638, 642 (9th Cir. 2019).

- 16 -

In its February 2023 Order, the Court found that Pasene alleged the elements necessary to establish a claim for malicious prosecution against McCormick and Coons. *See* Dkt. No. 92 at 40–42. As an initial matter, Pasene plausibly alleged that the proceedings against him terminated in his favor, as they ended in the vacatur of his conviction and dismissal of the charges against him. Dkt. No. 92 at 42; FAC at ¶ 4. Further, the Court found that despite the grand jury indictment, the FAC plausibly asserted that Pasene's criminal prosecution lacked probable cause, as it was based on McCormick and Coons' wrongful conduct, and that it was instituted with malicious motives. *See* Dkt. No. 92 at 40–42; FAC at ¶¶ 3, 58, 63; *supra* at 15 (noting potential motives for fabrication of evidence). Finally, Pasene plausibly alleged that he was prosecuted for the purpose of denying him a specific constitutional right—that is, by intentionally initiating the prosecution against him based on fabricated evidence and suppressed exculpatory evidence, McCormick and Coons unlawfully seized and detained him in violation of the Fourth Amendment.[11] *See* FAC at ¶¶ 60, 64; *Albright*, 510 U.S. at 271 (recognizing a Fourth Amendment basis for a malicious prosecution claim); *Manuel v. City of Joliet*, 580 U.S. 357, 366–67 (2017) (same).

---

[11]Pasene additionally alleges that his malicious prosecution constituted a violation of the Due Process Clause of the Fourteenth Amendment. *See* FAC at ¶¶ 60, 64. The Supreme Court, however, has held that the Fourteenth Amendment's substantive due process protections cannot serve as a basis for a malicious prosecution claim under Section 1983. *Albright v. Oliver*, 510 U.S. 266, 268 (1994); *see also Awabdy*, 368 F.3d at 1068–69 (clarifying *Albright*'s holding regarding the constitutional bases for malicious prosecution claims).

Similarly, Pasene's FAC also plausibly alleges a malicious prosecution claim against Sellers. First, as the Court has previously established, Pasene has plausibly alleged that the proceedings against him were favorably terminated. Dkt. No. 92 at 42. No "affirmative indication of innocence" is required; rather, it is sufficient simply that "the criminal prosecution ended without a conviction." *Thompson v. Clark*, 596 U.S. 36, 49 (2022). Accordingly, because the First Circuit Court for the State of Hawaiʻi dismissed with prejudice the charges against Pasene following the Hawaiʻi Supreme Court's decision to vacate his conviction, this element is satisfied. *See* FAC at ¶¶ 4, 58.

Second, although the grand jury indictment is *prima facie* evidence of probable cause, Pasene has rebutted this inference with specific factual detail showing how the criminal prosecution against him was induced, at least in part, by Sellers' failure to retain the Chinatown surveillance footage. Pasene explains that Sellers "admitted [he] reviewed the Chinatown cameras," and "saw somebody who resembled Cedro Muna running and getting into a taxi cab and leaving at the time the shooting started." FAC at ¶ 59b. Despite this knowledge, however, Pasene alleges that Sellers "intentionally continued the prosecution against Mr. Pasene on the basis of . . . suppressed material exculpatory evidence." *Id.* at ¶ 60. At this stage of the proceedings, these allegations are sufficient to permit the inference that Sellers' wrongful conduct in failing to retain or disclose such footage caused

Pasene's prosecution without probable cause, particularly given the potentially exculpatory nature of such evidence. *See id.* at ¶ 63 (asserting Sellers' "wrongful and bad faith conduct . . . was actively instrumental in causing the initiation of the legal proceedings against Mr. Pasene.").

Third, as with McCormick and Coons, Pasene's FAC sufficiently alleges that Sellers instituted the proceedings against him with malice, or with some motivation other than bringing him to justice. Indeed, Sellers himself testified that Muna is related to an HPD officer who worked with the investigating officers and detectives. *Id.* at ¶ 40 ("Cedro Muna is also related to officer Eric Tanavasa who also was a cru [sic] member at HPD. This was also testified to by Defendant Daniel Sellers at trial."). As previously explained, taken in the light most favorable to Pasene, this allegation permits the inference that Sellers may have acted with favoritism towards Muna, or at least with a motive other than bringing Pasene to justice. *See* Dkt. No. 92 at 38.

Finally, Pasene has successfully alleged that Sellers acted for the purpose of denying him a specific constitutional right. As with McCormick and Coons, if Sellers instituted a criminal prosecution against Pasene while knowingly concealing exculpatory footage, then the FAC permits the inference that he did so for the purpose of depriving Pasene of his Fourth Amendment right to freedom

from detention or prosecution without probable cause.[12]  *See* FAC at ¶¶ 59b, 60, 64; *Albright*, 510 U.S. at 271; *Manuel*, 580 U.S. at 366–67.  This claim therefore survives.

    **E.**    **Count 4: Intentional Suppression of Exculpatory Evidence**

In Count 4, Pasene brings a claim pursuant to *Tatum v. Moody*, 768 F.3d 806 (9th Cir. 2014) for the intentional suppression of exculpatory evidence as it relates to Defendants' failure to preserve footage from the Chinatown surveillance cameras on the night of the shooting.  *Tatum* provides that a law enforcement officer violates the Due Process Clause of the Fourteenth Amendment if he: (1) fails to disclose, (2) highly significant or potentially dispositive exculpatory evidence to prosecutors, (3) through "conduct that is culpable in that the officers understood the risks to the plaintiff's rights from withholding the information or were completely indifferent to those risks," (4) which resulted in the plaintiff's detention of "unusual length."  *Id.* at 819–20.  "Highly significant" or "exculpatory" evidence "is not merely material but *strongly* indicative of the plaintiff's innocence."  *Id.* at 820.  "[O]fficial conduct violates due process only when [it] shocks the conscience, a standard satisfied in circumstances [where officers] either consciously or through complete indifference disregard[ed] the risk

---

[12]Although Pasene also asserts that Sellers acted for the purpose of denying him his right to due process under the Fourteenth Amendment, as explained above, *supra* at 17 n.11, such constitutional grounds are unavailing.

of an unjustified deprivation of liberty." *Id.* at 820–21 (quotation marks and citation omitted).

Here, Sellers contends that Pasene engages in impermissible group pleading by failing to individually articulate how each Defendant participated in the failure to retain and disclose the footage from the Chinatown surveillance cameras.  Dkt. No. 106 at 9–10.  The Court, however, does not agree.

First, as the Court has already explained in both of its previous Orders, Pasene has adequately alleged that Sellers had the Chinatown footage in his possession, knew it showed Muna near the site of the shooting at the time of the shooting, and nonetheless failed to retain, preserve, or disclose it.  *See* FAC ¶¶ 52f, 53c, 59b, 72; Dkt. No. 92 at 43; Dkt. No. 64 at 33.  Specifically, Pasene contends that Sellers—along with McCormick and Coons—"admitted to reviewing the ChinaTown camera footage of the 26 cameras that are located at the Chinatown substation that belong to the HPD," "saw someone that resembled Cedro Muna running and getting into a taxi cab and leaving at the time the shooting started," and "waited two days to attempt to recover these cameras and at that time the footage was not recoverable."  FAC at ¶¶ 28, 53c, 59b.  At this stage of the proceedings, this level of specificity is more than sufficient.

Second, such footage is highly significant or even exculpatory evidence.  Though the precise details of the footage are unknown, Pasene's allegations track

- 21 -

the DPA's characterization of the footage at the third trial—that the footage depicted Muna getting into a taxi and fleeing the area in close proximity to the time of the shooting.  *See* FAC at ¶ 59b; *Pasene*, 439 P.3d at 349.  Given that Muna and Pasene shared similar physical characteristics, and Muna was—at that point—a suspect in the case, the footage was highly significant, if not exculpatory.  *See* FAC at ¶ 72–73.

Third, Pasene has adequately alleged the culpability of Sellers' conduct. Having viewed the footage, Sellers was aware of the significance of what it depicted, even if he did not believe it to be exculpatory at the time.  Accordingly, Sellers certainly understood or was completely indifferent to the risks posed to Pasene's rights by failing to disclose the Chinatown footage, and nonetheless acted in a culpable manner by failing to do so.

Fourth and finally, Pasene has adequately pled that he was detained for an unusual length of time.  Pasene was incarcerated for ten and a half years—certainly an "unusual length" of time and well beyond the twenty-seven months that the *Tatum* court found to satisfy the standard.  *See* 768 F.3d at 820.  In sum, Count 4 survives insofar as it relates to Sellers' failure to preserve or disclose the Chinatown footage.

Beyond the Chinatown surveillance footage, Sellers additionally contends that the Court previously mischaracterized Pasene's allegations in Count 4

regarding McCormick, Coons, and Sellers' failure to disclose that "Malo Sooalo, Muña's cousin, was in a physical altercation with Peneueta on the night of the shooting, providing Muña with motive to harm Peneueta." Dkt. No. 92 at 44 (citation omitted). Specifically, Sellers contends that Pasene alleged only that Sellers knew of the *familial relationship* between Muna and Sooalo—not that he knew that Sooalo and Peneueta had been involved in a physical altercation on the night of the shooting. Dkt. No. 106 at 10–11. Sellers is correct. The FAC provides:

> 40. Cedro Muna is related to Malo Sooalo from Kalihi , kuhio park terrace where the descendant [sic] Joseph Peneueta was from. Cedro Muna is also related to officer Eric Tanavasa who also was a cru [sic] member at HPD. This was also testified to by Defendant Daniel Sellers at trial.
>
> 41. Malo Sooalo is a person who was in a physical altercation with the descendant [sic] the night of the shooting. Malo is Cedro Muna's cousin and the descendant of Joseph Peneueta's friend. This was testified to by bail bonds agent Lisa DelRio who testified at the first trial for the state with this information. A police report had to be made about this physical altercation because the police came to the scene and broke it up. Why this exculpatory and important was not turned over to the plaintiff is unknown.

FAC at ¶¶ 40–41. Pasene therefore fails to plausibly allege that Sellers knew of, let alone failed to disclose, the physical altercation between Sooalo and Peneueta. To the extent that Pasene relies on it as an alternative basis to hold Sellers liable on Count 4, it is not sufficient.

### F.   **Count 5: Supervisory Liability**

There is no *respondeat superior* liability under 42 U.S.C. § 1983.  *Vazquez v. Cnty. of Kern*, 949 F.3d 1153, 1166 (9th Cir. 2020).  Rather, Section 1983 provides for supervisory liability for a subordinate's constitutional violations "if the supervisor participated in or directed the violations, or knew of the violations and failed to act to prevent them."  *Maxwell v. Cnty. of San Diego*, 708 F.3d 1075, 1086 (9th Cir. 2013) (quotation marks and citation omitted).

Here, Pasene has failed to establish that Sellers was a supervisor, let alone that he "participated in," "directed," or knowingly "failed to act to prevent" constitutional violations committed by any subordinates.  Indeed, the FAC implies that Sellers was himself a *subordinate*, not a supervisor.  *See* FAC at ¶ 30 (explaining "McCormick and [Coons] were the lead investigators . . . [and] directed all aspects of the investigation or were informed of the results.").  As a subordinate cannot be held liable on a theory of supervisory liability, Count 5 is dismissed.  *See, e.g.*, *Hernandez v. Gates*, 100 F. Supp. 2d 1209, 1218–20 (C.D. Cal. 2000) (finding no supervisorial liability under Section 1983 where the defendants lacked a direct supervisory relationship to the alleged constitutional wrongdoers).

## II.   <u>Qualified Immunity</u>

The doctrine of qualified immunity is an affirmative defense, shielding government officials from personal liability "insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 817–18 (1982). To overcome qualified immunity, the plaintiff must therefore "plead facts showing (1) that the official violated a statutory or constitutional right, and (2) that the right was 'clearly established' at the time of the challenged conduct." *Ashcroft v. al-Kidd*, 563 U.S. 731, 735 (2011) (citing *Harlow*, 457 U.S. at 818). "A clearly established right is one that is 'sufficiently clear that every reasonable official would have understood that what he is doing violates that right.'" *Mullenix v. Luna*, 577 U.S. 7, 11 (2015) (quotation marks and citation omitted). In other words, "qualified immunity protects all but the plainly incompetent or those who knowingly violate the law." *Id.* at 12 (quotation marks and citation omitted).

Sellers contends, with little elaboration, that he is entitled to qualified immunity on Counts 2 and 4.[13] *See* Dkt. No. 106 at 9, 11–13. The Court disagrees. As an initial matter, for the reasons detailed in the analyses of Counts 2

---

[13]Sellers also states that Counts 1a–c and 5 should be dismissed on the basis of qualified immunity. *See* Dkt. No. 106 at 8–9, 13. However, because Pasene has failed to state a claim against Sellers on those counts, it is unnecessary to address Sellers' alternative argument that he is entitled to qualified immunity.

and 4, *supra*, the Court has already found that Pasene has adequately pled facts establishing that Sellers violated his Fourth Amendment right against malicious prosecution and Fourteenth Amendment right against an officer's failure to disclose significant or potentially dispositive exculpatory evidence to prosecutors. Indeed, with respect to at least the *Tatum* claim, Sellers acknowledges the same. *See* Dkt. No. 106 at 11 ("The Court has already ruled that Plaintiff adequately alleged *Tatum* claims as to Sellers' alleged failure to recover the Chinatown video footage.").

Further, Sellers fails to provide any authority to support his argument that such rights were not clearly established. Nor can he, given that, as the Court has previously explained, the rights against both malicious prosecution and the failure to disclose significant or potentially dispositive exculpatory evidence have "long been clearly established for the purposes of qualified immunity." Dkt. No. 92 at 29 n.18; *see also Myers v. City of Hermosa Beach*, 299 F. App'x 744, 746 (9th Cir. 2008) ("[n]o doubt malicious prosecution is a possible constitutional claim."); *Galbraith v. Cnty. of Santa Clara*, 307 F.3d 1119, 1126–27 (9th Cir. 2002) (finding malicious prosecution claims cognizable under Section 1983 and the Fourth Amendment); *Poulos v. City of Los Angeles*, 2022 WL 17072884, at *12 (C.D. Cal. Sept. 30, 2022) (denying qualified immunity on the basis that "it was clearly established in 2001 that [the officer] had a duty to disclose exculpatory evidence to

the prosecutors); *Tatum v. Moody*, 768 at 821 n.10 (noting that the constitutional claim it recognized was clearly established for the purposes of qualified immunity).  Accordingly, upon viewing the footage from the Chinatown surveillance cameras, any reasonable officer would have understood the significance of what it depicted and realized that failing to preserve or disclose the footage would violate those rights.

In sum, Sellers has failed to show that his failure to preserve the Chinatown surveillance footage did not violate a clearly established right of which a reasonable person would have known.  His motion to dismiss Counts 2 and 4 is therefore denied insofar as the Court finds he is not entitled to qualified immunity on those claims.

## **CONCLUSION**

For the reasons set forth herein, Sellers' Motion to Dismiss the First Amended Complaint, Dkt. No. 106, is GRANTED IN PART and DENIED IN PART. Specifically, Counts 1a, 1b, 1c, and 5 are DISMISSED against Sellers.  Counts 2 and 4 survive insofar as they relate to Sellers' alleged failure to preserve or disclose

the footage from the Chinatown surveillance cameras.  No further leave to amend is permitted.

IT IS SO ORDERED.

DATED: December 7, 2023 at Honolulu, Hawaiʻi.

Derrick K. Watson
Chief United States District Judge

_Iosefa Pasene vs. Boisse Correa_, et al; Civil No. 21-00427 DKW-WRP; **ORDER GRANTING IN PART AND DENYING IN PART DEFENDANT'S MOTION TO DISMISS**