IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAI‘I

IOSEFA PASENE,

        Plaintiff,

  vs.

BOISSE CORREA, *et al.*,

        Defendants.

Case No. 21-cv-00427-DKW-WRP

**ORDER GRANTING
DEFENDANTS COONS AND
SELLERS' MOTIONS FOR
SUMMARY JUDGMENT**

      Plaintiff Iosefa Pasene, proceeding *pro se*, asserts various civil rights claims

against Honolulu Police Department ("HPD") Detectives Daniel Sellers[1] and

Theodore Coons, arising out of Pasene's detention on a murder conviction that was

vacated in 2019 by the Hawai‘i Supreme Court due to prosecutorial misconduct.[2]

On February 17, 2023 and December 7, 2023, the Court granted in part and denied

in part two motions to dismiss filed by Coons and Sellers, respectively.  Dkt. Nos.

92 & 128.  Now before the Court are Coons and Sellers' motions for summary

---

[1]Although the First Amended Complaint ("FAC") identifies Sellers as "Officer Daniel Sellers," *see* FAC at ¶ 14, Dkt. No. 70, it appears that at some point between the investigation and Pasene's third trial, Sellers became a detective.  *Compare* SCSF Ex. E at 6, Dkt. No. 407-7, *with* Aff. of Daniel Sellers at ¶ 1, Dkt. No. 407-2, *and* Tr. of Sellers' Mar. 6, 2014 Trial Test. at 147:10–12, Dkt. No. 407-3.  The Court therefore refers to Sellers as a detective herein.
[2]Pasene also originally named the City and County of Honolulu ("the City"), Chief Boisse Correa, Detective Gregory McCormick, Officer Albert Le, and a John/Jane Doe 911 dispatcher as Defendants.  *See* FAC at ¶¶ 11–17.  For various reasons, including the City and Correa's successful motions to dismiss, *see* Dkt. No. 92, and Pasene's difficulties identifying and/or serving Doe, McCormick, and Le, *see, e.g.*, Dkt. Nos. 137, 421 & 433, those Defendants no longer remain.

judgment on the remaining counts.  Dkt. Nos. 404 & 406.

Having reviewed the parties' briefing, evidentiary submissions, and the record generally, the Court finds that summary judgment is warranted for both Coons and Sellers.  Specifically, Pasene has failed to provide *any* evidence demonstrating a genuine dispute of material fact on any remaining count—as is his burden to do.  Instead, Pasene repeatedly argues only that he "believes he has enough to prove all his claims against all Defendants" and "plans to present [such] evidence at trial."  *See* Dkt. Nos. 420 & 424.  At this stage, however, that is no longer enough.  Pasene's claims cannot survive based on allegations or theories alone.  As a result, Defendants Coons and Sellers' motions for summary judgment, Dkt. Nos. 404 & 406, are GRANTED, as more fully explained below.

## FACTUAL & PROCEDURAL BACKGROUND[3]

In the early morning hours of March 28, 2009, three men—Iosefa Pasene, Cedro Muna, and Antonius Toloai—were released from HPD custody following their arrest the previous day on various narcotics charges.  CCSF at ¶¶ 1–2; Depo. of Iosefa Pasene Vol. I at 242:24–243:10, Dkt. No. 405-4; Sellers Aff. at ¶¶ 13–14; *State v. Pasene*, 439 P.3d 864, 871 (Haw. 2019).[4]  Pasene's cousin—Zorro Rye—

---

[3]The following facts are taken from Coons' concise statement of facts ("CCSF"), Dkt. No. 405, Sellers' concise statement of facts ("SCSF"), Dkt. No. 407, and the exhibits and references filed in support of each.  Because Pasene did not file a concise statement of facts in opposition to either the CCSF or SCSF, the facts contained in both are deemed admitted.  *See* L.R. 56.1(g).
[4]The Court takes judicial notice of publicly available court documents whose accuracy cannot and have not been reasonably questioned.  *See* Fed. R. Evid. 201(b).

picked up the three men from the police station upon their release and dropped

them off in Honolulu's Chinatown a short time later.  Pasene Depo. Vol. I at 132:3,

243:8–18; CCSF at ¶ 3.

Thereafter, at approximately 4:00 a.m., two men in a blue Buick sedan drove

up to a group of people gathered outside the Pauahi Recreation Center in

Chinatown, got out of the car, and shot and killed a man named Joseph Peneueta.

*Pasene*, 439 P.3d at 871; CCSF at ¶ 1.  Witnesses, including Gabriel Sakaria,

Richard Tagataese, Cherie-Ann Ramos, Ropati Daniel Saleimoa-Kekahu, and

Iakopo Samuelu, identified Pasene as one of the shooters and the driver of the blue

Buick.  *Pasene*, 439 P.3d at 873–75; SCSF Ex. E at 11–14, 32–34, 39–42, 59–60.[5]

In addition, HPD surveillance cameras located on North Pauahi Street recorded a

Buick leaving the scene of the shooting shortly afterwards.  SCSF Ex. C at 8, Dkt.

No. 407-5; SCSF Ex. E at 25–26.  Roughly two hours later, a blue Buick was

reported burning outside of Wahiawā.  *Pasene*, 439 P.3d at 871.

Following the shooting, Detective Theodore Coons from HPD's Homicide

Division was assigned as the scene investigator into Peneueta's death.  CCSF at

¶ 5; Decl. of Theodore Coons at ¶¶ 3, 5, Dkt. No. 405-2.  Detective Daniel

---

[5]With the exception of transcripts, in citing to the parties' exhibits, the Court utilizes the page
numbers assigned by CM/ECF in the top right corner of each page, rather than the page numbers
at the bottom of each page, because the latter does not extend consistently throughout each
document.

Sellers—who was assigned to the HPD Crime Reduction Unit ("CRU") located in

Chinatown—was familiar with HPD's surveillance camera network and knew from

prior operations that Pasene often drove a blue Buick with the license plate number

JGA 055. Sellers Aff. at ¶¶ 2–9; Sellers' Mar. 6, 2014 Trial Test. Tr. at 156:18–

157:5. After being notified that Peneueta had been shot in Chinatown, that the

shooters had arrived and fled in a Buick sedan, and that Pasene was a possible

suspect, Sellers provided Coons and the other Homicide Division detectives with a

report detailing his knowledge of a Buick and its operation by Pasene. Sellers Aff.

at ¶¶ 15–19, 24; Sellers' Mar. 6, 2014 Trial Test. Tr. at 163:19–164:6; SCSF Ex. B

at 3, Dkt. No. 407-4. Sellers did not, however, view any footage from the

Chinatown surveillance cameras from the time of the shooting. SCSF at ¶ 6;

Sellers Aff. at ¶ 22; Tr. of Sellers' May 4, 2012 Hearing Test. at 94:13–24, Dkt.

No. 407-6; Depo. of Iosefa Pasene Vol. II at 327:5–14, Dkt. No. 407-11.

As the scene investigator, Coons did review footage from various

surveillance cameras in Chinatown from around the time of the shooting. Coons

Decl. at ¶¶ 12–13. Following this review, Officer Richard Fikani was directed to

download and record footage from several of those cameras, including both the

camera on North Pauahi Street (Camera 12) as well as a camera located on River

Street (Camera 11). Cameras 11 and 12 depicted the Buick as well as Muna

entering a taxi and leaving Chinatown at approximately 4:16 a.m. *Id.* at ¶ 14;

CCSF Ex. M at 5, Dkt. No. 405-16; SCSF Ex. E at 25; SCSF Ex. F at 5, Dkt. No.

407-8.  Upon Fikani's attempt to record the footage, however, the recording device

malfunctioned.  CCSF at ¶ 6; SCSF at ¶ 8; Coons Decl. at ¶ 15; CCSF Ex. M at 5;

SCSF Ex. F at 5.  Fikani contacted Sensormatic Hawaii, the technical support

vendor for the surveillance cameras.  CCSF Ex. M at 5; SCSF Ex. E at 26; SCSF

Ex. F at 5.  Sensormatic instructed him to turn off the computer to prevent the

footage from being automatically overwritten[6] and to wait for a technician's arrival

the next day.  *Id.*  Although Fikani did so, the Sensormatic technicians were

unable to recover the footage because it had already been overwritten.  *Id.*  Both

the substance of the footage and the failure to recover the same were later

memorialized in reports disclosed to both the Deputy Prosecuting Attorney

("DPA") and Pasene's defense attorney.  CCSF at ¶ 7; SCSF at ¶ 9; CCSF Ex. M

at 2, 5; SCSF Ex. E at 1–2, 25–26; SCSF Ex. F at 1–2, 5; SCSF Ex. C at 1–2, 8.

Two days after the shooting—on March 30, 2009—Pasene was arrested.

CCSF at ¶ 4.  On April 2, 2009, following the presentation of HPD and eyewitness

testimony, Pasene was indicted by a Grand Jury for, among other things, second

degree murder.  CCSF at ¶ 12; SCSF at ¶ 5; CCSF Ex. D at 10–14, Dkt. No. 405-7;

SCSF Ex. G at 1–5, 407-9; *Pasene*, 439 P.3d at 871.  Following three separate

---

[6]At the time, HPD surveillance cameras preserved footage for only 42 hours before recording
over it.  CCSF Ex. M at 5; SCSF Ex. F at 5.

trials,[7] Pasene was convicted and sentenced to life imprisonment with the possibility of parole.  CCSF at ¶ 15; *Pasene*, 439 P.3d at 883.

At Pasene's third trial, the DPA presented testimony from Sellers that between February and March 2009, he frequently observed Pasene on the Chinatown surveillance cameras, operating a blue Buick with the license plate JGA 055.  Sellers' Mar. 6, 2014 Trial Test. Tr. at 156:18–157:5.  The DPA also introduced testimony from Sakaria and Tagataese, who identified Pasene as both the driver of the blue Buick and one of the Peneueta's shooters.  *Pasene*, 439 P.3d at 873, 875.  In addition, Muna testified that he and Pasene had traveled to Chinatown together, that he had witnessed Pasene and Peneueta arguing, that Pasene threatened Saleimoa-Kekahu with a gun, that he heard gunshots, and that, while boarding a taxi, he saw Pasene drive by in a blue Buick.  *Id.* at 879.  On cross-examination, Muna admitted that his testimony was inconsistent with a prior statement he had given to police on the day of the murder that made no mention of Pasene threatening Saleimoa-Kekahu with a gun or driving by in a blue Buick.  *Id.* Muna further admitted that his testimony only changed in 2013, after he had been arrested for skipping bail and fleeing to California, and that his cooperation in the instant case could be beneficial in his own legal proceedings.  *See id.*

---

[7]The first two trials ended with hung juries.  CCSF Ex. B at 26, 41–42, Dkt. No. 405-5; *Pasene*, 439 P.3d at 871.

Pasene's primary defense was one of mistaken identity, arguing that Muna could have been the killer.[8]  *Id.* at 873.  During his case-in-chief, Pasene presented testimony from Linda Del Rio, the bail bond agent who bailed both Muna and Pasene out of HPD custody on the morning of March 28, 2009.  *Id.* at 873–74, 879. Del Rio testified that Muna owned a blue four-door sedan, which he had attempted to use as collateral for his bond.  *Id.* at 879.  Del Rio further testified that Muna had used the sedan as collateral on a previous occasion and had called her between 10:30 and 11:00 a.m. on the morning of the shooting, stating that he "was in Wahiawa, and that he had done something and he needed to . . . turn himself in" because "Aunty, I shot someone."  *Id.*

In rebuttal, the DPA introduced testimony from both Sakaria and Tagataese who independently stated that they each knew Muna and was positive that the driver of the blue Buick at the time of the murder was Pasene, not Muna.  *Id.* at 875; *State v. Pasene*, 420 P.3d 988, at *6 (Haw. Ct. App. 2018).  The DPA also attempted to introduce evidence that Muna could not have been the killer because the surveillance footage from Camera 11 showed him getting into a taxi and driving away at the time of the shooting.  *Pasene*, 439 P.3d at 873–74, 876–877.

---

[8]Muna and Pasene shared similar physical characteristics and were dressed alike at the time of their release from police custody.  *Pasene*, 439 P.3d at 871 n.2 (describing "Pasene as a 21-year-old Samoan male with black hair and brown eyes, standing 6'2" tall and weighing 250 pounds" and "Muna as a 22-year-old Samoan male with black hair and brown eyes, standing 6'1" tall and weighing 240 pounds" with both "wearing plain white t-shirts with short mustaches and long hair.").

Because the actual footage was not recovered, however, the trial judge barred the DPA from referencing any specific details—instead limiting him to soliciting testimony from Coons and McCormick that "based upon what [they] viewed in the video, . . . essentially Mr. Muna was cleared." *Id.* at 874, 876–77. Nevertheless, despite this and other explicit warnings and instructions, the DPA informed the jury during opening statements and closing arguments that Coons and McCormick had eliminated Muna as a suspect *because* the surveillance footage depicted him getting into a taxi and departing Chinatown as shots were heard. *Id.* at 874, 880–81.

Based on these and other frequent and flagrant violations of the trial court's instructions by the DPA, Pasene moved for a mistrial several times during the third trial, and again after the guilty verdict. *Id.* at 874–76, 880–83. Each time, the motion was denied. *Id.* Pasene then appealed to the Intermediate Court of Appeals ("ICA"), arguing, among other things, that the trial court erred by denying his motions for a mistrial based on prosecutorial misconduct. *Pasene*, 420 P.3d at *1. The ICA, however, affirmed the conviction, noting that while it did not "condone or excuse [the] prosecutor's conduct," the "alleged acts of misconduct did not deny Pasene a fair trial and do not warrant vacating his convictions." *Id.* at *20 n.20.

Pasene then sought review by the Hawai'i Supreme Court. The Supreme Court vacated his conviction on April 22, 2019, finding that the trial court had

abused its discretion by denying the motions for a mistrial based on prosecutorial misconduct. CCSF at ¶ 17; *Pasene*, 439 P.3d at 870–71. In doing so, the Supreme Court noted that "[a]though the evidence supporting Pasene's convictions was strong," the DPA's conduct had been so egregious and pervasive as to taint the fairness of the entire trial, and therefore could not be said to be harmless beyond a reasonable doubt. *See Pasene*, 439 P.3d at 890, 896. Following remand, the trial court dismissed the charges against Pasene with prejudice, and he was released from custody on November 6, 2019. Dkt. No. 406 at 7; FAC at ¶¶ 43, 58.

On October 29, 2021, Pasene, proceeding *pro se*,[9] filed a Complaint against the various individuals and entities involved with investigating and prosecuting his case—specifically, the City and County of Honolulu, HPD Chief Boisse Correa, Detective Gregory McCormick, Detective Theodore Coons, Detective Daniel Sellers, Officer Albert Le, and a John/Jane Doe 911 dispatcher.[10] Compl. at ¶¶ 10–17, Dkt. No. 1. As interpreted by the Court, Pasene alleged the following counts pursuant to 42 U.S.C. § 1983:

> **Count 1:**[11] Deprivation of liberty without due process of law in violation of the Fourteenth Amendment against all individual Defendants, including claims under:

---

[9]Because Pasene is *pro se*, the Court liberally construes his filings. *See Erickson v. Pardus*, 551 U.S. 89, 94 (2007).

[10]In addition to his Complaint, Pasene filed an application to proceed *in forma pauperis*, Dkt. No. 4, which the Court granted on November 30, 2021, Dkt. No. 9.

[11]As the Court previously explained, Count 1 was initially framed as a generalized Section 1983 claim for violation of Pasene's right to due process of law under the Fourteenth Amendment. *See* Compl. at ¶¶ 47–60; Dkt. 64 at 20–21. In parsing Pasene's admittedly confusing Complaint

    **a.** *Neil v. Biggers*, 409 U.S. 188 (1972) for use of unconstitutionally suggestive identification procedures (Count 1a);

    **b.** *Horton v. Mayle*, 408 F.3d 570 (9th Cir. 2005), for failure to disclose a leniency deal made with a witness in exchange for his testimony (Count 1b); and

    **c.** *Devereaux v. Abbey*, 263 F.3d 1070 (9th Cir. 2001), for deliberate fabrication of evidence (Count 1c);

**Count 2:** Malicious prosecution in violation of the Fourth and Fourteenth Amendments against all individual Defendants;

**Count 3:** Civil rights conspiracy against all individual Defendants;

**Count 4:** Failure to disclose highly significant and/or exculpatory evidence in violation of *Tatum v. Moody*, 768 F.3d 806 (9th Cir. 2014) against all individual Defendants;

**Count 5:** Supervisory liability against all individual Defendants; and

**Count 6:** Failure to train, supervise, and/or discipline in constitutionally adequate investigation techniques, identification procedures, and/or *Brady* duties, in violation of *Monell v. Dep't of Soc. Servs. of City of New York*, 436 U.S. 658 (1978), against the City.

*See* Compl. at ¶¶ 2, 7, 47–97, 92;[12] *see also* Dkt. No. 64 at 20–42 (construing claims). In addition, although not enumerated in the counts, Pasene also generally alleged that "Defendant[s]' actions deprived Iosefa Pasene of his civil rights under

---

and FAC, the Court liberally construed Count 1 by splitting it into three separate constitutional claims—discussed here, and elsewhere, as Counts 1a, 1b, and 1c. *See* Dkt. No. 64 at 20–27; FAC at ¶¶ 50–57; Dkt. No. 92 at 15 n.10; Dkt. No. 128 at 10 n.10.

[12]Paragraph 92 is repeated after paragraph 97 in the Complaint.

the First, Fourth, Fifth, Eighth, and Fourteenth Amendments to the United States Constitution and the laws of the state of Hawaii." Compl. at ¶ 39.

On April 11, 2022, the City filed a motion to dismiss for failure to state a claim upon which relief may be granted, Dkt. No. 40, followed on May 6, 2022 by another motion to dismiss filed jointly by Coons and Correa on the same grounds, Dkt. No. 46. The Court granted both motions on September 2, 2022 with partial leave to amend. Dkt. No. 64. Specifically, the Court dismissed without prejudice Counts 1, 2, 4, 5, and 6 for group pleading and/or failure to state a claim, and dismissed with prejudice Count 3 and all claims alleged against the individual Defendants in their official capacities.[13] *Id.* at 43–44. Further, to the extent that Pasene intended to assert any First, Fifth, and Eighth Amendment claims, or any Hawai'i state law claims, the Court dismissed them without prejudice due to Pasene's failure to assert any relevant factual allegations. *Id.*

On October 12, 2022, Pasene filed the operative FAC, Dkt. No. 70, reasserting each of his previously alleged counts and adding factual detail in an attempt to cure the pleading deficiencies previously identified by the Court. In response, on October 27, 2022, the City, Coons, and Correa again moved to dismiss the FAC, arguing that Pasene's changes did not cure the pleading

---

[13]Each of the claims against the individual Defendants was asserted in both their official and individual capacities. Compl. at 2–4.

- 11 -

deficiencies from the original Complaint, and that the FAC should likewise be dismissed for failure to state a claim upon which relief may be granted. Dkt. Nos. 77 & 78. On February 17, 2023, the Court issued an Order granting in part and denying in part these motions to dismiss. Dkt. No. 92. Specifically, the Court dismissed all counts against Correa and the City, as well as any unenumerated claims under the First, Fifth, and Eighth Amendments or Hawaiʻi state law, but found that Pasene had now alleged sufficient factual detail to proceed on Counts 1, 2, 4, and 5[14] against Coons and the non-moving Defendants.[15] *Id.* at 55, 55 n.40.

On February 27, 2023, Sellers filed a motion to dismiss the FAC. Dkt. No. 94. The Court denied this motion, as Sellers had previously defaulted on Pasene's original Complaint. Dkt. No. 95. Sellers then moved to set aside the entry of default on February 28, 2023, Dkt. No. 96, and the Court granted that motion on July 27, 2023, Dkt. No. 105. On July 31, 2023, Sellers filed a renewed motion to dismiss the FAC. Dkt. No. 106. The Court granted the motion in part and denied it in part on December 7, 2023, finding that while the unenumerated claims and

---

[14]As explained in the Court's previous Orders, despite being re-asserted in the FAC, several of Pasene's claims were and remain dismissed with prejudice, including Count 3 and Counts 1–5 as alleged against the individual Defendants in their official capacities. *See* Dkt. No. 64 at 44; Dkt. No. 92 at 14 n.9; Dkt. No. 128 at 6 n.6.

[15]For the purposes of the February 17, 2023 Order, the non-moving Defendants included McCormick, Le, and Doe—who had not and have not been properly served—and Sellers, who had an entry of default against him. Dkt. No. 92 at 28 n.17.

Counts 1 and 5 failed to state a claim against Sellers, Counts 2 and 4 survived.
Dkt. No. 128.

On November 8, 2024, Coons and Sellers each filed a motion for summary
judgment on the claims remaining against them.  Dkt. Nos. 404 & 406.  On
November 18, 2024, Pasene filed an "objection" to the motions for summary
judgment, Dkt. No. 420, followed by a "continued response and answers to
Defendants [sic] joint motion for summary judgment" on November 21, 2024, Dkt.
No. 424.[16]  Coons and Sellers both replied on December 6, 2024.[17]  Dkt. Nos. 441
& 442.  Pursuant to Local Rule 7.1(c), the Court elected to decide this matter
without a hearing, Dkt. No. 444, and issued an Entering Order granting Coons and
Sellers' motions for summary judgment, Dkt. No. 446.[18]  This Order now follows
to further explain that ruling.

---

[16]Due to Pasene's *pro se* status, the Court construes both of these filings as a single opposition to
Coons and Sellers' motions for summary judgment.

[17]Following the completion of briefing, on December 12, 2024, Pasene filed an "amended
answer and response to Defendant's [sic] motion for summary judgment." Dkt. No. 445.  The
Court construes this filing as an unauthorized sur-reply, and therefore STRIKES it. *See* L.R. 7.2.

[18]On November 25, 2024, in the midst of summary judgment briefing, Pasene identified various
exhibits for trial. Dkt. No. 428.  There is, however, no need to address the admission of these
exhibits for trial in light of the Court's decision on the instant summary judgment motions.  To
the extent Pasene's submission seeks such admission, it is MOOT and deemed WITHDRAWN.

## STANDARD OF REVIEW

## I.    Summary Judgment

Federal Rule of Civil Procedure 56(a) provides that a party is entitled to summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Where, as here, "the non-moving party bears the burden of proof at trial, the moving party need only prove that there is an absence of evidence to support the non-moving party's case."  *In re Oracle Corps. Secs. Litig.*, 627 F.3d 376, 387 (9th Cir. 2010). If the moving party does so, "the burden then shifts to the non-moving party to designate specific facts demonstrating the existence of genuine issues for trial."  *Id.* In assessing a motion for summary judgment, all facts are construed in the light most favorable to the non-moving party.  *Genzler v. Longanbach*, 410 F.3d 630, 636 (9th Cir. 2005).

## II.    Qualified Immunity

The doctrine of qualified immunity is an affirmative defense, shielding government officials from personal liability "insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known."  *Harlow v. Fitzgerald*, 457 U.S. 800, 815–18 (1982). To overcome qualified immunity, the plaintiff must therefore "plead[] facts showing (1) that the official violated a statutory or constitutional right, and (2) that

the right was 'clearly established' at the time of the challenged conduct." *Ashcroft*

*v. Al-Kidd*, 563 U.S. 731, 735 (2011) (citing *Harlow*, 457 U.S. at 818).  "A clearly

established right is one that is sufficiently clear that every reasonable official

would have understood that what he is doing violates that right." *Mullenix v. Luna*,

577 U.S. 7, 11 (2015) (quotation marks and citation omitted).  In other words,

"qualified immunity protects all but the plainly incompetent or those who

knowingly violate the law." *Id.* at 12 (quotation marks and citation omitted).

## DISCUSSION

The following counts remain: Count 1a, Count 1b, Count 1c, Count 2, Count

4, and Count 5.  Specifically, Pasene maintains Counts 1a–c, 2, 4, and 5 against

Coons, and Counts 2 and 4 against Sellers.  *See* Dkt. No. 92 at 55; Dkt. No. 128 at

27–28.  Both Coons and Sellers now move for summary judgment on the grounds

of qualified immunity.  Dkt. No. 404-1 at 7–8; Dkt. No. 406 at 2.  The Court

addresses each count in turn.[19]

## I.    Count 1a: Unnecessarily Suggestive Identification Procedures

In Count 1a, Pasene asserts that Coons, individually and in concert with

others, employed unconstitutionally suggestive identification procedures with six

---

[19]Because the Court previously found that the right underlying each count was clearly
established at the time of the challenged conduct, the Court addresses only whether there is a
genuine dispute of material fact that Coons and/or Sellers violated that constitutional right.  *See*
*Pearson v. Callahan*, 555 U.S. 223, 236 (2009); Dkt. No. 92 at 29 n.18; Dkt. No. 128 at 26–27.

eyewitnesses, in violation of *Neil v. Biggers*, 409 U.S. 188 (1972). FAC at ¶ 52b.

Under *Biggers*, a police identification procedure violates a defendant's due process

rights where it is "so impermissibly suggestive as to give rise to a very substantial

likelihood of irreparable misidentification." 409 U.S. at 197 (quotation marks and

citation omitted). To make this determination, the Court must consider the

reliability of the witness' identification under the "totality of the circumstances,"

including factors such as:

> the opportunity of the witness to view the criminal at the time of the
> crime, the witness' degree of attention, the accuracy of the witness'
> prior description of the criminal, the level of certainty demonstrated by
> the witness at the confrontation, and the length of time between the
> crime and the confrontation.

*See id.* at 196, 199–200; *see also United States v. Montgomery*, 150 F.3d 983, 992

(9th Cir. 1998) ("An identification procedure is suggestive when it emphasizes the

focus upon a single individual thereby increasing the likelihood of

misidentification." (quotation marks, brackets, and citation omitted)).

Here, Pasene alleges that Coons showed at least three witnesses—Saleimoa-

Kekahu, Ramos, and Samuelu—a single photo of Pasene "off the record" and prior

to their official interviews, and "pressured" them, as well as Muna,[20] Tagataese,

---

[20]With respect to Muna, Pasene's core *Biggers* claim is that Coons unconstitutionally "pressured
Cedro Muna . . . to identify Mr.Pasene [sic] four years after the murder took place of Joseph
Peneuta [sic], and did so instead of charging him for possession of a firearm and terroristic
threatening case, and sentencing him to prison time for absconding [sic] while on bail on a
promotion of a dangerous drug in the second degree charge." *See* FAC at ¶¶ 52b, 52f. These

and Sakaria,[21] into positively identifying him as the shooter.  FAC at ¶¶ 26, 52, 52b, 52d–f, 52h–k.  As alleged by Pasene, such identification procedures "were so suggestive that [Coons] knew or should have known that those techniques would yield false information" and thus violated *Biggers*.  *Id.* at ¶ 52b.

In light of the evidence now provided on summary judgment, however, each of these assertions lacks merit.  As an initial matter, although Pasene claims that Coons "pressured Richard Tagataese" and "Gabriel Sakaria . . . to id Mr.Pasene [sic]," *see* FAC at ¶ 52b, there is no evidence that Coons ever *met* Tagataese or Sakaria, let alone coerced them into positively identifying Pasene as Peneueta's shooter, *see* Coons Decl. at ¶ 11.  Moreover, even if he had, both Tagataese and Sakaria independently testified that they clearly saw Pasene driving the Buick on the night in question, were 100% positive of their identifications, and were sure— based on their personal knowledge of Muna—that Muna was not the shooter/driver.  *See Pasene*, 420 P.3d at *5–6; *Pasene*, 439 P.3d at 875; Tr. of Grand Jury Proceedings at 36:2–9, Dkt. Nos. 405-6 & 407-10.  Given, therefore, Coons' evident lack of involvement in interviewing Tagataese and Sakaria and each witness' opportunity to view the driver of the Buick, level of certainty, and

---

allegations also form the core of Pasene's claim under *Horton v. Mayle*, 408 F.3d 570 (9th Cir. 2005), and are discussed within that section, *see infra* 21–24.

[21]Although Pasene also alleges that McCormick showed a single unduly suggestive photo of himself to Sakaria, Tagataese, and Muna, he does not make the same accusation against Coons. *See* FAC at ¶¶ 26, 52d–f.

familiarity with Muna versus Pasene, there is simply no basis to find that Coons

violated *Biggers* in this regard.

Similarly, while Coons did interview both Ramos and Samuelu and showed

at least Ramos a photo of Pasene,[22] each of their identifications was nevertheless

independently reliable given their proximate view of the events surrounding

Peneueta's shooting and their familiarity with Pasene after having regularly seen

him in the Chinatown area over several months. *See* SCSF Ex. E at 39–42, 59–60;

Tr. of Samuelu's Aug. 21, 2013 Trial Test. at 158:8–162:25, 166:24–167:3,

169:18–170:13, 179:4–7, Dkt. No. 405-12; Tr. of Ramos' Aug. 21, 2013 Trial

Test. at 244:22–25, 259:5–261:22, 265:5–25, Dkt. No. 405-13.  For example,

Samuelu testified at Pasene's second trial that because Pasene stood out in

Chinatown as somebody from "out of town," he clearly recognized Pasene when

he exited the car, pointed a shotgun towards Peneueta, and began chasing him and

shooting.  Samuelu's Aug. 21, 2013 Trial Test. Tr. at 158:15–18, 159:6–16,

160:13–162:21, 166:24–167:3, 169:18–170:13.  Likewise, Ramos also testified at

Pasene's second trial that she had known Pasene since September 2008 and "stood

there and watched" him shoot Peneueta.  *See* Ramos Aug. 21, 2013 Trial Test. Tr.

at 261:1–13, 265:14–25.  As such, under the totality of the circumstances, the

---

[22]Notably, Coons disputes ever "pressuring" Ramos into identifying Pasene as the shooter.  *See* Coons Decl. at ¶¶ 20–21.

single photo allegedly shown by Coons was not unduly suggestive. Moreover, because neither Ramos nor Samuelu ever testified in front of the Grand Jury or at Pasene's third trial, the only one that resulted in his conviction, there could be no "irreparable misidentification" for this additional reason. *See Biggers*, 409 U.S. at 198; Grand Jury Tr. at 2:2–11; *Pasene*, 439 P.3d at 875–80; Dkt. No. 404-1 at 9.

That leaves Saleimoa-Kekahu. But even there, Pasene has failed to establish that Coons' identification procedures were so unduly suggestive as to lead to "a very substantial likelihood of irreparable misidentification." *Biggers*, 409 U.S. at 198 (quotation marks and citation omitted). Notably, while Coons did interview Saleimoa-Kekahu, contrary to Pasene's allegations, the witness was shown photos not only of Pasene, but also of Rye, Peneueta, Muna, and Toloai. *See* Pasene Depo. Vol. I at 106:24–107:22; SCSF Ex. E at 34; Grand Jury Tr. at 33:10–17, 43:14–44:12. Moreover, Saleimoa-Kekahu clearly observed the events leading up to the shooting and was familiar with Pasene—they frequently socialized together, knew each other well, and indeed, even Pasene acknowledges that "I looked at him as a friend." *See* SCSF Ex. E at 32–34; Grand Jury Tr. at 20:16–18, 21:8–33:4; Pasene Depo. Vol. I at 108:3–17. As such, given the various independent factors supporting the reliability of Saleimoa-Kekahu's identification, the Court does not find that even in the light most favorable to Pasene, Coons' actions rose to the level of a *Biggers* violation.

In response to all of this, Pasene asserts that he "is ready to present to a jury trial evidence that proves that the Defendants presured [sic] and coached the State witnesses to identify Plaintiff as a shooter even though the evidence pointed at Cedro Muna," that he and Tagataese, Sakaria, Ramos, and/or Samuelu did not even know each other prior to the shooting, and that each witness' identification was unreliable for various reasons.[23]  *See* Dkt. No. 424 at ¶¶ 2–5, 7, 10–11; FAC at ¶¶ 20–25, 52d–f, h–k.  But at this stage of the proceedings, Pasene's unsupported assertions are no longer enough.  *See T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir. 1987) ("[T]he nonmoving party may not merely state that it will discredit the moving party's evidence at trial and proceed in the hope that something can be developed at trial in the way of evidence to support its claim.").  Fatally, Pasene fails to provide any of this evidence *now*, as he must, in order to establish that there are any material disputes of fact on his *Biggers* claim to preserve for trial.  *See Far Out Prods., Inc. v. Oskar*, 247 F.3d 986, 997 (9th Cir. 2001) (explaining that on a motion for summary judgment, "the non-moving party must go beyond the pleadings and by its own evidence set forth specific facts showing that there is a genuine issue for trial." (quotation marks and

---

[23]These include, for example, that the witness was running from the shooting, had an obstructed view, talked to other witnesses, contradicted the medical examiner, was in secret communication with one of the Defendants, was high on methamphetamine, had personal relationships with Peneueta or other witnesses, was picked up in Chinatown by the Defendants, got a deal to lie and blame Pasene for Peneueta's death, or was influenced by the prospect of leniency in their own various criminal proceedings.  Dkt. No. 424 at ¶¶ 7, 10–11; FAC at ¶¶ 20–25, 52d–f, h–k.

citation omitted)); *Jason E. ex rel. Linda E. v. Dep't of Educ.*, 2014 WL 6609213,

at *11 (D. Haw. Nov. 20, 2014) ("[S]elf-serving statements in an opposition to a

summary judgment motion cannot create a genuine issue of material fact for trial

or constitute evidence.").  As such, based on the *evidence actually provided*, which

comes only from the defense, no reasonable jury could find that Coons violated

Pasene's constitutional due process right under *Biggers*.[24]  *See Anderson v. Liberty*

*Lobby, Inc.*, 477 U.S. 242, 250–51 (1986).  Coons is therefore entitled to summary

judgment on Count 1a.

## II.    **Count 1b: Failure to Disclose Cedro Muna's Leniency Deal**

In Count 1b, Pasene asserts a claim under *Horton v. Mayle*, 408 F.3d 570

(9th Cir. 2005), alleging that Coons and McCormick[25] unconstitutionally failed to

disclose promises of leniency made to Muna in exchange for his testimony at

Pasene's second and third trials.  FAC at ¶¶ 31–38, 52b, 52f, 53a, 59e.  Under

*Horton*, the failure to disclose a leniency deal—that is, the promise of

consideration to a State witness in exchange for testimony—may violate *Brady v.*

*Maryland*, 373 U.S. 83 (1963) because evidence of the deal could be material

impeachment material for the defense.  408 F.3d at 578; *accord Mellen v. Winn*,

---

[24]Indeed, even Pasene's defense counsel did not believe there was a basis to challenge
identification as a "[l]ot of the witnesses that [Pasene is] talking about actually know[] who he is.
The ones that don't were shown a photographic lineup."  Tr. of Motions in Limine Hearing at
48:12–49:2, Dkt. No. 405-15.
[25]Because McCormick is not party to the instant motions, the Court does not address his alleged
involvement further.

900 F.3d 1085, 1103–04 (9th Cir. 2018) (re-affirming that law enforcement

officers have a *Brady* duty to disclose material impeachment evidence to

prosecutors); *Napue v. Illinois*, 360 U.S. 264, 265, 269–70 (1959) (finding a denial

of Fourteenth Amendment due process where the State failed to correct a witness'

false statements that he had not received promises of consideration in return for his

testimony).

Here, Pasene claims that Muna's initial statement—taken on the day of the

shooting—in no way implicated Pasene in Peneueta's murder.  FAC at ¶¶ 32, 52f.

But four years later, following Muna's arrest and extradition on unrelated charges

and Pasene's first mistrial, Muna provided a second and third statement which, for

the first time, claimed that he saw Pasene argue with Peneueta, threaten Saleimoa-

Kekahu with a gun, drive past in the blue Buick, and shoot and kill Peneueta.  *Id.* at

¶¶ 33–34, 52f, 53a, 59e.  Muna then testified to the same at Pasene's second and

third trials on August 23, 2013 and March 10, 2014, respectively.  *Id.* at ¶¶ 35–36,

52f; *Pasene*, 439 P.3d at 879.  At trial, Pasene asserts that Muna denied receiving a

deal to testify, but later confessed to Pasene's mother and sister that Coons and

McCormick gave him:

> a deal to lie…and blame [Pasene] as the one that shot and killed Joseph
> Peneuta [sic] on 3/28/09…[I]n exchange he would not get charged for
> a terroristic threatening case where he was accused of threatening
> someone with a gun in Chinatown and where the police pulled him over
> in Waikiki and recovered a firearm.  He was also promised to get
> released after he testified for the state and blame Iosefa Pasene, he

would receive probation on his promotion of a dangerous drug charge in the second degree. Cedro Muna also was not charged for absconding while on bail.

*Id.* at ¶¶ 37–38, 52b, 52f; *accord* Pasene Depo. Vol. I at 126:20–23, 127:12–15.

As a result of this alleged deal, Muna, again according to Pasene, was released from custody despite "facing over a decade in prison" and having been "on [t]he run while facing a class B felony." *See* FAC at ¶¶ 35–36, 52f.

On summary judgment, however, Pasene's *Horton* claim also falls apart. First, as a threshold matter, Muna's trial testimony is not as Pasene recalls it. Pasene's defense attorney asked Muna on cross-examination: "[Y]ou knew that if you cooperated in a murder case, your attorney could . . . argue to the judge in your case . . . this guy was helpful to the State, and . . . a judge could consider that . . . right?" *Pasene*, 439 P.3d at 879. Muna replied: "Yeah." *Id.* Second, even if Muna had outright denied any deal, Pasene ignores that HPD officers have no authority to offer a reduced sentence or the dismissal of charges to a potential witness in exchange for their testimony. *See* Decl. of Brandon Nakasato at ¶¶ 5–6 (explaining that HPD officers, including detectives, cannot negotiate or enter into plea deals with witnesses absent authorization by the Department of the Prosecuting Attorney). Third, even if HPD officers did have such authority, Coons retired in 2012—*before* Muna made his second and third statements and testified at Pasene's second and third trials. *Compare* Coons Decl. at ¶ 2, *with* FAC at ¶¶ 31,

35–36.  As such, Coons simply could not have offered any type of leniency deal to

Muna, let alone failed to disclose the same to either the DPA or to Pasene.  *See*

Coons Decl. at ¶¶ 26–27 (denying participation in or knowledge of any offer to

dismiss charges or offer a sentence reduction to Muna in exchange for his

testimony against Pasene).  And because Pasene again offers no *evidence* to

counter this—beyond his own speculation and unsupported assertions that he is

"ready to present evidence" that Coons "coerced" and "presured [sic] Cedro Muna

into falsely identifying Plaintiff as a suspect 4 years later" and gave him a

"promise-deal on his cases and charges to falsely testify against Plaintiff at

Plaintiff['s] second and third trials"—Coons is also entitled to summary judgment

on Count 1b.  *See* Dkt. No. 420 at ¶¶ 8–10, 22, 27; Dkt. No. 424 at ¶ 6; Pasene

Depo. Vol. I at 126:20–130:22; *T.W. Elec. Serv., Inc.*, 809 F.2d at 630.

## III.    Count 1c: Fabrication of Evidence

In Count 1c, Pasene brings a claim pursuant to *Devereaux v. Abbey*, 263

F.3d 1070 (9th Cir. 2001) (en banc), alleging that Coons and others[26] manufactured

evidence against him, which resulted in the deprivation of his liberty without due

---

[26]Many of Pasene's *Devereaux* claims against other Defendants have already been dismissed.
*See, e.g.*, Dkt. No. 92 at 40 n.27 (Correa); Dkt. No. 128 at 14–16 (Sellers).  To the extent that
they remain against the non-moving Defendants, the Court, once again, does not address them
herein. *See, e.g.*, FAC at ¶ 53b (accusing McCormick of falsely testifying at Pasene's first trial
that he was unaware of any evidence implicating Muna despite having received Muna's name as
a suspect and knowing that Muna had confessed to shooting somebody on the day of Peneueta's
murder).

process of law.  *See* 263 F.3d at 1074–75 ("[T]here is a clearly established

constitutional due process right not to be subjected to criminal charges on the basis

of false evidence that was deliberately fabricated by the government"); FAC at ¶¶

37, 51–53.  To successfully bring a *Devereaux* claim, a plaintiff must prove: "(1)

the defendant official deliberately fabricated evidence and (2) the deliberate

fabrication caused the plaintiff's deprivation of liberty."  *Spencer v. Peters*, 857

F.3d 789, 798 (9th Cir. 2017).  With respect to the first element, deliberate

fabrication of evidence can be proved through either "direct evidence" or through

"circumstantial evidence related to a defendant's motive."[27]  *Caldwell v. City &*

*Cnty. of San Francisco*, 889 F.3d 1105, 1112 (9th Cir. 2018).  "To establish the

second element of causation, the plaintiff must show that (a) the act was the cause

in fact of the deprivation of liberty," meaning that there is a "reasonable likelihood

that the allegedly fabricated [] evidence could have affected the judgment of the

jury," and "(b) the act was the 'proximate cause' or 'legal cause' of the injury,

meaning that the injury is of a type that a reasonable person would see as a likely

---

[27]To support a *Devereaux* claim using circumstantial evidence, the plaintiff must:

> *at a minimum*, point to evidence that supports at least one of the following two
> propositions: (1) Defendants continued their investigation [of the plaintiff] despite the
> fact that they knew or should have known that he was innocent; or (2) Defendants used
> investigative techniques that were so coercive and abusive that they knew or should have
> known that those techniques would yield false information.

*Devereaux*, 263 F.3d at 1076.

result of the conduct in question." *See Spencer*, 857 F.3d at 798; *Richards v. Cnty. of San Bernardino*, 39 F.4th 562, 572–74 (9th Cir. 2022).

In his FAC, Pasene alleges that Coons violated *Devereaux* by: (1) coercing Muna to "lie" and "blame [Pasene] as the one that shot and killed Joseph Peneuta [sic];" (2) pressuring Tagataese, Sakaria, Saleimoa-Kekahu, Ramos, and Samuelu into misidentifying Pasene as the shooter; and (3) falsely testifying and/or failing to correct McCormick's false testimony in front of the Grand Jury.[28]  FAC at ¶¶ 26, 37, 52, 52a–c, 52f, 52h–k, 53, 53a.  According to Pasene, such fabrications were deliberate because they were motivated by personal bias—specifically, the fact that Muna was related to Eric Tanavasa,[29] an HPD CRU officer—as well as the desire to obtain a conviction following the first and second mistrials.  *See id.* at ¶¶ 40, 52–53e; *see also* Dkt. No. 92 at 38–39 (drawing inferences).  And because these "misidentification[s]" were the "sole evidence incriminating him," Pasene claims that there is a reasonable likelihood that they affected the judgment of the

---

[28]Pasene additionally asserts as part of his *Devereaux* claim that "in an effort to secure Mr.Pasene's [sic] conviction without regard to his actual innocence," Coons "suppressed material, exculpatory information from Mr.Pasene [sic], Mr.Pasene's [sic] defense counsel, and the prosecution" including Muna's leniency deal, Del Rio's statements regarding the Buick and Muna's confession, the Chinatown surveillance footage, and the identity of the 911 caller.  FAC at ¶¶ 53, 53a–d.  Such allegations are more properly considered part of Pasene's *Horton* claim, *supra* 21–24, as well as his *Tatum* claim for intentional suppression of exculpatory evidence, *infra* 38–47, and the Court therefore addresses them in those sections.
[29]Tanavasa is also spelled "Tanuvasa" elsewhere in the record.  *See, e.g.*, Tr. of Sellers' Aug. 22, 2013 Trial Test. at 136:22, Dkt. Nos. 405-10 & 407-12

jury and caused his wrongful conviction.  *See* FAC at ¶¶ 3, 52, 57; *Richards*, 39
F.4th at 574.

On summary judgment, however, the uncontroverted evidence provided by
Coons once again shows that such allegations are a factual impossibility.  First, as
explained above, insofar as Pasene claims that Coons manufactured evidence by
giving Muna a deal to lie and blame Pasene for the shooting, Coons both lacked
the authority as an HPD officer to do so and, in any case, was already retired from
HPD by the time Muna changed his statements and testified at Pasene's second and
third trials.  *See supra* 21–24; Coons Decl. at ¶¶ 2, 26–27; Nakasato Decl. at ¶¶ 5–
6.  Similarly, while Pasene asserts that Coons deliberately fabricated evidence by
coercing Tagataese, Sakaria, Saleimoa-Kekahu, Ramos, and Samuelu into falsely
identifying him as the shooter, Coons never met with either Tagataese or Sakaria,
and Saleimoa-Kekahu, Ramos, and Samuelu's identifications were all
independently reliable, given their familiarity with Pasene and proximity to the
events.  *See supra* 15–21; Coons Decl. at ¶¶ 11, 20–21.  Pasene does not offer any
statement, affidavit, or deposition testimony from any of the aforementioned
witnesses that even remotely substantiates Pasene's self-serving claims.

Pasene additionally alleges that Coons manufactured evidence by falsely
testifying and/or failing to correct McCormick's false testimony in front of the

Grand Jury[30] that "witness Ropati Daniel Saleimoa-[K]ekahu identified me, Iosefa

Pasene, shooting an A[K]-47, when Ropati never said that at all" and that "witness

Richard Tagataese identified my cousin Zorro Rye with a gun on Pauahi [S]treet

when this witness never did." FAC at ¶ 52c; *accord* Pasene Depo. Vol. I at

131:15–132:24, 166:15–17. But these claims lack evidentiary support. Notably,

*Coons* never testified before the Grand Jury. *See* Grand Jury Tr. at 2:2–11.

Moreover, even assuming that *McCormick* testified falsely in the manner Pasene

suggests, under the Hawaiʻi Rules of Penal Procedure, there is no way that Coons

could have known about McCormick's statements, let alone disabused the Grand

Jury of the same. *See* Coons Decl. at ¶ 23 (indicating that he was unable to

participate in the Grand Jury hearing because it was closed); Haw. R. Penal Proc.

6(d)–(e) (providing that Grand Jury proceedings are secret and thus, only the

jurors, prosecutor, independent Grand Jury counsel, interpreters, reporter, and

witness under examination may be present). As such, given that Pasene has, once

again, failed to present any evidence which would create a material dispute of fact

---

[30]It is unclear whether Pasene claims that *Coons* testified falsely in front of the Grand Jury, or simply that Coons should be liable for *McCormick's* allegedly false testimony. *Compare* Pasene Depo. Vol. I at 131:15–132:24 (asserting Coons lied under oath to the Grand Jury), *with* FAC at ¶ 52c ("Coons as the lead homicide detective . . . should have reported [McCormick's] false information and corrected this, but he chose not to and by his malicious acts my constitutional rights were violated."). Nevertheless, this discrepancy is of little consequence as either way, Pasene has failed to factually establish this basis for his *Devereaux* claim. *See infra* 27–29; *see also* Dkt. No. 92 at 38 n.25 (previously finding at the motion to dismiss stage that Pasene had not plausibly alleged a claim against Coons for McCormick's allegedly perjured Grand Jury testimony).

that Coons fabricated *any* evidence, let alone did so deliberately,[31] *see generally*

Dkt. Nos. 420 & 424, the Court finds that Coons is entitled to summary judgment

on Count 1c.

## IV.   <u>Count 2: Malicious Prosecution</u>

In Count 2, Pasene alleges that by intentionally initiating the prosecution

against him based on fabricated evidence and suppressed exculpatory evidence,

both Coons and Sellers engaged in malicious prosecution in violation of the Fourth

Amendment.[32]   FAC at ¶¶ 58–65.  To bring a claim of malicious prosecution, a

plaintiff must allege that the prior proceedings were: (1) terminated in his favor;

(2) initiated without probable cause; (3) initiated with malice; and (4) conducted

"for the purpose of denying [him] equal protection or another specific

constitutional right."  *Awabdy v. City of Adelanto*, 368 F.3d 1062, 1066 (9th Cir.

2004) (quotation marks and citation omitted); *Myers v. Cohen*, 688 P.2d 1145,

1148 (Haw. 1984).  A Grand Jury indictment is *prima facie* evidence of probable

cause, which a plaintiff may rebut by proving, among other things, that "the

---

[31]Pasene's allegations regarding Coons' purported motives to fabricate evidence similarly lack evidentiary support.  *See infra* 34–37.

[32]Pasene initially also claimed that Sellers and Coons initiated his prosecution for the purpose of denying him his Fourteenth Amendment due process rights.  *See* FAC at ¶¶ 60, 64.  The Supreme Court, however, has held that the Fourteenth Amendment's substantive due process protections cannot serve as a basis for a malicious prosecution claim under Section 1983, and Pasene appears to acknowledge the same.  *See Albright v. Oliver*, 510 U.S. 266, 268 (1994); Dkt. No. 420 at ¶ 13.  The Court therefore does not address the Fourteenth Amendment aspect of Pasene's claim any further.  *See* Dkt. No. 128 at 17 n.11.

criminal prosecution was induced by fraud, corruption, perjury, fabricated evidence, or other wrongful conduct undertaken in bad faith." *Awabdy*, 368 F.3d at 1067; *accord DeGroot v. United States*, 786 F. App'x 638, 641–42 (9th Cir. 2019).

Here, both Coons and Sellers concede that Pasene has established the first element of a malicious prosecution claim—that is, that the prior proceedings against him were terminated in his favor. *See* Dkt. No. 404-1 at 18; Dkt. No. 406 at 11–12; SCSF at ¶ 1; *see also Thompson v. Clark*, 596 U.S. 36, 49 (2022) (A plaintiff bringing "a Fourth Amendment claim under § 1983 for malicious prosecution . . . need only show that the criminal prosecution ended without a conviction"); Dkt. No. 128 at 18 (noting that the trial court dismissed the charges against Pasene with prejudice following the Hawai'i Supreme Court's vacatur of his conviction). Consequently, there is no dispute of material fact on this point.

With respect to the second element—lack of probable cause—there is no dispute that Pasene was indicted by a Grand Jury and thus, there is *prima facie* evidence of probable cause. *See* SCSF Ex. G at 1–5; CCSF Ex. D at 10–14; *Pasene*, 439 P.3d at 871. Pasene, however, attempts to rebut this *prima facie* evidence by pleading that the criminal prosecution against him was induced, at least in part, by Coons and Sellers' fraud, perjury, fabrications, suppression of evidence, and/or other wrongful conduct undertaken in bad faith. *See* FAC at

¶¶ 59–62; *Awabdy*, 368 F.3d at 1067.  Specifically, Pasene claims that both Sellers and Coons "admitted they reviewed the Chinatown cameras" and "saw someone that resembled Cedro Muna running and getting into a taxi cab and leaving at the time the shooting started," but lied about the timing and failed to preserve the footage despite the materially exculpatory nature of such evidence.  *See* FAC at ¶¶ 28, 53c, 59b–c, 61–62; Pasene Depo. Vol. I at 133:23–134:3.  Pasene also claims that Coons suppressed "exculpatory and very much important information" by failing to document Linda Del Rio's statements that Muna confessed to shooting somebody on the day of Peneueta's murder and had previously used/attempted to use the blue Buick as collateral.  FAC at ¶¶ 53b, 59d.  And finally, Pasene accuses Coons of fabricating evidence by pressuring Muna into changing his statements and generating "false and tainted witness identifications" despite being "aware" that those "identifications failed to provide probable cause to arrest Mr.Pasene [sic]."  *Id.* at ¶¶ 59e, 60; Pasene Depo. Vol. I at 135:2–8.  As a result, Pasene claims that he was "falsely arrest[ed]," "deprived [] of his liberty," and "maliciously prosecut[ed] [] despite the absence of probable cause or existence of other evidence linking Mr.Pasene [sic] to the crime."  FAC at ¶ 62.

As explained in the *Devereaux*, *Biggers*, and *Horton* analyses, *supra* 15–29, and the *Tatum* analysis, *infra* 38–47, none of these allegations is supported by the evidence presented on summary judgment.  As an initial matter, neither Coons nor

Muna testified in front of the Grand Jury. *See* Grand Jury Tr. at 2:2–11. Instead, the DPA relied primarily on eyewitnesses, such as Tagataese and Saleimoa-Kekahu, both of whom independently testified that they saw Pasene in Chinatown on the night of the shooting and identified him as one of the occupants of the Buick and/or one of the shooters. Grand Jury Tr. at 34:22–41:19, 49:15–17. And while Pasene argues that he is "ready to present to a jury trial evidence that proves" that those identifications[33] were tainted because Coons[34] maliciously coerced each witness into positively identifying Pasene, *see* Dkt. No. 424 at ¶¶ 2–7, 10–11, such unsupported assertions lack merit in the face of the *evidence* undermining these claims. *See supra* 15–21; *T.W. Elec. Serv., Inc.*, 809 F.2d at 630.

Similarly, when it comes to the Chinatown surveillance footage, although Pasene claims that he is "ready to present evidence" that Coons and/or Sellers "intentionally failed to recover [the Chinatown surveillance footage] inorder [sic] to cover up for the real suspect (Cedro Muna)," *see* Dkt. No. 420 at ¶¶ 7, 11, 19 & Dkt. No. 424 at ¶ 9, there is simply no indication that either Coons or Sellers did so. *See infra* at 39–42. Notably, Sellers never even *viewed* the footage at issue— let alone wrongfully suppressed evidence by deliberately failing to retain the same.

---

[33]Pasene's argument that Coons pressured Muna into changing his statements and falsely identifying Pasene at *trial* is likewise contravened by the evidence. *See* Dkt. No. 420 at ¶¶ 8–10; Dkt. No. 424 at ¶¶ 6–7; *supra* 21–24.

[34]To the extent that Pasene claims that Sellers was also engaged in fabricating the witnesses' identifications, the Court has previously dismissed such claims. *See* Dkt. No. 424 at ¶ 2; Dkt. No. 128 at 12, 27–28.

*See* Sellers Aff. at ¶ 22; Sellers' May 4, 2012 Hearing Test. Tr. at 94:13–24; SCSF

Ex. E at 1–2, 25–26; SCSF Ex. F at 1–2, 5; *see also* Pasene Depo. Vol. II at 327:5–

14 (admitting same).  Moreover, while Coons did view the surveillance footage,

the loss of that footage was caused by an *unintentional* technological

malfunction—the circumstances of which were memorialized in a report and

disclosed to both the DPA and Pasene's defense counsel.  *See* Coons Decl. at ¶¶

12–17; SCSF Ex. E at 1–2, 25–26; CCSF Ex. M at 2, 5.  Pasene provides no

*evidence* demonstrating otherwise.[35]  *See generally* Dkt. Nos. 420 & 424.

Finally, with respect to Pasene's claim that his prosecution was maliciously

induced by Coons' deliberate failure to document Del Rio's statements, not only

does Pasene fail to present any evidence of the same, but there is no indication that

Coons *could* have done so, given that Del Rio did not tell any HPD officer about

Muna's confession.  *See* Tr. of Del Rio's Aug. 26, 2013 Trial Test. at 160:17–23,

Dkt. No. 405-9; *see also infra* 44–46 (further explaining in the context of Pasene's

*Tatum* claim).   As a result, the Court does not find that any of Pasene's

unsupported allegations of misconduct—whether with respect to Muna, the witness

identifications, the Chinatown surveillance footage or Del Rio—suffice to rebut the

---

[35]The Chinatown surveillance footage was never mentioned to the Grand Jury.  *See* Dkt. No.
404-1 at 16–17; Dkt. No. 406 at 13; *see generally* Grand Jury Tr.  Moreover, to the extent that
Pasene accuses Coons of falsely testifying at his third trial that Muna was ruled out by the
surveillance cameras, Coons testified that Muna was eliminated as a suspect for *several
reasons*—only one of which was the Chinatown footage.  *See* Dkt. No. 420 at ¶¶ 11, 19; *Pasene*,
439 P.3d at 877.

presumption of probable cause flowing from the Indictment.

The failure to show that his prosecution was initiated without probable cause is fatal to Pasene's malicious prosecution claim. *See Arquette v. State*, 290 P.3d 493, 503 (Haw. 2012) ("[I]n a valid claim for initiating a malicious prosecution, all [] elements must be satisfied"); *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) ("The moving party is 'entitled to a judgment as a matter of law' because the nonmoving party has failed to make a sufficient showing on an essential element of her case with respect to which she has the burden of proof."). Nevertheless, the Court addresses the remaining elements of a Section 1983 malicious prosecution claim—that is: (3) that Sellers and Coons instituted the proceedings against Pasene with malice; and (4) that they did so for the purpose of denying Pasene a specific constitutional right.

Generally, "to establish the element of malice for a malicious prosecution claim, a plaintiff must show *inter alia* that the defendant initiated the prior proceeding with the intent, without justification or excuse, to commit a wrongful act and the emphasis is on the misuse of criminal or civil actions as a means for causing harm." *Arquette*, 290 P.3d at 507 (quotation marks and citation omitted); *accord Thompson*, 596 U.S. at 44 (defining malice as "without probable cause and for a purpose other than bringing the defendant to justice."). Here, according to Pasene:

> [t]he criminal proceedings against [him] were initiated with malice in
> that Defendants caused the charges against Mr.Pasene [sic] to be filed
> by knowingly providing the prosecution misinformation, concealing
> exculpatory evidence, and otherwise engaging in wrongful and bad
> faith conduct that was actively instrumental in causing the initiation of
> the legal proceedings against Mr.Pasene [sic].

FAC at ¶ 63. Moreover, Pasene claims that he is "ready to prove" that Defendants

wished to obtain a conviction after the first mistrial and that Sellers, in particular,

"had a bias [sic] motive to falsely accused [sic] Plaintiff of this murder" as he

wished to "help CRU member Eric Tanavasa clear his nephew Cedro Muna," had

previously assaulted Pasene "while [he] was walking on the Chinatown college

walk with his girlfriend," and had a "personal problem" with Pasene's cousin,

Mario Tuua, who had submitted a complaint against Sellers for a different assault

in 2008.[36]  *See* Dkt. No. 420 at ¶ 9; Dkt. No. 424 at ¶ 12; FAC at ¶¶ 40, 52–53e.

Once again, however, each of these arguments lacks any basis in the record.

For instance, as just discussed, Pasene has failed to provide any evidence

indicating that either Coons or Sellers actually committed any of the wrongful acts

of which he accuses them.  *See supra* 30–34. As important, Pasene has also failed

---

[36]Although not raised in the FAC or briefs in opposition, Pasene also appears to claim that
Sellers' involvement in *United States v. Kealoha*, Crim. No. 22-00335-JMS-WRP, is evidence of
a pattern of malicious prosecution.  *See* Pasene's Answers to Sellers' Interrogatories at ¶ 16, Dkt.
No. 407-13; Pasene Depo. Vol. II at 399:18–400:20. Even if Pasene's allegations are accurate—
which does not appear to be the case—it is entirely unclear how Sellers' alleged conduct in an
*entirely different case* has any import to determining whether he acted with malicious motive
against *Pasene*.  *See* SCSF Ex. L at 5, Dkt. No. 407-14. As such, the Court does not consider it
further.

to provide any evidence supporting his claims that Coons and/or Sellers committed

those acts to further their own personal vendettas and loyalties.  For example, to

the extent that Pasene claims that Coons and Sellers were motivated to fabricate

and/or suppress evidence to obtain a conviction after the first and second mistrials,

Pasene provides no *evidence* to indicate that this was the case.  *See* FAC at ¶¶ 52–

53e; Dkt. No. 92 at 23; Dkt. No. 420 at ¶ 9; Pasene Depo. Vol. I at 134:23–135:20;

*see also Arquette*, 290 P.3d at 507 (noting that while "an inference of malice may

be supported by direct or circumstantial evidence[,] . . . bare allegations or

factually unsupported conclusions are insufficient to raise a genuine issue of

material fact[.]" (quotation marks, brackets, parentheses, and citations omitted)).

Similarly, while Pasene asserts that he is "ready to prove" that Sellers has a

personal hatred towards his family, had previously assaulted both him and his

cousin,[37] and wished to help Tanavasa clear his nephew Muna, Pasene provides no

actual evidence to support any of these allegations.  *See* Dkt. No. 424 at ¶ 12;

Sellers Aff. at ¶¶ 10–12; Sellers' Aug. 22, 2013 Trial Test. Tr. at 136:20–23

(testifying that he had only "heard of" the familial relationship between Tanavasa

and Muna, and could not "confirm it.").  And, even if Sellers did have a bias

against Pasene, Sellers neither identified Pasene nor eliminated Muna as a suspect

---

[37]It appears that the alleged assault may be related to a stop that Sellers and other HPD officers
conducted in Chinatown in February 2009, after they received an anonymous tip that Pasene was
armed.  *Compare* Dkt. No. 424 at ¶ 12, *with* Sellers Aff. at ¶¶ 10–12.

during the course of the investigation, and there were "many pieces of evidence considered by the detectives in ruling Muna out." *See Pasene*, 439 P.3d at 889; Sellers Aff. at ¶¶ 16, 20–21, 24–26; *see also* SCSF Ex. B at 3 (responding to McCormick's request for "information and knowledge on murder suspect Iosefa PASENE."). As such, Pasene has no evidentiary support for his speculation that Coons and/or Sellers acted with malice due to their desire to obtain a conviction, personal feud with Pasene and his family, or because of favoritism towards Muna based on his familial relation to Tanavasa.

Finally, Pasene has failed to show the remaining element of a Section 1983 malicious prosecution claim—*i.e.,* that the prosecution took place for the purpose of denying him a specific constitutional right. According to Pasene, "Defendants' wrongful prosecution of [him] . . . was brought for the purpose of denying Mr.Pasene's [sic] constitutional rights, including his [Fourth Amendment] right to be free from unreasonable searches and seizures[.]" FAC at ¶ 64. However, as detailed at length above, there is simply no *evidence* which indicates that either Coons or Sellers acted wrongfully in initiating the prosecution, or with any intention other than bringing the person that they believed to be Peneueta's murderer to justice. *See supra* 30–37; Sellers Aff. at ¶¶ 19–21, 24–26; *see also* SCSF Ex. E (recounting investigation). This element has therefore also not been satisfied.

- 37 -

In sum, Pasene has failed to provide *any* evidence establishing a genuine issue of material fact on three out of the four elements of his malicious prosecution claim.  As a result, both Coons and Sellers are entitled to summary judgment on Count 2.

## V.    <u>Count 4: Intentional Suppression of Exculpatory Evidence</u>

In Count 4, Pasene brings a claim pursuant to *Tatum v. Moody*, 768 F.3d 806 (9th Cir. 2014) for failure to disclose highly significant or exculpatory evidence in violation of the Due Process Clause of the Fourteenth Amendment.  FAC at ¶¶ 70–75.  To prevail on a *Tatum* claim, a plaintiff must establish that a law enforcement officer: (1) failed to disclose; (2) highly significant or potentially dispositive exculpatory evidence to prosecutors; (3) through "conduct that is culpable in that the officers understood the risks to the plaintiff's rights from withholding the information or were completely indifferent to those risks;" and (4) which resulted in the plaintiff's detention of "unusual length."  768 F.3d at 816, 819–20.  To be considered "highly significant" or "exculpatory," the suppressed evidence must be "not merely material but *strongly* indicative of the plaintiff's innocence."  *Id.* at 820.  Moreover, "official conduct violates due process only when it shocks the conscience, a standard satisfied . . . by conduct that either consciously or through complete indifference disregarded the risk of an unjustified deprivation of liberty."  *Id.* at 820–21 (quotation marks, brackets, and citation omitted).

Here, Pasene asserts that Coons and/or Sellers violated *Tatum* by failing to: (1) preserve footage from HPD's Chinatown surveillance cameras which showed Muna leaving Chinatown shortly after the shooting; (2) follow up with a 911 caller who claimed to know the identity of Peneueta's shooter; (3) record or disclose Del Rio's statements that Muna had confessed to shooting somebody on the day of Peneueta's murder and had used/attempted to use a blue Buick as collateral for bail; and (4) record or disclose that Muna's cousin, Malo Sooalo,[38] had been involved in a physical altercation with Peneueta on the night of the shooting.[39]  *See* FAC at ¶¶ 27, 28, 40–41, 53b–d, 59b, 59d, 72; *see also* Dkt. No. 92 at 43–44 (summarizing).  The Court addresses each argument in turn.[40]

### a.  <u>Chinatown Footage</u>

Pasene first asserts that Sellers and Coons violated *Tatum* because they had possession of the Chinatown surveillance footage, knew that it "showed . . . Cedro

---

[38]Sooalo is also spelled "Sooala" elsewhere in the record.  *See, e.g.*, Sellers' Aug. 22, 2013 Trial Test. Tr. at 136:6.

[39]Pasene also asserts a *Tatum* claim against Defendant Albert Le for allegedly failing to obtain contact information or a written statement from a witness at The Queen's Medical Center who identified the shooter as Muna.  *See* FAC at ¶¶ 29, 53e, 59a; Dkt. No. 92 at 43.  Because Le has still not been served and Pasene makes no mention of either Coons or Sellers in relation to this claim, the Court does not discuss it further herein.

[40]Although Sellers concedes that Pasene's decade-long incarceration was of "unusual length," *see* Dkt. No. 406 at 24, Coons does not squarely address that element, instead arguing only that "none of the periods of detention were caused by Coons' alleged failure to disclose highly significant exculpatory evidence to prosecutors," *see* Dkt. No. 404-1 at 22.  While that may be true, *see infra* 39–47, it also true that ten and a half years of incarceration is, by any measure, an unusual length of time and thus, there can be no genuine dispute of material fact on this element.  *See Tatum*, 768 F.3d at 820 (finding twenty-seven months of incarceration "sufficiently lengthy to trigger the narrow due process right at issue here.").

Muna on camera leaving Chinatown after the murder and not before," and

nevertheless failed to timely act to retain, preserve, or disclose it.  FAC at ¶ 72.

According to Pasene, such evidence was highly significant or even exculpatory as

it "would of [sic] proved Plaintiff was not a shooter in the death of Joseph Peneuta

[sic] murder." *Id.*

But even assuming that this is true, and that the Chinatown footage was

strongly indicative of Pasene's innocence—something which, at the very least,

Sellers disputes[41]—there is no genuine dispute of material fact on the other

elements of this argument.  As an initial matter, the evidence plainly shows that the

existence of the Chinatown surveillance footage—and the circumstances

surrounding the loss of the same—was disclosed to both the DPA and to Pasene's

defense attorney in July of 2009.  *See* SCSF Ex. C at 1–2, 8 (disclosing existence

of footage); SCSF Ex. E at 1–2, 25–26 (describing footage and attempts to recover

it); SCSF Ex. F at 1–2, 5 (further detailing attempts to preserve footage); CCSF Ex.

M at 2, 5 (same); *see also* Pasene Depo. Vol. I at 118:3–23 (acknowledging

possession of the report).  Indeed, Pasene's attorney was well aware of the footage

---

[41]Sellers argues that the Chinatown surveillance footage is not strongly indicative of Pasene's
innocence because HPD eliminated Muna as a suspect based not only on "their review of the
Chinatown footage," but also on "the testimony of a taxi driver that he drove Muna to a hotel
right before the shooting, and the statements of witnesses that identified Pasene—not Muna—as
one of the shooters."  Dkt. No. 406 at 23–24.  But the other reasons for eliminating Muna as a
suspect are of little consequence to the ultimate question—that is, whether the footage *itself* was
strongly indicative of Pasene's innocence—and Sellers does not address Pasene's arguments in
that regard.

and what it purportedly contained. *See Pasene*, 439 P.3d at 876 (objecting to the testimony regarding the contents of the Chinatown surveillance footage because it "somehow was unrecorded or destroyed."). As such, there can be no material dispute of fact on the first element of this *Tatum* claim.

Moreover, even if there had been no disclosure, there is no indication that either Coons or Sellers engaged in *any* misconduct with respect to the Chinatown footage, let alone misconduct which would "shock[] the conscience." *See Tatum*, 768 F.3d at 820–21. Notably, Pasene claims that he "is ready to present evidence," including "Defendants [sic] police reports," which proves that "Defendant[s] Daniel Sellers and Theordore [sic] Coons . . . intentionally failed to recover [the Chinatown footage] inorder [sic] to cover up for the real suspect (Cedro Muna) and falsely accuse Plaintiff as the shooter." Dkt. No. 420 at ¶ 7; Dkt. No. 424 at ¶ 9. But once again, Pasene fails to follow through, and thus, the uncontroverted evidence presented on summary judgment instead establishes that Sellers never even *saw* the footage, let alone deliberately failed to retain the same. *See* Sellers Aff. at ¶ 22; *see also* Sellers' May 4, 2012 Hearing Test. Tr. at 94:13–24 (explaining that because the Homicide Division had jurisdiction over the investigation, it would be "overstepping [his] boundaries to go to the camera and to, you know, possibly taint or tamper with possible evidence there"); Pasene Depo. Vol. II at 327:5–14 (admitting to lacking evidence that Sellers reviewed the

Chinatown footage).  Likewise, while Coons did review the footage, the loss of the same was caused by an *unintentional* technological malfunction which HPD acted that same day to address.  *See* CCSF Ex. M at 5 (explaining that Fikani immediately contacted Sensormatic Hawaii to "report the problem and get a real time solution because the digital video is recorded over approximately 1 day and 18 hours, after it is recorded"); SCSF Ex. E at 26 (same).  And although the technicians from Sensormatic were unable to arrive until the following day—at which time, the footage had already been overwritten—HPD's unsuccessful efforts to preserve the footage do not come anywhere close to the level of conscious disregard or complete indifference required to support a *Tatum* claim.  *See id.*  As a result, there is no genuine dispute of material fact, and Coons and Sellers are entitled to summary judgment on this basis.

**b.    911 Caller**

Next, Pasene argues that Coons violated *Tatum* by failing to follow up on a 911 call made on the day of Peneueta's murder by an unknown person who "stated that they knew the identity of the Chinatown shooting suspect."  FAC at ¶¶ 27, 53d; Pasene Depo. Vol. I at 189:4–13.  According to Pasene, "[w]hen a witness calls in and say [sic] I have the name and identity of the shooting suspects, that to me is very, very valuable information."  Pasene Depo. Vol. I at 189:7–9.  As such,

Coons deliberately "suppress[ed] exculpatory evidence" by failing—as one of "the lead homicide detectives"—to further investigate the call. *Id.* at 189:4, 10–11.

Once again, however, this claim fails in light of the evidence adduced on summary judgment. First, both the existence of the call and a recording of the same were disclosed to the DPA as well as to Pasene's defense attorney. *See* CCSF Ex. K at 2–6, Dkt. No. 405-14; Pasene Depo. Vol. I at 188:14–20. As such, any suggestion that Coons failed to disclose such evidence is simply unavailing.

Second, there is little indication—other than Pasene's unsupported assertions—that the 911 caller's statement that they knew the identity of Peneueta's shooter is highly significant and/or exculpatory. For instance, although Pasene appears to imply that the unknown caller would have exculpated him by identifying another person—likely, Muna—as the shooter, the caller could just have easily inculpated Pasene by identifying *him* as the shooter, consistent with other eyewitnesses in the case. *See* FAC at ¶¶ 27, 53d, 59c; *see also Pasene*, 439 P.3d at 875–80 (summarizing trial testimony). Moreover, while Pasene speculates that the caller may have been a more credible witness because "this caller could have been, you know, non related [sic] to the decedent" and "[t]here's something different than these other witnesses . . . [who] didn't call the police," he provides no actual *evidence* to back up such conjecture. *See* Pasene Depo. Vol. I at 190:17–192:15. Consequently, Pasene has also failed to meet his burden of showing that

- 43 -

the 911 call was "not merely material but *strongly* indicative of [his] innocence."

*Tatum*, 768 F.3d at 820.

Third and finally, when considered with the additional context provided on summary judgment, it also becomes apparent that Coons' alleged failure to follow up on the 911 caller was questionably even negligent, let alone intentional or deliberately indifferent to the degree required to sustain a *Tatum* claim. Coons did not personally take the 911 call. *See* Coons Decl. at ¶ 4. In addition, the caller both refused to provide any identifying information and specifically stated that they did not wish to speak to an officer. *See* CCSF Ex. K at 4. As a result, despite Pasene's conclusory arguments that as one of the "lead detectives and detectives investigating the murder of the decedent Joseph Peneuta [sic], [Coons] should have followed up with this witness and got this important information from this witness," it is unclear precisely *how* Coons could have done so. *See* Dkt. No. 420 at ¶ 17; Pasene Depo. Vol. I at 188:10–189:13, 190:11–191:3, 193:21–192:6, 206:8–18. Pasene has therefore failed to establish a genuine dispute of material fact on three *Tatum* elements, and Coons is entitled to summary judgment on this basis.

### c.   Del Rio's Statements

Pasene claims that Coons violated *Tatum* when he:

failed to memorialize, intentionally suppressed, and/or recklessly failed to disclose Linda DelRio [sic] statement that Cedro Muna confessed to

her that he shot someone, the day of the murder. Also that Mr.Muna
[sic] tried to use the blue buick(suspects [sic] car that was found
burning hours after the murder), as collateral on that bond and bail
bonds before.

FAC at ¶¶ 53b, 59d. According to Pasene, although "Linda DelRio [sic] was
called as a state witness," he was not made aware of this "exculpatory and very
much important information" until "the first trial which started on 6/18/12."[42]  *Id.*
at ¶ 53b.

Of course, Muna's confession that he shot somebody on the day of the
murder could[43] certainly be highly significant or exculpatory in nature.[44]  *See* Del
Rio's Aug. 26, 2013 Trial Test. Tr. at 159:14–160:11; *Pasene*, 439 P.3d at 879.
Nevertheless, this claim fails for a simple reason—there is no evidence that Coons
ever *knew* about Muna's alleged confession. Indeed, according to Del Rio, she
never provided any information about Muna's confession to any of the detectives
with whom she spoke. *See* Del Rio's Aug. 26, 2013 Trial Test. Tr. at 160:17–23.

---

[42]Del Rio was originally called as a State witness in Pasene's first trial, but was called as a
Defense witness in his second and third trial. *Compare* Tr. of Del Rio's June 20, 2012 Trial
Test. at 96:3–9, Dkt. No. 405-11, *with* Del Rio's Aug. 26, 2013 Trial Test. Tr. at 152:13–15, *and*
*Pasene*, 439 P.3d at 879.

[43]On a motion for summary judgment, "the court may not assess the credibility of [the
nonmoving party's] evidence nor weigh against it any conflicting evidence presented by the
moving party." *T.W. Elec. Serv., Inc.*, 809 F.2d at 631.

[44]The significance or exculpatory nature of Del Rio's statement that Muna had previously used
the blue Buick as collateral for bail and had attempted to do so again prior to the shooting on
the morning of March 28, 2009 is far less apparent, particularly given that Pasene already knew that
the car belonged to Muna and frequently borrowed it from him. *See* Pasene Depo. Vol. I at
21:2–23:5.

Given, therefore, that Coons did not have such information, there is no way in which he could have failed to disclose the same, or acted with complete indifference to Pasene's constitutional rights in failing to do so. And since Pasene provides no evidence, or even argument, which would indicate otherwise, *see generally* Dkt. Nos. 420 & 424, Coons is entitled to summary judgment on this ground.

### d.    Physical Altercation Between Sooalo and Peneueta

Finally, Pasene claims that Coons[45] violated *Tatum* by failing to disclose to prosecutors that "Cedro Muna is related to Malo Sooalo. . . a person who was in a physical altercation with the descendent [sic] the night of the shooting." FAC at ¶¶ 40–41. Though not explicitly alleged, Pasene appears to suggest that such evidence was "exculpatory and important" as it indicates Muna may have had a motive to harm Peneueta. *See id.* at ¶ 41; Dkt. No. 92 at 44, 46.

But once again, even assuming that such testimony was strongly indicative of Pasene's innocence—something which, even at the motion to dismiss stage, was far from certain, *see* Dkt. No. 92 at 46—there is no evidence that *Coons* had any knowledge of the alleged altercation. Notably, at Pasene's first trial, Del Rio was

---

[45]The Court previously dismissed this *Tatum* argument against *Sellers*, noting that while Pasene claimed that Sellers knew of the familial relationship between Muna and Sooalo, he had failed to allege that Sellers knew of the physical altercation between Sooalo and Peneueta. *See* Dkt. No. 128 at 22–23.

the only witness who testified regarding the purported fight between Sooalo and Peneueta. Del Rio's June 20, 2012 Trial Test. Tr. at 124:25–125:9. Moreover, Del Rio explained that she only knew about the altercation because she is "in the streets" and "would sit down and talk to the people." *Id.* at 137:19–22. According to Del Rio, an unnamed "girl[] . . . that knew [Del Rio] was looking for Malo . . . called [her] and told [her] that Malo was in town and he was fighting with [Peneueta]." *Id.* at 138:18–22. But there is no indication—whether from Del Rio's testimony or otherwise—that *Coons* had any knowledge about this alleged altercation or that he intentionally or carelessly failed to disclose the same. *See generally id.* And because Pasene again provides no evidence, or even argument, to the contrary, *see generally* Dkt. Nos. 420 & 424, Coons is entitled to summary judgment on this basis.

## VI.    Count 5: Supervisory Liability

Finally, in Count 5, Pasene brings a claim against Coons for supervisory liability under Section 1983. FAC at ¶¶ 76–83. Under Section 1983, there is no pure *respondeat superior* liability. *Vazquez v. Cnty. of Kern*, 949 F.3d 1153, 1166 (9th Cir. 2020). Rather, "a supervisor is liable for the acts of his subordinates if the supervisor participated in or directed the violations, or knew of the violations of subordinates and failed to act to prevent them." *Id.* (quotation marks, brackets, and citation omitted).

- 47 -

Here, Pasene alleges that Coons "failed to adequately train, supervise, and/or control [his] subordinates who obtained coerced, fabricated, or suggested identifications, and suppressed exculpatory information" as well as "generally show[ed] a reckless or callous indifference to Mr. Pasene's rights."  FAC at ¶¶ 80– 82.  Specifically, Pasene appears to claim that as one of the lead investigators for the case, Coons knew or should have known that: (1) McCormick had fabricated false identifications by using misleading photos and pressuring witnesses;[46] (2) Le had failed to obtain contact information or a statement from the witness at The Queen's Medical Center who allegedly identified the shooter as Muna; (3) the dispatcher had failed to document the 911 caller's contact information for a follow-up statement; and (4) Sellers had failed to recover the Chinatown footage.  *See* FAC at ¶¶ 26–30, 37, 52a–f, 53h–k, 53a, 53c–e, 59a–b, 59e, 60, 72, 79–82; Pasene Depo. Vol. I at 206:4–18, 215:8–216:21; Dkt. No. 92 at 48.  Despite such knowledge, Coons failed to do anything to prevent or correct these violations of Pasene's rights.  *See* FAC at ¶¶ 78, 82–83.

These allegations are controverted by the record.  As an initial matter, while Pasene characterizes Coons as a "sergeant" and the "lead investigator" into

---

[46]The extent to which Pasene alleges that Coons should be liable for McCormick's conduct as a co-lead investigator is somewhat unclear.  *See* FAC at ¶¶ 30, 80–82; Dkt. No. 92 at 26–27. Nevertheless, out of an abundance of caution and because Pasene is *pro se*, the Court includes it in the analysis herein.

Peneueta's murder, *see, e.g.*, Pasene Depo. Vol. I at 206:14–15, 215:11–12, that

was simply not the case. *See Pasene*, 439 P.3d at 876 (characterizing McCormick

as "the lead homicide detective assigned to investigate Peneueta's killing"); SCSF

Ex. E at 5 (naming Lieutenant William Kato as the supervisor, McCormick as the

lead investigator, and Coons as the scene investigator); Coons Decl. at ¶¶ 5, 7

(explaining that as the "scene investigator," his duties included "assisting the lead

investigator."). Moreover, even if Coons had been in a position of authority as the

scene investigator, "HPD detectives, while assigned to investigate a case, are not

tasked with supervising, training, or disciplining other officers" or 911 dispatchers

who are in a separate division of HPD. *See* Nakasato Decl. at ¶¶ 7–8; Coons Decl.

at ¶¶ 8–9. Because Coons was neither a supervisor nor acted in a supervisory

capacity over any other officer or dispatcher in relation to the Peneueta homicide,

he cannot be held liable on a theory of supervisory liability. *See Hernandez v.

Gates*, 100 F.Supp.2d 1209, 1218 (C.D. Cal. 2000) ("To succeed on a claim of

supervisory liability, plaintiff must establish that defendants were directly

responsible for overseeing the performance of the wrongdoer."). And because

Pasene again provides no evidence otherwise, *see, e.g.*, Pasene Depo. Vol. I at

206:8–18, 215:8–216:21, Coons is entitled to summary judgment on Count 5.

## <u>CONCLUSION</u>

For the reasons set forth herein, Defendants Theodore Coons and Daniel Sellers' motions for summary judgment, Dkt. Nos. 404 & 406, are GRANTED. The Clerk is instructed to enter Judgment in favor of Defendants Coons and Sellers.[47]

IT IS SO ORDERED.

DATED: June 16, 2025 at Honolulu, Hawai'i.



Derrick K. Watson
Chief United States District Judge

_____

<u>Iosefa Pasene v. Boisse Correa, et al.</u>, Civ. No. 21-00427-DKW-WRP; **ORDER GRANTING DEFENDANTS COONS AND SELLERS' MOTIONS FOR SUMMARY JUDGMENT**

_____

[47]On April 1, 2025, Pasene filed a "Motion to Appeal Defendants [sic] Summary Judgment," seeking, among other things, an extension of time to appeal the entry of summary judgment in favor of Coons and Sellers, the appointment of counsel to help with the appeal, and "all records in this case considered in the court [sic] decision to grant Defendants [sic] motion for summary judgment on 1/13/2025." Dkt. No. 451. As Pasene acknowledged therein, such motion was premature. *See id.* at ¶ 2. The motion to appeal, Dkt. No. 451, is therefore deemed WITHDRAWN. Should Pasene wish to appeal or ask for similar relief now that the written Order has been issued, he may do so in the appropriate manner. *See* Fed. R. App. P. 4.